FOLEY & LARDNER LLP
Erik K. Swanholt (SBN 198042)
eswanholt@foley.com
Laura Moedano (SBN 334156)
lmoedano@foley.com
555 South Flower Street, Suite 3300
Los Angeles, CA 90071
Tel: (213) 972-4614; Fax: (213) 972-4757

Kelsey C. Boehm (pro hac vice)
kboehm@foley.com
1400 16th Street, Suite 200
Denver, CO 80202
Tel: (720)437-2013; Fax: (720)437-2000

*Attorneys for Defendant Barilla America, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

MATTHEW SINATRO and JESSICA PROST, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

BARILLA AMERICA, INC.,

Defendant.

Case No. 4:22-CV-03460-DMR

**DECLARATION OF ROBIN CANTOR**

Hearing Information:
Date: March 14, 2023
Time: 1:00 p.m.
Courtroom: 4

**DECLARATION OF ROBIN CANTOR**

1.      I, Robin Cantor, Ph.D., hereby declare as follows:

2.      I have been engaged by counsel for Barilla America, Inc. in the above-captioned matter.

3.      If called upon to testify, I would and could testify competently to all subject matter in my expert report, attached hereto as **Attachment A**.

4.      I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Executed on November 30, 2023.


Robin Cantor

# ATTACHMENT A

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW SINATRO, and JESSICA PROST, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>   vs.<br><br><br>BARILLA AMERICA, INC.<br><br>              Defendant. | Case No.: 4:22-cv-03460-DMR |

## EXPERT REPORT OF ROBIN CANTOR, PH.D.

Robin Cantor

November 30, 2023



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## TABLE OF CONTENTS

I.     Qualifications ................................................................................................. 1

II.    Assignment & Materials Reviewed ............................................................... 2

III.   Summary of Opinions .................................................................................... 3

IV.    Bases for Opinions ........................................................................................ 6

    A.     Background ......................................................................................... 6

        1.     Plaintiffs' Claims ................................................................... 6

        2.     Summary of Dr. Dennis's Report .......................................... 7

        3.     Summary of Mr. Weir's Report ............................................. 9

    B.     Dr. Dennis' Consumer Survey Results Are Not Proof of Materiality for Product Purchases .............................................................................. 11

        1.     Plaintiffs' Experts Fail to Adequately Investigate Whether the Label is Deceptive ............................................................... 11

        2.     Replicating Dr. Dennis' Consumer Survey Demonstrates that His Central Result is Biased and Reasonable Consumers Have Varied Interpretations of the Label ......................................... 13

        3.     Agreement with the Ingredient Sourcing Interpretation of the Label Does Not Mean it is an Important Factor for Product Purchases ................ 19

    C.     Dr. Dennis Has Not Demonstrated that a Conjoint Survey Can be Used to Reliably Isolate the Value of the Misrepresentation or that the Conjoint Results Can Be Used to Conduct Classwide Damages Calculations ............................... 25

    D.     Analysis of Available Barilla Price Data Reveals No Material Average Price Premium From Removal of the Label and Potentially Varied Effects Across Products ........................................................................................ 31

V.     Conclusion .................................................................................................... 34

Appendix A: Consumer Survey

Appendix B: Pricing Data and Analysis

Attachment List

Attachment 1: Cantor CV

Attachment 2: Cantor Testimony

Attachment 3: Materials Considered



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## TABLE OF EXHIBITS

Exhibit 1: Economic Sequence to Measure a Material Overpayment ........................................ 12

Exhibit 2: Italy Pasta & Noodles Percentage Share by Value (2020)........................................ 14

Exhibit 3: Cantor Survey Version 2........................................................................................... 15

Exhibit 4: Cantor Survey Version 3........................................................................................... 16

Exhibit 5: Survey Results by Version Regarding Respondents' Understanding of Statement "The Product's Ingredients Are Sourced from Italy"............................................................. 17

Exhibit 6: Survey Results by Version Regarding Respondents' Understanding of Statement "The Brand is the Largest Selling Pasta in Italy".................................................................. 17

Exhibit 7: Combinations of Respondents' Understanding of Statements About Sourcing and Selling in Version 3 of the Survey................................................................................ 18

Exhibit 8: Survey Results Regarding Respondents' Understanding of Statement "The product's ingredients are sourced from non-GMO plants.".......................................................... 19

Exhibit 9: Factors Influencing Pasta Product Selection in Cantor Survey ................................ 20

Exhibit 10: Relative Importance of Chosen Factors Influencing Purchase................................ 20

Exhibit 11: Percent Respondents Selecting a Reason as Important and Allocating Points ......... 21

Exhibit 12: Reasons That Are Most Important When Deciding Which Pasta Brand to Buy....... 22

Exhibit 13: Reasons That Are Most Important for Selection of Pasta Brand by Average Percentage of Points That Respondents Allocated to a Reason Conditional on Whether Respondent Selects "Price" as an Important Reason ........................................................................ 23

Exhibit 14: Reasons That Are Most Important for Selection of Pasta Brand by Average Percentage of Points That Respondents Allocated to a Reason Conditional on Whether Respondent Selects "Made in Italy" as an Important Reason.......................................................... 24

Exhibit 15: Kantar Marketing Study Indicating Importance of Price for Respondents.............. 25

Exhibit 16: WTP for Label, Zero WTP, and Product Price ...................................................... 30

Exhibit 17: Dollar and Unit Sales by Product Line for Products at Issue ................................. 31

Exhibit 18: Price per Unit by Barilla Product Line.................................................................. 32

Exhibit 19: Difference-in-Differences Regression Results with Product Fixed Effects and Supply/Demand Controls............................................................................................. 33

Exhibit 20: Interaction Term Coefficients for Each Classic Blue Box Product Categorized by Sign and Statistical Significance ......................................................................................... 34



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## I.      Qualifications

1. My name is Robin Cantor. I am a Managing Director in the Washington, D.C. office of the Berkeley Research Group ("BRG"). I specialize in applied economics; health, environmental and energy economics; statistics; and risk management. I have a B.S. in mathematics from Indiana University of Pennsylvania with a specialization in statistics and a Ph.D. in economics from Duke University with a specialization in econometrics.

2. My responsibilities include conducting complex economic, statistical, and risk analyses for consulting, litigation support, and expert testimony, as well as managing a staff of internal and external professionals.

3. Prior to joining BRG, I held managerial and leadership positions at numerous companies and organizations:

   a) I was a Principal Scientist at Exponent, Inc., where I led a group in the Health Sciences practice specializing in economics at the interface of science and technology.

   b) I was a Managing Director in the Insurance and Claims Services practice of Navigant Consulting, Inc., where I led the Liability Estimation and Insurance Coverage practice.

   c) I was a Principal and Managing Director of the Environmental and Insurance Claims Practice of LECG, LLC.

   d) I was the Program Director for Decision, Risk, and Management Sciences, a research program of the National Science Foundation (NSF), and a senior researcher at Oak Ridge National Laboratory. I am a past Coordinator and grants manager for the NSF Human Dimensions of Global Change, the NSF Methods and Models for Integrated Assessment, and the NSF/EPA Decision Making and Valuation for Environmental Policy.

   e) I held faculty and advisory appointments in the Graduate Part-Time Program in Environmental Engineering, Science, and Management at the Johns Hopkins University.

4. I have more than 30 years of research, teaching, and consulting expertise. My testimonial experience includes analysis of economic damages in commercial litigation and reliability of statistical models and estimation methods. I have been qualified in state and federal court as an expert on economic damages, economics (including microeconomics, econometrics, cost-benefit analysis, and cost-benefit methodologies), risk management, and claims analysis in healthcare and other insurance matters. I have testified numerous times on survey methodology, including three specific cases involving the reliability of choice-based conjoint survey results for economic analysis. While at the National Science



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Foundation, I was the director of a special competition for advancing the science of stated-preference methods including choice-based conjoint methods. My duties in that capacity included leading the peer review process of the submitted proposals and making the recommendations for funding.

5.  I joined other prominent economists and social scientists in an *amicus curiae* brief submitted to the U.S. Supreme Court in *Tyson Foods, Inc. v. Bouaphakeo et al.* (No. 14-1146) regarding the reliability of "average" or statistical evidence in class actions.

6.  I have published scholarly articles and presented research at professional conferences on numerous areas of economic analysis including the use and reliability of survey methods. I have submitted analysis, testimony, and affidavits in federal arbitration, regulatory and Congressional proceedings, and federal and state courts. My publications include refereed journal articles, book chapters, expert reports, reports for federal sponsors, a co-authored book on economic exchange under alternative institutional and resource conditions, and an edited book on product liability.

7.  I am a member of the Society for Risk Analysis, the American Economic Association, the American Bar Association, and the Women's Council on Energy and the Environment. I serve or have served on more than 20 science review and advisory panels for national and international organizations. I am a past President of the Women's Council on Energy and the Environment and a Fellow of the Society for Risk Analysis. I received the Outstanding Practitioner Award from the Society of Risk Analysis in 2022. I was the 2002 President of the Society for Risk Analysis. In 2001, I was appointed as a member of the Research Strategies Advisory Committee of the U.S. Environmental Protection Agency's Science Advisory Board. I am a past President of the Board of Directors for MATRIX, The Business Center for Women and Minorities. I have served on the editorial boards of the *Journal of Risk Analysis* and the *Journal of Risk Research.*

8.  My curriculum vitae is attached as Attachment 1 to this report. My testimonial experience in the last four years is attached as Attachment 2. My current billing rate for this engagement is $850/hour for analysis and testimony. Other BRG staff members have also worked at my direction on this matter, and they have been billed at rates ranging from $200/hour to $770/hour. BRG's compensation is not dependent on the outcome of this litigation.

## II.    Assignment & Materials Reviewed

9.  I have been engaged by Foley & Lardner LLP, ("Counsel") on behalf of Barilla America, Inc. to provide an expert opinion with respect to the 2023 Declaration of Mr. Weir ("Weir Declaration") and the 2023



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Expert Report of Dr. Dennis ("Dennis Report") addressing common impact and the calculation the classwide damages in this matter.[1]

10. To provide my expert opinions, I also reviewed publicly available information, case pleadings, depositions, and certain documents received from Counsel that were produced in this matter. The documents reviewed and considered in my report are contained in Attachment 3 and in the footnotes of this report.

11. My findings and opinions are based on my understanding of the information available to me as of the date of this report and my experience and training as an economist. As of the date of this report, Dr. Dennis has not provided any of the work product typically associated with the design of a conjoint survey, its implementation, or analysis of results.[2] Should such work product or other additional relevant materials be made available to me after the submission date of this report, I will consider such information as necessary. I reserve the right to supplement this report based upon any additional work that I may conduct or supervise from my review of such materials.

12. My opinions are contained in Section III. The foundations and analyses that I conducted for my opinions are explained in Section IV. Section V contains my conclusions.

## III. Summary of Opinions

13. Based on my training and experience as an economist and my analysis of the information available to me in this matter, I have reached the following findings and opinions regarding the damages methodology, consumer survey, and the proposed conjoint survey proffered by Mr. Weir and Dr. Dennis to demonstrate common impact and damages on a classwide basis:

   a. **Opinion I.**  Plaintiffs and their experts conflate "ITALY'S #1 BRAND OF PASTA" (the "Label") with advertising that misrepresents the geographic origin of products[3] as if the Label

---

[1] Declaration of Colin B. Weir ("Weir Declaration), Matthew Sinatro, et al. v. Barilla America, Inc. (Aug. 16, 2023) and Declaration and Expert Report of J. Michael Dennis ("Dennis Report"), PH.D., Matthew Sinatro, et al. v. Barilla America, Inc. (Aug. 16, 2023).

[2] Such work product would include at least the final survey design, a sampling plan, pretesting documentation, raw survey response data, survey results, results of the statistical analysis of responses, post-survey analysis and modeling, and the assumptions and methodological judgments applied to support the values that Dr. Dennis seeks to measure. *See e.g.,* Shari Seidman Diamond. 2011. Reference Manual on Scientific Evidence, "Reference Guide on Survey Research," *The National Academies Press,* pp. 415-417.

[3] Plaintiff's Memorandum of Points and Authorities in Support of Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel ("Plaintiff's Motion for Class Certification"), Matthew Sinatro, et al. v. Barilla America, Inc. (Aug. 30, 2023), 1:10.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

is expressly false and that there is no variation in the interpretation of the Label.[4] Although the economic expert assumes that the alleged conduct is true (the Defendant puts the Label on the Products), the expert must propose a methodology capable of demonstrating and isolating an effect that it is consistent with Plaintiffs' theory of the damages (i.e. that it is misleading *and* material to the purchasing decision). Plaintiffs' experts have not demonstrated that the Label misled a sufficient proportion of reasonable consumers about the ingredient sourcing and caused them to base their purchases on this misguided interpretation and that these misguided purchases were sufficient to result in a price premium affecting all or nearly all members of the putative classes. Instead, Plaintiffs' experts improperly assume that a price premium for the Label if measured by their proposed conjoint methodology will resolve the question of whether there is a common impact of the conduct for all or nearly all of the members of the putative classes and that this premium can be used to reliably calculate class-wide damages.

b.  **Opinion II.** Dr. Dennis found from his survey that 43% of his respondents did not believe the Label communicated that the Product's ingredients were sourced from Italy, despite offering only the "ITALY'S #1 BRAND OF PASTA" language and no other choices or definitions. Using but not adopting Dr. Dennis' survey design and modifying it to offer an alternative interpretation that the Label means "The brand is the largest selling pasta in Italy," I find that more than 80% of respondents agree with this latter interpretation when it is presented alone or with the Challenged Representation. Thus, these representative consumers do not have a singular interpretation of the Label consistent with Plaintiffs' allegations and are likely to believe it communicates an unchallenged interpretation. In addition, the results from the Cantor survey demonstrate a minimal influence, if any, on product selection from the country-of-origin interpretation that Plaintiffs allege. The purchase decisions of the representative consumers with unchallenged interpretations of the Label contribute nothing to the demand impact and do not support the price premium alleged by Plaintiffs. Mr. Weir's proposed methodology for the calculation of damages would use the biased price premium measured by Dr. Dennis for the Label and Mr. Weir has proposed no methodology to isolate the effect caused by the Challenged Representation, including the materiality of any such statement on the purchasing decision of consumers.

---

[4] "The results of Dr. Dennis's consumer perception survey meaningfully support Plaintiff's theory of liability. Of the nearly 600 interviews conducted, the majority—57%—believed the Italian Origin Representation communicated that the Products' ingredients are solely sourced from Italy." *See*, Plaintiff's Motion for Class Certification, 9:10-12.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

c. **Opinion III.** Mr. Weir and Dr. Dennis incorrectly opine that damages should be evaluated without consideration of the supply and profit maximization factors influencing the pricing in the markets for the Products. The issue is not whether the quantity purchased should be considered fixed for the purposes of calculating damages. The issue under Plaintiffs' theory of damage as measured by a price premium is how demand for the Products is altered by the alleged deception and the result for the *equilibrium prices* when comparing the actual and but-for worlds. The supply side of the market must be considered for the investigation of equilibrium prices.

In addition, Plaintiffs' experts propose no methodology to investigate product pricing aimed at the consumers who are at the cusp of purchasing any of the Products (i.e., the *marginal* consumers). Mr. Weir, however, proffers information supporting that the retail Products are sold under highly competitive demand and supply conditions. Under the competitive conditions described by Mr. Weir, I would expect that the marginal consumers have the lowest valuation of the Products' attributes, are generally price sensitive, and might purchase only on the basis of price if these consumers view other products as near-perfect substitutes. These conditions support that the Label, however it is interpreted by some consumers, would be immaterial for the determination of equilibrium prices. Under these circumstances, the price premium for the Label and the alleged deception would be essentially zero. Plaintiffs' experts have presented no evidence to rule out that this economically plausible description of the actual and but-for economic conditions applies to the Products. To the contrary, Mr. Weir quotes several sources to support the view that the market for pasta is highly competitive, which supports the conclusion that equilibrium prices are highly material to this analysis.

Responses in the Cantor consumer survey regarding the important factors for consumers to choose a pasta brand support that the Made in Italy country-of-origin factor is immaterial to many consumers and to equilibrium pricing. The results indicate the high importance of price, taste, and quality in the choice of a pasta brand. Made in Italy appears to be important to a small proportion of consumers (approximately 12%) and even for this segment, quality, taste, and price are also important in their selection so country of origin is not the *only* reason even this small subset of consumers purchase pasta. In addition, when the importance of each factor is measured in the selection of a pasta brand, respondents assign on average more than 97% of weight to factors other than Made in Italy and only 2.2% of the weight to this factor. When price is important, as it is for more than 60% of the respondents, the Made in Italy factor on average receives less than 2% of their assigned weight. Even when Price is not selected as a



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

factor, Made in Italy receives only 3.2% of the assigned weight. Thus, asking respondents why they buy a particular brand of pasta indicates that on average they do not assign material weight to the Made in Italy factor.

d. **Opinion IV.** Dr. Dennis' proposed conjoint methodology will use information from a statistical analysis of hypothetical choices to estimate an average change in value in the products between the product with the Label and the product without the Label. Due to the large number of combinations of Product attributes (price, brand, nutritional information, etc.) required to investigate the proposed attributes and their levels, the results for individual respondents are typically not reliable for demand changes. This issue holds for Dr. Dennis' proposed analysis in particular as one of Dr. Dennis' descriptions of his survey design implies approximately 147,500 product combinations. As a result, the proposed conjoint analysis estimates an average shift in demand. Plaintiffs' experts have proposed no methodology to test whether or not the model of demand change embedded in the conjoint approach is reliable for the economic conditions of the Products' markets. In addition, even as proposed, Dr. Dennis's conjoint design will violate some basic guidelines for the definition of attributes and their levels. Moreover, it is clear from his description of what he plans to present to respondents in the conjoint survey that his measure of the pricing premium will fail to isolate the impact of the country-of-origin deception that Plaintiff allege.

e. **Opinion V.** Real world sales information demonstrates that contrary to Plaintiffs' theory of damages, prices fail to decrease under the but-for conditions of no Label. The Label has been removed from the Classic Blue Box (CBB) products since October of 2022. My analysis demonstrates that changes in the price per unit overall and by specific products did not change materially and thus fail to support Plaintiffs' premium price theory.   This real-world information that was readily available and reviewed by Mr. Weir and Dr. Dennis who failed to test or ignored whether prices for the Products are lower under their hypothetical but-for market conditions that they have assumed.

## IV.    Bases for Opinions

### A.    Background

#### 1.    Plaintiffs' Claims

14. I understand that Plaintiffs and proposed Class Members allege that the "Defendant falsely and misleadingly labels certain of its Barilla® brand pastas as **ITALY'S #1 BRAND OF PASTA®**," [the



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

"Label"] deliberately leading reasonable consumers, including Plaintiffs, to believe that the Products are <u>made in Italy</u>" [the "Challenged Representation"]."[5]

15. I understand that the California Class is defined as:[6]

> All persons or entities who, during the Class Period, purchased one or more of the Products in California for purposes other than resale.

16. Plaintiffs seek monetary damages, declaratory and injunctive relief, and penalties to redress alleged violations.[7] In order to demonstrate common impact and measure class-wide damages, Plaintiffs proffer the expert reports of Dr. Dennis and Mr. Weir. Mr. Weir opines that he can calculate class-wide damages caused by the alleged conduct based on a price premium to be provided by Dr. Dennis.

## 2.     Summary of Dr. Dennis's Report

17. Dr. Dennis prepared an expert report in which he described his assignment as twofold: (1) to test the hypothesis that "Defendant's use of the Challenged Representation led reasonable consumers to perceive that the Products were made in Italy—meaning, the Products were made from ingredients solely sourced in Italy,"[8] and (2)  "to evaluate whether it would be feasible to devise a method for conducting a market research study that can be used to reliably measure whether and to what extent

---

[5] First Amended Class Action Complaint, Matthew Sinatro, et al. v. Barilla America, Inc. (Jul. 20, 2023), ¶ 2. (Emphasis bold original and emphasis underline added.) I note that throughout their reports, Mr. Weir and Dr. Dennis refer to the Label as the "Representation" or "Challenged Representation" which conflates the Label with the alleged impact of communicating false, deceptive, and/or misleading information to a reasonable consumer. In this report, I distinguish between the Label and the Challenged Representation.

[6] Plaintiffs' Notice of Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel, Matthew Sinatro, et al. v. Barilla America, Inc. (Aug. 30, 2023), ¶ 1. (Internal citations omitted.)

I understand that the "Class Period" is defined as the period of time extending from four years prior to the filing of this action and present: June 11, 2016 through present. I understand that the "Products" include all Barilla® brand pasta products with the following front-packaging label representation: "ITALY'S #1 BRAND OF PASTA". They include: (a) Barilla® *Classic Blue Box* pastas, including: (1) Angel Hair, (2) Campanelle, (3) Cellentani, (4) Ditalini, (5) Elbows, (6) Farfalle, (7) Fettuccine, (8) Fideo Cut Spaghetti, (9) Gemelli, (10) Jumbo Shells, (11) Large Shells, (12) Linguine, (13) Linguine Fini, (14) Manicotti, (15) Medium Shells, (16) Mezzi Rigatoni, (17) Mini Farfalle, (18) Mini Penne, (19) Mini Wheels, (20) Mostaccioli, (21) Orzo, (22) Pastina, (23) Penne, (24) Pipette, (25) Rigatoni, (26) Rotini, (27) Spaghetti, (28) Spaghetti Rigati, (29) Thick Spaghetti, (30) Thin Spaghetti, (31) Tri-Color Penne, (32) Tri-Color Rotini, (33) Wavy Lasagne, and (34) Ziti ("Classic Blue Box"); (b) Barilla® *Collezione Artisanal* pastas, including: (1) Bucatini, (2) Casarecce, (3) Orecchiette, (4) Penne, (5) Rigatoni, and (6) Spaghetti ("Collezione Artisanal"); (c) Barilla® *Gluten Free* pastas, including: (1) Elbows, (2) Fettuccine, (3) Penne, (4) Rotini, and (5) Spaghetti ("Gluten Free"); (d) Barilla® *Veggie* pastas, including (1) Rotini, and (2) Spaghetti ("Veggie"); and (e) Barilla® *Whole Grain* pastas, including (1) Elbows, (2) Lasagne, (3) Linguine, (4) Penne, (5) Rotini, (6) Spaghetti, and (7) Thin Spaghetti ("Whole Grain").

[7] First Amended Class Action Complaint, ¶ 119.

[8] Dennis Report, ¶ 20.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

class members overpaid, if anything, for the Products because of the Challenged Representation."[9] Dr. Dennis proposed to "test his first hypothesis with a scientifically rigorous and reliable consumer survey."[10] Regarding his second assignment, Dr. Dennis states that his "price premium survey, once conducted, will be a source of data for Mr. Colin Weir, Plaintiffs' expert in economics, who [] will be responsible for calculating economic damages that are specifically attributable to the Challenged Representation."[11]

18. To evaluate the first claim, Dr. Dennis designed and conducted a consumer perception survey of adult residents of California ("Dennis Survey"). He also hosted a series of qualitative focus groups and interviews to inform the design of the survey. He evaluates the statistical representativeness of the final sample to assert that his survey results can be generalized to the broader Proposed Class.

19. Dr. Dennis attempts to the measure the impact of the Challenged Representation in this survey by showing respondents the Label and then asking them if it communicates that the Product's ingredients are sourced from Italy.[12] Respondents could choose between three fixed responses: 1) the statement does communicate this, 2) the statement does not communicate this, and 3) don't know/ not sure. Dr. Dennis only tests this singular interpretation of the Challenged Representation (i.e., that the Product only sources Italian ingredients), as opposed to measuring different understandings of the Label in question. He asserts that the third response relieves respondents of any pressure to answer the question in any particular way.[13]

20. In addition to this measure of his Challenged Representation, Dr. Dennis also includes demographic questions, attention checks, and questions about pasta purchase habits over the last year in his survey instrument. After excluding roughly 15% of eligible respondents due to their purportedly unreliable answers, Dr. Dennis finds that 57% of consumers surveyed (n=582) "perceived the Challenged Representation to mean that the Product's ingredients are solely sourced from Italy," compared with 32.3% who did not interpret the Label to have this meaning and 10.7% of respondents who did not have an opinion.[14]

---

[9] Dennis Report, ¶ 22.

[10] Dennis Report, ¶ 21.

[11] Dennis Report, ¶ 25.

[12] I note that when describing his consumer survey results, Dr. Dennis indicates that he asked respondents if the Label communicated that the ingredients were *solely* sourced from Italy (Dennis Report, ¶ 37).

[13] Dennis Report, ¶ 70.

[14] Dennis Report, ¶ 37-38.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

21. To evaluate Plaintiff's second claim and measure the potential overpayment by the Class, Dr. Dennis proposes a choice-based conjoint survey, which he calls the "price premium survey." He cites past case law and marketing literature to assert the validity of conjoint surveys and prevalence of their use in litigation, since he believes these surveys accurately assess how customers make real-world choices in the marketplace.

22. In the proposed conjoint survey, Dr. Dennis would ask respondents to select a product for purchase between a set of three products, which vary based on brand, nutritional facts, packaging information, and price. Dr. Dennis states that he consulted with economic expert Mr. Weir on the appropriate price levels and range based on his "review of historical prices paid by Class Members for the Products."[15]

23. Dr. Dennis states that he would sample 900 responses for this analysis, process the data with Sawtooth Software, and then conduct a "market simulation". He further states that this analysis would leverage Hierarchical Bayesian modeling to estimate the "value respondents place on each level of each attribute."[16] Dr. Dennis states that by "using the actual prices paid by consumers, as well as the fixed quantity of Products supplied," he purportedly incorporates both demand and supply factors to estimate the but-for market value of the Products reliably.[17]

### 3.     Summary of Mr. Weir's Report

24. Mr. Weir prepared a declaration on behalf of Plaintiffs to "ascertain whether it would be possible to determine damages on a class-wide basis using common evidence, and if so, to provide a framework for the calculation of damages suffered by the proposed class of consumers as a result of the allegedly false, deceptive, and/or misleading Representation."[18] Mr. Weir states that he also has "been asked to work with Dr. Michael Dennis to help design (from an economic perspective), and to evaluate the economic suitability of a proposed conjoint survey (to be designed, implemented and analyzed by Dr. Dennis) to measure the overpayment for the Products solely attributable to the Challenged Representation."[19]

---

[15] Dennis Report, ¶ 119.

[16] Dennis Report, ¶ 129.

[17] Dennis Report, ¶ 132.

[18] Weir Declaration, ¶ 7.

[19] Weir Declaration, ¶ 8.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

25. Mr. Weir opines that "it is possible to determine class-wide damages in this case using Defendant's own available business records, third-party records, and industry resources."[20] He "propose[s] the use of conjoint analysis to calculate Price Premium Damages wherein consumers would receive the value of the price premium they paid solely as a result of Defendant's conduct of labeling their Products with the Challenged Representation."[21] Mr. Weir further states that his proposed "methodology can determine the damages for any given Representation, across any prescribed time period, and across geographic regions, given any of the possible liability scenarios that may arise in this litigation."[22]

26. Regarding the use of conjoint analysis, Mr. Weir states that he "worked with Dr. Dennis to develop parts of the survey that he plans to utilize"[23] and this conjoint analysis "will measure the price premium (measured in percentage terms) at the time and point of sale solely attributable to the Representation through the use of a Label Claims attribute and price along with several distractor attributes."[24] Mr. Weir opines that "Dr. Dennis' proposed conjoint survey is properly designed to measure the price premium paid due solely to the presence of the Challenged Representation on the Products."[25] Mr. Weir states that the "results of Dennis' conjoint survey will be used as an input in my Price Premium Damages calculation."[26]

27. With respect to supply side considerations, Mr. Weir notes that "the data on actual sales of the Products in the real-world marketplace [] occurred at prices that already reflect the supply-side factors then extant in the marketplace."[27] Mr. Weir further notes that "Dr. Dennis relied upon these historical data in setting the prices to be used in his conjoint survey."[28]

28. Regarding the competitive dynamics, Mr. Weir notes that "the market for the Products in [*sic*] highly competitive and an 'ordinary' market, subject to ordinary market conditions, such as changes in consumer demand that affect price. As such, the Defendant does not control the retail price paid by

---

[20] Weir Declaration, ¶ 23.

[21] Weir Declaration, ¶ 24.

[22] Weir Declaration, ¶ 24.

[23] Weir Declaration, ¶ 42.

[24] Weir Declaration, ¶ 43.

[25] Weir Declaration, ¶ 45.

[26] Weir Declaration, ¶ 47.

[27] Weir Declaration, ¶ 55.

[28] Weir Declaration, ¶ 55.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

consumers."[29] Mr. Weir presents industry information from grocery retailers to support his view that the market for pasta is highly competitive and product pricing adjusts for changing economic conditions and consumer preferences.[30]

29. For the calculation of damages, Mr. Weir notes that "[t]his litigation calls for a Price Premium damages calculation [ ] wherein consumers would receive the difference between the market value (purchase price) of the Products (with the Representation) and the market value of the Products (without the Representation), at the time and point of sale."[31]

### B. Dr. Dennis' Consumer Survey Results Are Not Proof of Materiality for Product Purchases

#### 1. Plaintiffs' Experts Fail to Adequately Investigate Whether the Label is Deceptive

30. Although Plaintiffs have alleged that the Label is deceptive, their basis for it being misleading is due to a false claim about the Products being made in Italy:[32]

> Defendant falsely and misleadingly labels certain of its Barilla® brand pastas as "ITALY'S #1 BRAND OF PASTA®," deliberately leading reasonable consumers, including Plaintiffs, to believe that the Products are made in Italy (hereinafter, "Italian Origin Representation" or "Challenged Representation").

31. Mr. Weir and Dr. Dennis exclusively consider that the Label indicates a "country of origin" claim affecting consumer preferences and their perceived value of the Products. Thus, they begin with the assumption that the Label communicates false or misleading information that the Products are made from ingredients sourced from Italy. The Label, however, makes no expressed reference to the country of origin for the ingredients. Mr. Weir and Dr. Dennis' proposed methodology will not reliably isolate a price premium and damages, if any, consistent with Plaintiffs' theory that consumers are misled to believe that the ingredients are made in Italy.

32. Exhibit 1 shows the sequence of relationships necessary to isolate and measure damages associated with the Challenged Representation. If the damages methodology fails to distinguish and isolate among Label interpretations, it will overestimate the price premium and overpayments alleged by Plaintiffs.

---

[29] Weir Declaration, ¶ 58.

[30] Weir Declaration, ¶¶ 59-63.

[31] Weir Declaration, ¶ 68.

[32] First Amended Class Action Complaint, ¶ 2.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

In this matter, Plaintiffs' experts have demonstrated through Dr. Dennis' consumer survey that there are multiple interpretations of the Label.

**Exhibit 1: Economic Sequence to Measure a Material Overpayment**



33. Mr. Weir and Dr. Dennis also have not demonstrated how reasonable consumers understand and act on the basis of the Label. They have not established that a single unambiguous interpretation of the Label predominates for reasonable consumers and that this interpretation is deceptive because it is based on the ingredients being "solely sourced from Italy."[33] Rather, Mr. Weir reviews economic literature relevant to country-of-origin claims indicating that some consumers might prefer products with specific geographic origins and also might be willing to pay (WTP) for such attributes. He does not measure actual price premiums for country-of-origin claims on pasta products. He cites one article that addresses

---

[33] In other matters, Mr. Weir and Dr. Dennis have previously proffered experts reports investigating product labels with ambiguous or multiple interpretations. Similar to the instant matter, their proposed methodology included a conjoint survey to estimate the pricing premium to be used in the damages model that was subsequently excluded by the court for failing to isolate the misrepresentation at issue.  *See, e.g.,* In Re: Kind LLC "Healthy and All Natural Litigation," United States District Court, S.D. New York, 627 F. Supp.3d 269, Order Granting Defendant's Motion for Summary Judgment, Disqualifying the Opinions of Dr. Dennis and Dr. Toutov, and Decertifying the Class, September 9, 2022. *See* also, Patrick McMorrow, et. al., Plaintiffs, v. Mondelez International, Inc., Defendant, United States District Court, S.D. California, Order Denying Motion for Class Certification, Granting Motion to Exclude Expert Testimony of Micheal Dennis and Granting Motion to Exclude Testimony of Colin Weir, March 3, 2020.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

pasta and the effect of "Italian Sounding" names on consumers' directly stated WTP.[34] The reliability of the results in the single article is questionable because stated WTP is not actual purchasing behavior, the WTP methodology is subject to hypothetical bias, and the US application involves a small sample of just 237 participants.[35] Nonetheless, the focus of the Bonaiuto article is to understand differences between unambiguous label information (Made in Italy versus an Italian Sounding brand name) and specifically designed to focus on perceived country-of-origin effects across the product alternatives.[36]

34. Mr. Weir and Dr. Dennis proceed with the consumer survey and damages framework with the country-of-origin interpretation of the Label ("the Sourcing Interpretation"). Dr. Dennis admits that his research hypothesis is based entirely on Plaintiffs theory.[37] As a result, Dr. Dennis never tests alternative interpretations in the Dennis Survey and he never establishes that even if some consumers believe the Label communicates the Sourcing Interpretation, it is a major factor in their selection of pasta products, and material for the market prices for the Products. The Dennis Survey, however, found a substantial portion of respondents (43%) were not deceived by the Label in a way consistent with Plaintiffs' theory. In addition, Dr. Dennis might have obtained some information about non-deceptive interpretations of the Label or other considerations for purchasing pasta from his focus groups discussions, but that information has not been made available to me.[38] In the next section, I discuss my analysis using but not adopting Dr. Dennis' survey methodology to investigate an alternative unchallenged interpretation of the Label.

### 2. Replicating Dr. Dennis' Consumer Survey Demonstrates that His Central Result is Biased and Reasonable Consumers Have Varied Interpretations of the Label

35. Dr. Dennis investigated the Sourcing Interpretation of the Label and although he allowed respondents to reject or offer no opinion about it, it was the only interpretation presented in his survey. Neither Dr. Dennis nor Mr. Weir investigated other unchallenged interpretations of the Label. As an economic matter, it is reasonable that the Label is a claim about market share or selling performance in Italy.

---

[34] Flavia Bonaiuto et al. 2021. "Italian Food? Sounds Good! Made in Italy and Italian Sounding Effects on Food Products' Assessment by Consumers," *Frontiers in Psychology*, March 12.

[35] Bonaiuto et al., p. 1. I note that the study in the US was based on a contingent valuation methodology and not a conjoint survey.

[36] I note that even this article admits that many factors (experience, attention process, etc.) can come into play for how perceived Italianness affects consumers' perceptions of the branded products. (Bonaiuto et al., pp. 2-3.)

[37] Dennis Report, ¶ 20.

[38] Dennis Report, ¶ 79.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

36. There is information that Barilla has the largest market share of pasta sales in Italy. Data reported in an economics journal in 2015 reflecting 2006-2007 market shares of Italy's pasta brands indicates that Barilla was the largest selling brand and with more than 40% share.[39] Industry reports also confirm Barilla's large current market share position in Italy.[40] Exhibit 2 shows that in 2020, the Barilla brand held the largest percentage share by value of the Italian pasta and noodles market. This information supports an interpretation of the Label ("the Selling Interpretation") that would not mislead reasonable consumers even if it influenced their product choices.

**Exhibit 2: Italy Pasta & Noodles Percentage Share by Value (2020)**

| Company | % Share |
|---|---|
| Barilla Holding S.p.a. | 18.7% |
| Pastificio Rana S.p.a. | 7.9% |
| Flli De Cecco De Filippo Fara San Martino Spa | 7.6% |
| Hoary Tradition Italian Srl | 3.5% |
| Other | 62.4% |
| Total | 100% |

*Note*: "Other" comprises private labels.
*Source:* Exhibit reproduced from MarketLine Industry Profile Report "Pasta & Noodles in Italy," February 2022, Table 8, p.22.

37. To investigate whether reasonable consumers believe that the Label communicates the Selling Interpretation, I used the design of the Dennis Survey with certain modifications that are detailed in Appendix A. The Cantor Survey has three versions reflecting different treatments of the Label presentation: Version 1 is a replication of the Dennis Survey for the Sourcing Interpretation 200 respondents, Version 2 uses the design but only tests the Selling Interpretation with 400 respondents, and Version 3 uses the design and tests the Sourcing and Selling Interpretations (randomized to prevent ordering effects) with 400 respondents.[41]

---

[39] *See,* Simeone, Mariarosaria & Marotta, Giuseppe & Rotondo, Giacomo. 2015. "Competitive Strategies in the Italian Pasta Industry," *Agricultural Economics Review*, 16:1 79.

[40] *See* e.g., "Pasta and Noodles in Italy," MarketLine Industry Profile, *MarketLine*, February 2022; *See* also, Letter from ████████████████████████ September 15, 2022.

[41] In the final counts for each version of the interpretation treatment, a limited number of eligible respondents were dropped from the results based on the same screening methods used by Dr. Dennis. This made the counts 185, 364, 359, for Version 1, 2, and 3, respectively.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 3: Cantor Survey Version 2**



*Source*: Cantor Survey, Cantor Workpapers.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 4: Cantor Survey Version 3**



*Source*: Cantor Survey, Cantor Workpapers.

38. Exhibit 5 compares the Dennis and Cantor Survey results by treatment versions for the Sourcing Interpretation of the Label. Presenting the Sourcing Interpretation only (Version 1) produces lower but statistically similar results to the Dennis Survey. Presenting both the Sourcing and Selling Interpretations (Version 3) reduces the proportion of respondents who believe the Label communicates the Sourcing Interpretation compared with either the Dennis Survey results or the Version 1 treatment. The reduction from the Dennis Survey is statistically significant and indicates that Dr. Dennis' result was upwardly biased by presenting only the Sourcing Interpretation to respondents.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 5: Survey Results by Version Regarding Respondents' Understanding of Statement "The Product's Ingredients Are Sourced from Italy"**

| Interpretation | Survey Version | # Respondents | Proportion | Confidence Interval |
|---|---|---|---|---|
| The statement does communicate this | Dennis | 332 | 57.0% | (53.0%, 61.1%) |
| | Version 1 | 91 | 49.2% | (42.0%, 56.4%) |
| | Version 3 | 132 | 36.8% | (31.8%, 41.8%) |
| The statement does not communicate this | Dennis | 188 | 32.3% | (28.5%, 36.1%) |
| | Version 1 | 71 | 38.4% | (31.4%, 45.4%) |
| | Version 3 | 190 | 52.9% | (47.8%, 58.1%) |
| Don't know / not sure | Dennis | 62 | 10.7% | (8.1%, 13.2%) |
| | Version 1 | 23 | 12.4% | (7.7%, 17.2%) |
| | Version 3 | 37 | 10.3% | (7.2%, 13.5%) |

*Note*: The analysis replicates Dr. Dennis' quality control checks on the survey data as described in his footnote 9 resulting in 908 final respondents in total for three versions of the survey.
*Source*: Dennis Survey, Cantor Survey data, and Cantor Workpapers.

39. When presented with an alternative, but still single interpretation of the Label (Version 2), the results show that approximately 80% of the respondents believe the Selling Interpretation. This result was lower but statistically similar to the result when both the Sourcing and Selling Interpretations were presented to respondents (Version 3). Presenting the Selling Interpretation alone did not indicate a biased response compared to presenting both interpretations.

**Exhibit 6: Survey Results by Version Regarding Respondents' Understanding of Statement "The Brand is the Largest Selling Pasta in Italy"**

| Interpretation | Survey Version | # Respondents | Proportion | Confidence Interval |
|---|---|---|---|---|
| The statement does communicate this | Version 2 | 293 | 80.5% | (76.4%, 84.6%) |
| | Version 3 | 310 | 86.4% | (82.8%, 89.9%) |
| The statement does not communicate this | Version 2 | 39 | 10.7% | (7.5%, 13.9%) |
| | Version 3 | 32 | 8.9% | (6.0%, 11.9%) |
| Don't know / not sure | Version 2 | 32 | 8.8% | (5.9%, 11.7%) |
| | Version 3 | 17 | 4.7% | (2.5%, 6.9%) |

*Source*: Cantor Survey data, Cantor Workpapers.

40. Exhibit 7 shows that the disaggregated results of Version 3 indicate that approximately 58% of the respondents believe the Selling Interpretation solely compared to 8.4% of the respondents who believe the Sourcing Interpretation solely. Named Plaintiffs Ms. Prost and Mr. Sinatro testified that they believe the Made in Italy interpretation only, suggesting they fall into the 8.4% minority selecting only the



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Sourcing Interpretation.[42] Conservatively assuming that there are only two interpretations of the Label, isolating damages caused by the deception that Plaintiffs allege relies on the implausible proposition that highly competitive market prices reflect a premium driven solely by less than 10% of the consumers.

**Exhibit 7: Combinations of Respondents' Understanding of Statements About Sourcing and Selling in Version 3 of the Survey**

| Understanding of Statement About Sourcing | Understanding of Statement About Selling | # Respondents | % Respondents |
|---|---|---|---|
| The statement does not communicate this or don't know / not sure | The statement does communicate this | 208 | 57.9% |
| The statement does communicate this | The statement does communicate this | 102 | 28.4% |
| The statement does communicate this | The statement does not communicate this or don't know / not sure | 30 | 8.4% |
| The statement does not communicate this or don't know / not sure | The statement does not communicate this or don't know / not sure | 19 | 5.3% |

*Source*: Cantor Survey data, Cantor Workpapers.

41. It is unlikely that the observed differences in the results from the Dennis and Cantor surveys are due to a systematic difference in the respondents or survey implementation. Exhibit 8 shows that results for the GMO sourcing question indicate no statistical differences between the Cantor Survey and the Dennis Survey responses. Appendix A compares the sociodemographic information of the Cantor and Dennis survey respondents with the California population showing that they are comparable.

---

[42] Deposition of Jessica Prost, Matthew Sinatro, et al. v. Barilla America, Inc. (Nov. 11, 2023), 35:1-36:7, 44:9-12. Deposition of Matthew Sinatro, Rough Transcript, Matthew Sinatro, et al. v. Barilla America, Inc. (Nov. 27, 2023), 11:15-12:7.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 8: Survey Results Regarding Respondents' Understanding of Statement "The product's ingredients are sourced from non-GMO plants."**

| Interpretation | Survey Version | # Respondents | Proportion | Confidence Interval |
|---|---|---|---|---|
| The statement does communicate this | Dennis | 482 | 82.8% | (79.8%, 85.9%) |
| | Version 1 | 154 | 83.2% | (77.9%, 88.6%) |
| | Version 2 | 306 | 84.1% | (80.3%, 87.8%) |
| | Version 3 | 311 | 86.6% | (83.1%, 90.2%) |
| The statement does not communicate this | Dennis | 42 | 7.2% | (5.1%, 9.3%) |
| | Version 1 | 14 | 7.6% | (3.8%, 11.4%) |
| | Version 2 | 19 | 5.2% | (2.9%, 7.5%) |
| | Version 3 | 26 | 7.2% | (4.6%, 9.9%) |
| Don't know / not sure | Dennis | 58 | 10.0% | (7.5%, 12.4%) |
| | Version 1 | 17 | 9.2% | (5.0%, 13.4%) |
| | Version 2 | 39 | 10.7% | (7.5%, 13.9%) |
| | Version 3 | 22 | 6.1% | (3.6%, 8.6%) |

*Source*: Dennis Survey, Cantor Survey data, Cantor Workpapers.

### 3.     Agreement with the Ingredient Sourcing Interpretation of the Label Does Not Mean it is an Important Factor for Product Purchases

42. Numerous factors influence pasta product selection which is a staple in American diets.[43] The Dennis Survey did not explore reasons for consumer's selection of a pasta brand. The second modification I made to the Dennis Survey design added two questions at the end of the survey to probe this selection. I compiled a list of factors and elicited which factors were important to respondents' selections. The list of factors was based on the same marketing materials referenced by Mr. Weir and industry report noted earlier. The list of factors is shown in Exhibit 9. I included "Made in Italy" to investigate the importance of that country-of-origin claim and to reflect the interpretation that Plaintiffs allege consumers believe from the Label. Respondents were also allowed to select and report "Other" in their answers.

---

[43] *See*, e.g., Curran, Jack. 2023. "Dry Pasta Production in the US," IBIS*World* Industry Report OD4975, September, Chung CE, Lee KW and Mi Sook Cho. 2010. "Noodle consumption patterns of American consumers: NHANES 2001-2002," *Nutrition Research and Practice*, pp. 243-251.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 9: Factors Influencing Pasta Product Selection in Cantor Survey**



*Source*: Cantor Survey, Cantor Workpapers.

43. To understand the relative importance of any factor, respondents were also asked to weigh their important factors by assigning percentage shares from a total of 100 percentage points as shown in Exhibit 10.

**Exhibit 10: Relative Importance of Chosen Factors Influencing Purchase**

Next, we would like to understand how important each of these reasons is to you when deciding which pasta brand to buy.

Please allocate 100% across the reasons by putting a number between 0% and 100% for each reason, such that the percentages for all chosen reasons add up to exactly 100%. Enter the most points for the reasons you care about the most and the fewest points for reasons you care about the least.

| | | |
|---|---|---|
| Price | | % |
| Healthy choice | | % |
| Good for everyday use | | % |
| Available shape(s) | | % |
| Made in Italy | | % |
| Has a great taste | | % |
| Total (must be 100%) | 0 | % |

*Source*: Cantor Survey, Cantor Workpapers.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

44. Exhibit 11 shows the proportion of respondents choosing each factor as important in their selections of a pasta brand and assigning at least 1 point to that factor. Approximately 12% of respondents assigned at least 1 point to Made in Italy. The rest of the respondents or approximately 88% indicated that Made in Italy is not among their most important reasons for selecting a pasta brand as they either did not select the factor at all or assigned it no points. More than 60% of respondents, however, indicated that Price was an important factor and assigned it at least 1 point. Quality, value, and taste were also selected by a majority of the respondents.

**Exhibit 11: Percent Respondents Selecting a Reason as Important and Allocating Points**

| Reason | # Respondents Selecting the Reason | % Respondents Selecting the Reason | # Respondents Allocating Point(s) the Reason | % Respondents Allocating Point(s) the Reason |
|---|---|---|---|---|
| Price | 568 | 62.6% | 557 | 61.3% |
| Quality of the pasta | 541 | 59.6% | 529 | 58.3% |
| Good value | 504 | 55.5% | 484 | 53.3% |
| Has a great taste | 491 | 54.1% | 482 | 53.1% |
| Available shapes | 372 | 41.0% | 361 | 39.8% |
| High quality ingredients | 372 | 41.0% | 363 | 40.0% |
| Healthy choice | 281 | 30.9% | 269 | 29.6% |
| Brand name | 267 | 29.4% | 255 | 28.1% |
| Good for everyday use | 216 | 23.8% | 206 | 22.7% |
| Made in Italy | 111 | 12.2% | 108 | 11.9% |
| Made in USA | 56 | 6.2% | 52 | 5.7% |
| Innovative brand | 33 | 3.6% | 28 | 3.1% |
| Other | 23 | 2.5% | 22 | 2.4% |

*Source*: Cantor Survey data, Cantor Workpapers.

45. The relatively small importance of the Made in Italy factor is reflected in the assignment of points by respondents when asked to weigh reasons for their selection of a pasta brand. Exhibit 12 shows that on average, only 2.2% of all possible points are allocated by respondents to Made in Italy and that more than 97% of points are allocated to other reasons with most points allocated to price, quality, taste, and value.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 12: Reasons That Are Most Important When Deciding Which Pasta Brand to Buy By Average Percentage of Points That Respondents Allocated to a Reason**



*Source*: Cantor Survey data, Cantor Workpapers.

46. The exhibits above indicate that the most important reason for selecting a brand of pasta and the factor that receives the highest weight in that choice is Price. The first panel in Exhibit 13 shows that for the more than 60% respondents who selected Price, it receives approximately a third of all points on average. The Made in Italy factor receives less than 2% of points. The second panel shows that even when Price is not selected as a factor, Made in Italy receives only 3.2% of points.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 13: Reasons That Are Most Important for Selection of Pasta Brand by Average Percentage of Points That Respondents Allocated to a Reason Conditional on Whether Respondent Selects "Price" as an Important Reason**



*Source*: Cantor Survey data, Cantor Workpapers.

47. In addition, for the 108 or 12% of respondents who selected Made in Italy as an important reason for their selection of a pasta brand, the weight given to that factor is far less than the weight given to Price shown above. Exhibit 14 shows that the Made in Italy factor is given approximately 19% of points on average and that other factors such as quality, taste, and price also matter.

48. Compared to the 12% group, Price and Good Value are relatively more important to the 88% of respondents that allocated *no points* to the Made in Italy factor.[44] The greater emphasis on price and value is consistent with pasta being a food staple for buyers and with marginal consumers who are largely driven by price in their purchases. In addition, further analysis of the small group of 8.4% of respondents in Version 3 who solely believed the Label communicated the Sourcing Interpretation indicates they place almost no weight on the Made in Italy factor.[45]

---

[44] There was no statistical difference in the proportions of the two groups who selected the Sourcing Interpretation when it was presented to them in the Version 1 and 3 treatments.

[45] Respondents in this group allocated an average of 0.3% to the Made in Italy factor. This was the lowest weight across the four groups shown above in Exhibit 7. The range of the average weights for the four groups is 0.3% to 2.8%



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 14: Reasons That Are Most Important for Selection of Pasta Brand by Average Percentage of Points That Respondents Allocated to a Reason Conditional on Whether Respondent Selects "Made in Italy" as an Important Reason**



*Source*: Cantor Survey data, Cantor Workpapers.

49. The results above for the Made in Italy factor are not surprising given other marketing information. The materials referenced by Mr. Weir indicate multiple factors influence consumer preferences for pasta brands.[46]



50. The Kantar marketing study also indicates



---

indicating that regardless of how the Label is interpreted, on average the Made in Italy factor is immaterial for respondents when selecting the brand of pasta to buy.

[46] *See,* BAI-CA00000307-356 ("Kantar marketing study").

[47] *See,* BAI-CA_00000320.

[48] *See,* BAI-CA_00000344-347.

[49] *See,* e.g., BAI-CA_00000317.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████████████████. Industry studies confirm the commodity pricing aspect of pasta products:[50]

> Most consumers view dry pasta as a commodity product, and therefore, base their purchasing decisions on price, which further reinforces the price-based competition between branded and private label products.



### C.    Dr. Dennis Has Not Demonstrated that a Conjoint Survey Can be Used to Reliably Isolate the Value of the Misrepresentation or that the Conjoint Results Can Be Used to Conduct Classwide Damages Calculations

51. The conjoint method is a survey tool that elicits respondent preferences for products and their features, also known as attributes, in hypothetical choice experiments designed to mimic the comparison of products and shopping. Typically, respondents are presented with products differing in a select number of attributes, including price, and asked to choose one product among several alternatives or none. Conceptually, respondents indicate the tradeoffs they are willing to make across product attributes in

---

[50] *See*, Curran, Jack. 2023. "Dry Pasta Production in the US," IBIS *World* Industry Report OD4975, September, p. 26.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

these hypothetical choices.[51] From this survey information, conjoint practitioners often investigate the additional amount that respondents are willing to pay for the product with certain attributes. Conjoint surveys have been applied broadly, however, their reliability depends on the design and capacity to match the real-world choice conditions:[52]

> [T]he way preferences are elicited in a typical conjoint task is likely to miss many key inputs to choice and to skew the relative importance of the inputs it does identify. While these limitations might be remedied to some degree through improving the design of conjoint studies, they are largely a function of the nature of conjoint tasks which, at a fundamental level, do not replicate the manner in which most choices are made.

52. In addition, conjoint surveys requiring respondents to make hypothetical choices often suffer from biases that can lead to inaccurate and upwardly biased measures of willingness to pay for product attributes.[53]

53. Dr. Dennis proffers a rudimentary design of a conjoint survey to measure the price premium respondents are willing to pay for the Label but has not yet conducted any survey. He presents a list of pasta product attributes and their levels that he plans to use in the choice tasks he will present to respondents to investigate tradeoffs across brand, nutritional facts/ingredients, label claims including "geography-related claims," and price.[54] Dr. Dennis plans to include "Italy's #1 Brand of Pasta," "Product of Italy," and "Authentic Italian Pasta" as different levels of the geography-related attribute.

54. Dr. Dennis has not addressed the ambiguity issue in the context of his conjoint survey design. Notwithstanding the flaws in the Dennis consumer survey, the results demonstrate that 43% of potential class members disagree with the Sourcing Interpretation of the Label. Dr. Dennis proffers a design for a conjoint survey that includes the Label but he proposes no methodology to distinguish between interpretations or to isolate respondents who are willing to pay for the Label but only believe the Sourcing Interpretation.

55. As the Cantor Survey demonstrated, interpretations of the Label vary across representative consumers. When the meaning of included attributes and their levels are unclear to respondents in a conjoint survey,

---

[51] *See, e.g.,* Bryan K. Orme. 2014. *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*. Manhattan Beach, CA: Research Publishers LLC.

[52] David Gal and Itamar Simonson. 2020. "Predicting Consumers' Choices in the Age of the Internet, AI, and Almost Perfect Tracking: Some Things Change, the Key Challenges Do Not," *Consumer Psychology Review*, p. 5.

[53] *See, e.g.,* Schmidt and Bijmolt. 2020. "Accurately measuring willingness to pay for consumer goods: a meta-analysis of the hypothetical bias", *Journal of the Academy of Marketing Science.*, indicating an average hypothetical bias of 21% that is even greater for indirect stated preference methods such as conjoint surveys.

[54] Dennis Report, ¶¶ 109, 111-119.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

measurement error is likely to be introduced. Survey practitioners recognize cognitive processes that can affect interpretation and subsequently measurement errors when respondents face incomplete or vague questions.[55] Practitioners caution that when respondents believe they ought to understand the terms or issues presented in survey questions or are unable to ask for clarification, they may "muddle through on their own."[56]

56. The concise meaning of attributes and their levels has similarly been recognized in the context of conjoint design:[57]

> Attribute descriptions should be concise statements with concrete meaning. Avoid using ranges to describe a single level of an attribute, such as "weighs 3 to 5 kilos." Rather than leaving the interpretation to the respondent, it would be better to specify "weighs 4 kilos." Levels such as "superior performance" also leave too much in question. What does "superior performance" mean? Try to use specific language to quantify (if possible) the exact meaning of the level.

57. Dr. Dennis also has not properly investigated the importance of the various label attributes he plans to include. Practitioners have cautioned that the inclusion of minor attributes can bias conjoint results:[58]

> Evaluation tasks intentionally force respondents to attend to attributes that they might otherwise not notice. In doing so, attention can elevate the importance of particular attributes to a level that is greater than would occur in the marketplace. For example, featuring the attribute 'surge protector' may make this attribute salient even though it may not be salient in actual choices…Simply mentioning an attribute increases its importance, raising the specter of attributes appearing important that otherwise would be ignored in the market choices.

---

[55] *See, e.g.,* Groves, Robert M., Floyd J. Fowler, Jr., Mick P. Couper, James M. Lepkowski, Eleanor Singer, and Roger Tourangeau. Survey Methodology, 2nd ed. Hoboken, NJ: John Wiley & Sons, Inc., 2009 at pp. 218-219. *See also,* Shari Seidman Diamond. 2011. Reference Manual on Scientific Evidence, "Reference Guide on Survey Research", *The National Academies Press,* p. 388. "When unclear questions are included in a survey, they may threaten the validity of the survey by systematically distorting responses if respondents are misled in a particular direction, or by inflating random error if respondents guess because they do not understand the question. If the crucial question is sufficiently ambiguous or unclear, it may be the basis for rejecting the survey." (Internal citations omitted).

[56] *See* Groves, et al. at p. 227.

[57] Bryan K. Orme. 2014. *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research.* Manhattan Beach, CA: Research Publishers LLC, p. 54. (Emphasis added.) I note that after describing the geography-related label claim as an attribute with several levels, Dr. Dennis indicates in ¶121 that each label claim will be treated as an attribute. That would mean that he plans to include 14 attributes representing $6*(2^12)*6$ or 147,456 product combinations in the survey which also presents reliability issues. Dr. Dennis recognizes in footnote 32 that general guidance in conjoint design suggests a limitation of 6-7 attributes to avoid overwhelming respondents.

[58] Joel Huber. 1997. "What We Have Learned from 20 Years of Conjoint Research: When to use Self-explicated, Graded Pairs, Full Profiles or Choice Experiments," Sawtooth Software Research Paper Series, p. 2.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

58. Importantly, the review article cited by Mr. Weir cautions that application of conjoint surveys to investigate the value of country-of-origin information can overestimate its importance in real world purchases:[59]

> An even bigger discrepancy appears when comparing the results of conjoint analysis studies and studies intercepting consumers while shopping. The latter suggest that, in practice, <u>origin information is considerably less important to consumers than is usually inferred from conjoint analyses</u>. On this background, it seems that <u>conjoint analyses tend to overestimate the impact of origin information on consumer choices</u>. A likely reason is that conjoint analysis studies direct consumers' attention towards origin information whereas this information tends to "drown" in the overwhelming amount of information and distractors in a real shopping environment.

59. When Dr. Dennis removes the Label from the choices offered to the respondents in the proposed conjoint survey, he also will remove the information on the market performance of the brand that is interpreted by more than 80% of respondents in the Cantor Survey. Dr. Dennis' approach to estimating the value of the Label will contain measurement error if market performance in Italy is important to the conjoint respondents for their selection of products.

60. Another concern is that the proposed conjoint survey will produce *average* changes in demand, and Dr. Dennis has provided no proposed methodology to account for the alternative plausible economic conditions that affect the marginal consumer. As noted by Orme:[60]

> Many consultants and other software packages compute WTP, but [] tend to average across respondents rather than focusing WTP more relevantly on respondents on the cusp of choosing the enhanced product features.

61. The Dennis and Cantor consumer surveys indicate that a large proportion of respondents were not misled by the Label as to the origin of Barilla's ingredients in the Products. Hence, this large proportion of respondents is likely to experience a shift in demand due to removal of the Label that is not due to the Sourcing Interpretation. Therefore, it would be inappropriate to assume a parallel shift in demand.[61]

---

[59] Thorgersen, J. 2023. "How does origin labelling on food packaging influence consumer product evaluation and choices? A systematic literature review" Elsevier Ltd., p. 18. (Emphasis added).

[60] Orme 2021, "Estimating willingness to pay given competition in conjoint analysis," *Sawtooth Software,* p. 2.

[61] Allenby, Greg M. and Brazell, Jeff D. and Howell, John R. and Rossi, Peter E. 2014. "Valuation of Patented Product Features," Fisher College of Business Working Paper No. 2013-05-02, available at SSRN: https://ssrn.com/abstract=2359003 ("It is possible to construct cases where the average WTP vastly overstates the WTP of the marginal customer. If the bulk of the market has a low value of WTP and there is a small portion of the market with extremely high WTP, then a profit maximizing firm may set price much lower than average WTP so as to sell to the majority of potential customers who have relatively low WTP.")



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

62. In addition, Mr. Weir's market premium methodology focusses entirely on a fundamentally flawed measure of the alleged premium for the Products at issue. It is well established that measures of WTP, even if measured reliably, are factors of product demand. Dr. Dennis and Mr. Weir fail to apply basic economic principles regarding how pricing outcomes are determined in the relevant markets for the Products where prices are determined by the interaction of supply and demand.[62] Yet as I noted above, Mr. Weir has provided information about the highly competitive nature of the markets and pricing of the Products.

63. Plaintiff's theory is that demand for the Products with the Label under the actual conditions is on average greater than under the conditions of no Label. Mr. Weir assumes that the demand difference for every buyer can be represented by the average WTP change resulting from Dr. Dennis' conjoint survey. He plans to use this WTP value to reflect what consumers purportedly *overpaid* by not receiving "the basis of the bargain."[63] The market price premium, however, is measured by the difference between actual prices and but-for prices. Importantly, it is the interaction of supply and demand that determines equilibrium pricing in the two states of the world (actual and but-for).[64]

64. For example, Exhibit 16 below considers the possible implications of some portion of consumers who are price sensitive for a Product and have no WTP for the Sourcing Interpretation of the Label.[65] Even if there are also consumers who have a positive WTP for this interpretation (shown as $D_0$ [actual world] minus $D_1$ [but-for world]), an average WTP is a poor proxy for all consumers. Moreover, if the nearly 90% of buyers with no WTP for Made in Italy are the marginal buyers determining equilibrium prices ("$P_0$" and "$P_1$"), then there will be no market price premium caused by the deception alleged by Plaintiffs. Price, which is determined by the intersection of demand and supply ("S"), is the same under the actual and but-for conditions. Because Mr. Weir has failed to address the implications of WTP values for the alleged deception of the Label that are zero for the marginal consumers in essentially

---

[62] Allenby, Greg M. and Brazell, Jeff D. and Howell, John R. and Rossi, Peter E. 2014. "Valuation of Patented Product Features," Fisher College of Business Working Paper No. 2013-05-02, available at SSRN: https://ssrn.com/abstract=2359003

[63] First Amended Class Action Complaint, ¶ 107.

[64] This basic principle of economics has been recognized by the courts as well. *See, e.g., In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 500 F. Supp. 3d 940, 949 (N.D. Cal. 2020), *aff'd sub nom. Schell v. Volkswagen AG*, No. 20-17480, 2022 WL 187841 (9th Cir. Jan. 20, 2022) (rejecting plaintiff expert's overcharge analysis because the expert "ignore[d] the 'supply' part of the supply/demand curve.").

[65] I have used a competitive market to illustrate the WTP and equilibrium price concepts. Similar results can be shown for a monopolistically competitive firm selling a differentiated product. Equilibrium prices are determined by the intersection of marginal revenue and marginal cost, however, the graph is more cluttered.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

commodity pasta markets, he has not ruled out that there is no market price premium for the Challenged Representation and no financial loss to consumers purchasing the Products.

**Exhibit 16: WTP for Label, Zero WTP, and Product Price**



65. In the above set of market conditions, WTP for the alleged deception for some consumers would be insufficient to show economic injury to all or nearly all members of the proposed class. It is a subjective value that varies across consumers and can be positive, zero, or negative depending on heterogeneous consumer preferences. In the illustrative diagram above, WTP for the alleged deception is positive ($D_0$) or zero ($D_1$) for consumers.

66. As I explained above, another critical missing link between the shift in demand that Dr. Dennis might measure and the damage analysis that Mr. Weir seeks is a proper specification of the profit maximization model to determine the but-for equilibrium price. Dr. Dennis and Mr. Weir cannot estimate a price premium without first establishing a difference between the actual price and the but-for equilibrium price.

67. In addition, in this matter, there are multiple Products. Across the different product lines, there are 54 separate Products with the Label. The retail sales data provided information for each of the Products at issue in various Product Lines and is summarized in Exhibit 17. These Products include various shapes,

30



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ingredients, recipe uses, among other features that might be important to consumers at the point of sale. Dr. Dennis fails to consider the implications of the large number of different products on the proposed conjoint survey. Mr. Weir apparently anticipates that Dr. Dennis will be providing one premium for all Products allowing only for "different geographies, and for any defined time period."[66] Dr. Dennis and Mr. Weir's methodologies fail to reflect the widely varying pricing patterns that are evident in the real-world data that they have purportedly considered for the conjoint design.



*Note*: Analysis is limited to the products at issue identified in Interrogatory 2 of "Defendant Barilla America Inc.'s First Supplemental Objections and Responses to Plaintiff's Interrogatories, Set 1."
*Source*: Circana Data, Cantor Workpapers.

### D. Analysis of Available Barilla Price Data Reveals No Material Average Price Premium From Removal of the Label and Potentially Varied Effects Across Products

68. Neither Dr. Dennis nor Mr. Weir has proffered any evidence of a pricing premium by analysis of actual sales data. Plaintiffs' experts have only hypothesized that prices for the Products are lower in the world without the Label. As a result, they have not yet demonstrated that there is a common impact on all or nearly all of the members of the putative classes.

69. I understand that Barilla removed the Label from some but not all products in 2022. I also understand that this change in the packaging would have been implemented for 80% of the Products available to consumers by February 2023.[67] These conditions support a natural experiment in the real world sales of the Products to investigate the pricing premium consistent with Plaintiffs theory of damages.

70. To perform this analysis, I used the Circana/IRI California retail sales data described above that was available to Mr. Weir and Dr. Dennis. My processing of the data is discussed in more detail in

---

[66] Weir Declaration, ¶ 71.

[67] Defendant Barilla America, Inc.'s First Supplemental Objections and Responses to Plaintiffs' Interrogatories, Set 1, Matthew Sinatro et al. v. Barilla America, Inc. (Aug. 15, 2023), pp. 15-16.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Appendix B. Based on this information, I calculated the monthly weighted average price per unit for each Product and Product line between February 2018 and July 2023.

71. Exhibit 18 shows the weighted average price per unit by Product Line. ██████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████

███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████

Whole Grain — Classic Blue Box — Veggie — Gluten Free — Collezione Artisanal

*Note*: Price per Unit is calculated by dividing total dollars sold by total units sold. Analysis is limited to the products at issue identified in "Defendant Barilla America Inc.'s First Supplemental Objections and Responses to Plaintiff's Interrogatories, Set 1."
*Source*: Circana Data, Cantor Workpapers.

72. I use the fact that the Label was *not removed* from the Whole Grain Product Line to test Plaintiffs' theory of damages in a standard model to compare pricing patterns.[68] I have controlled for factors

---

[68] *See, e.g.,* Athey, S. and G. W. Imbens. 2017. "The State of Applied Econometrics: Causality and Policy Evaluation," *Journal of Economic Perspectives,* 31(2), Spring, pp. 4; 9 ("Estimates of causal effects are ultimately based on comparisons of different units with different levels of the treatment."; "Difference-in-differences methods have been an important tool for empirical researchers since the early 1990s. These methods are typically used when some groups, like cities or states, experience a treatment, such as a policy change, while others do not.")



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

known to affect pasta product pricing such as the price of wheat, per capita income, and the Covid shutdown.[69]

73. Barilla retail sales fails to support the price premium theory. The results shown in Exhibit 19 indicate that overall the effect of removing the label after October 2022 or after February 2023 is inconsistent with Plaintiff's theory on direction and significance. The results indicate a positive but statistically insignificant effect after the Label was removed from the CBB products.[70]



*Note*: Analysis is limited to Classic Blue Box and Whole Grain Barilla products at issue identified in "Defendant Barilla America Inc.'s First Supplemental Objections and Responses to Plaintiff's Interrogatories, Set 1." Product fixed effect coefficients are suppressed in the table. Analysis relies on clustered standard error terms and rounds values to the nearest thousandth. Analysis removes the Classic Blue Box Pipette product because it was discontinued in the scanner data before removal of the Label. The COVID-19 flag takes on the value of 1 between March 1, 2020, and August 31, 2020.
*Source*: Circana Data, BLS Wheat PPI Data, BEA Personal Income per Capita Data, Cantor Workpapers.

74. In addition, I investigated whether the results of the removing the Label were uniform across the 33 CBB products.[71] Exhibit 20 shows that effects of removing the label are varied. For most of the products the removal effect is not statistically different from zero (i.e., no effect), but the signs on this insignificant result vary. Variation in the effect results across the Products support that Mr. Weir and

---

[69] *See, e.g.,* Jack Curran. 2023. "Dry Pasta Production in the US," IBIS World Industry Report OD4975, September, pp. 6; 8.

[70] I conducted additional tests for the sensitivity of the results to alternative assumptions about annual fixed effects and real prices. In all cases, the results indicated a positive effect.

[71] As noted, one product was dropped from the model because it had no pricing data after the Label was removed.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Dr. Dennis' methodology for measuring damages due to the Challenged Representation, if any, cannot be estimated reliably by a single price premium.



## V.    Conclusion

75. Plaintiffs' experts proffer a combined methodology purportedly to estimate a price premium for the Label that will be applied to sales of the Products over the class period. Dr. Dennis' and my consumer surveys indicate clearly that there are multiple interpretations of the Label which diverge substantially from the Challenged Representation that Plaintiffs allege has caused an economic loss to consumers. In addition to other concerns about its reliability, the conjoint survey proposal proffered by Dr. Dennis fails to isolate the effect, if any, of the Label to the interpretation of the Challenged Representation that Plaintiffs allege is deceptive. Dr. Dennis' conjoint survey has been designed to measure an upwardly biased value because he fails to isolate the effect of unchallenged interpretations, he plans to use an average measure of WTP over segments of consumers who likely differ substantially regarding the relevance of the country-of-origin factor to their pasta choices, and WTP is an overestimate of the but-for equilibrium price. Dr. Dennis' proffered methodology will not produce a measure that Mr. Weir can properly use in a reasonably reliable damages methodology based on information common to the proposed classes.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# APPENDIX A

## CONSUMER SURVEY

1. The Cantor Survey[1] replicates the design of the Dennis Survey[2] with two modifications:

   a. There are three versions of the Label presentation
      i. Version 1: replicates Dennis Survey with 200 respondents
      ii. Version 2: tests the Selling interpretation instead of the Sourcing interpretation used by the Dennis Survey with 400 respondents
      iii. Version 3: tests both the Selling and Sourcing interpretations randomized to prevent ordering effects with 400 respondents

   b. Two questions we added to the end of the survey to explore reasons for consumers' selection of pasta brands:
      i. The first question presented respondents with a list of factors and asked which, if any, factors influenced their pasta purchase
      ii. The second question asked respondents to weigh their chosen factors by assigning percentage shares from a total of 100. Points were required to add to 100, but respondents did not have to allocate points to all factors selected in (i).

2. Amplitude Research administered the survey in a double-blind setting such that neither Amplitude nor the respondents were aware of the objectives of the survey. The survey was conducted between October 13 and October 19, 2023 until a sample size of 1000 respondents was reached.

3. 84 respondents initiated the survey but did not answer any questions and 116 respondents started but did not finish the survey. Further, 848 respondents were terminated because of the various screens as in the Dennis Survey.

| TERMINATES | |
|---|---:|
| QD_AGE_17 | 4 |
| QELIGIBLE1 | 415 |
| QELIGIBLE2 | 2 |
| QINDUSTRY | 138 |
| QP_STATE | 61 |
| QPAST_SURVEY | 70 |
| QPRIMARY_SHOP | 25 |
| QS_CONFIRM | 23 |
| QS_PASTA_TYPE1 | 73 |
| QS_PASTA_TYPE2 | 37 |
| | 848 |

*Source:* Amplitude Research

4. Application of the following four screens further reduced the count of respondents to 908:
   a. Were you able to examine the product? (QQ_EXAMINE)
   b. The company making this product received a certification for using non-GMO ingredients (QCP_3)

---

[1] *See,* Cantor Workpapers for the survey screenshots and survey response data.
[2] *See,* Dennis Report, Attachment C, Survey Questionnaire.

2

c.   When answering the questions about your understanding of the packaging, did you or did you not base your answers on the packaging we showed you in the survey? (QCP_BASIS)

d.   Please select any PASTA product brands you purchased in the last 12 months. (QBRAND)

|  | Final Respondent Count |
|---|---|
| Version 1 | 185 |
| Version 2 | 364 |
| Version 3 | 359 |
| Total | 908 |

*Source*: Cantor survey data.

5.   A comparison of the demographics of the respondent profile of the Cantor and Dennis surveys and the population of California reveals that the demographic profile of the respondents is similar across most categories. The Dennis Survey is more heavily weighted towards female respondents than the general California population (70% females in Dennis Survey vs. 50% females in California population. Additionally, the Cantor and Dennis survey respondents are less heavily weighted toward Hispanic, Latino or Spanish origin than the general California population (20% in Cantor Survey, 28% in Dennis Survey and 40% in California).

**Comparison of Respondent Demographics Against Dennis' Survey**

| Description of Respondents | Cantor Survey (n = 908) | Dennis Survey (n = 582) | California |
|---|---|---|---|
| Female | 55% | 70% | 50% |
| Age 18-29 | 15% | 21% | 16% |
| Age 30-39 | 20% | 17% | 15% |
| Age 40-49 | 18% | 19% | 13% |
| Age 50-59 | 19% | 18% | 12% |
| Age 60-69 | 17% | 13% | 11% |
| Age 70 and over | 12% | 13% | 11% |
| Hispanic, Latino, or of Spanish origin | 20% | 28% | 40% |
| Race white | 68% | 63% | 71% |
| Highest level of eduction completed is college degree or higher | 50% | 45% | 35% |
| Live in town under 100,000 people or rural area | 41% | 41% | |
| Had purchased Barilla-brand pasta in the last 12 months | 84% | 83% | |
| Are the primary grocery shopper in the household | 79% | 82% | |
| Are the primary purchaser of pasta in the household | 87% | 90% | |
| Had been purchasing pasta for more than five years | 76% | 69% | |
| Indicate that they purchase pasta-type products a great deal | 31% | 35% | |

*Sources*: United States Census Bureau, "Quick Facts California," available at https://www.census.gov/quickfacts/fact/table/CA/PST045222, site visited on November 20, 2023. United States Census Bureau, "American Community Survey, ACS 1-Year Estimates Subject Tables," available at https://data.census.gov/table/ACSST1Y2022.S0101?g=040XX00US06, sited visited on November 20, 2023.

6.   The Cantor Survey Questionnaire is attached.

3

## SURVEY QUESTIONNAIRE

## CONSUMER PERCEPTION SURVEY HAS THE FOLLOWING STRUCTURE

- SCREENER INSTRUMENT – IDENTIFIES ELIGIBLE RESPONDENTS FOR THE MAIN SURVEY
- MAIN SURVEY – ELIGIBLE RS ARE ASSIGNED TO MAIN SURVEY
- FINAL BATTERY – ALL RESPONDENTS COMPLETING THE MAIN SURVEY ARE ASSIGNED THE FINAL BATTERY.

### SCREENER SURVEY TO IDENTIFY ELIGIBLE RESPONDENTS

We'll be asking you about purchases you might have made at grocery stores, discount retailers, online stores, specialty stores, and other retailers where you might purchase various products.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

[ASK ALL]
[PROMPT]P_STATE

Let's start with an easy question.   Where do you live?

[Dropdown of U.S. States, including Washington DC, include a Not in USA option]

**TERMINATE IF NOT IN**

**CALIFORNIA** STORE

**DOV FOR CENSUS**

**REGION 4**

4

[ASK ALL]
D_GENDER
[SP]

What is your gender?

Male ............................................................................. 1
Female ......................................................................... 2
Non-Binary ...................................................................3

**NO TERMINATIONS**

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

D_AGE

What is your age?

Less than 18…………1  **→ TERMINATE**

18-29 .........................2
30-39………………. 3
40-49………………. 4
50-59………………. 5
60-69………………..6
70 and over........................ 7

**TERMINATE IF UNDER AGE 18**

**TERMINATE IF AGE AND GENDER INFORMATION DO NOT MATCH PANELIST PROFILE DATA**

5

------------------------------------------------------------

**[RECAPTCHA TEST. USE TRAFFIC LIGHT-TYPE RECAPTCHA. AFTER THREE FAILURES, TERMINATE]**

------------------------------------------------------------

D_HISPAN.  [SINGLE SELECT]

Are you of Hispanic, Latino, or of Spanish origin?
- o   Yes
- o   No

---

RACE.  [SINGLE SELECT]

What do you consider to be your race?

- o   African American or Black
- o   American Indian or Alaska Native
- o   Asian
- o   Native Hawaiian or Other Pacific Islander
- o   White
- o   Multi-racial
- o   Some other race
- o   Prefer not to say

EDUC.  What is the highest level of education that you have completed?

- o   Less than High School
- o   High School or GED
- o   Completed Technical or Trade School
- o   Some College
- o   College degree (4 year)
- o   Post-graduate course work or degree

**NO TERMINATIONS**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**[SINGLE SELECT]**

**PRIMARY_SHOP**

How much of the grocery shopping, if any, do you do for your household?  Please select one.

- o   All of it
- o   Most of it
- o   About half
- o   Not much of it
- o   None of it       --→ **TERMINATE**

**[TERMINATION IF R ANSWERS 'NONE OF**

**IT']**

-------------------------------------------------------------------------------------------------------

7

--------------------------------------------------------------------

[MULTI-SELECT; RANDOMIZE RESPONSE LIST; ANCHOR NONE OF THESE.]

INDUSTRY.

Thinking about the **past 12 months**, please indicate the types of companies, if any, you or a member of your household have worked for. Please select all that apply, or none of these.

- Marketing or market research firm **→ TERMINATE**
- Public relations firm **→ TERMINATE**
- Grocery company **→ TERMINATE**
- Hair care products company
- Aerospace manufacturer
- College or university
- Hospital (general or specialty)
- Federal or state government agency
- City or county office
- Construction (residential or commercial)
- Agricultural/farm/agribusiness
- Computing/Information technology
- Financial services firm
- Insurance company
- Food service company
- Transportation company
- Real estate company
- None of these

**[TERMINATE IF R SELECTS 'MARKETING OR MARKET RESEARCH FIRM'; 'PUBLIC RELATIONS FIRM'' 'GROCERY COMPANY']**

8

----------------------------------------------------------

[SELECT ALL THAT APPLY; RANDOMIZE RESPONSE LIST, BUT ANCHOR 'NONE OF THESE'.  CANNOT SELECT A PRODUCT AND NONE OF THESE]

PAST_SURVEY.

Have you taken any surveys or participated in other kinds of research **in the last 30 days** on any of these topics? Please select all that apply, or none of these.

- Hair care products
- Toothpaste/Oral care
- Sporting goods or outdoor gear
- Advertisements on TV
- Beverage products
- Snack food products
- Skin care products
- Websites you visit
- Bread-type products
- Pasta products  → **TERMINATE**
- Video Games

- None of these

**TERMINATE IF R SELECTS** 'Pasta products'

---

INSERT NEW SCREEN.

Thank you for telling us about yourself.

---

9

[ASK ALL]

S_PROD.

Have you purchased, or not purchased, any of these types of products **in the past 12 months**?

Some of these are not common products, so please select **YES** only if you are sure you purchased the product. Select **NO** if you did <u>not</u> purchase the product.

[RANDOMIZE RESPONSE LIST]

|  | Yes | No |
|---|---|---|
| Protein powders | [ ] | [ ] |
| Creatine | [ ] | [ ] |
| Multivitamins | [ ] | [ ] |
| Sleep aids | [ ] | [ ] |
| Digestive aids | [ ] | [ ] |
| Specialty Vitamins (not multivitamins) | [ ] | [ ] |
| Dietary supplements | [ ] | [ ] |
| Energy bars/energy drinks | [ ] | [ ] |
| Craft Beer brands | [ ] | [ ] |

**NO TERMINATIONS HERE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

10

[MULTI-SELECT. RANDOMIZE PRODUCT TYPES. ANCHOR "Something Else' 'None of these']

**S_FOOD_PRODUCTS.**

Which **GROCERY-TYPE PRODUCTS**, if any, have you purchased (not for resale) in the **past 12 months**?  [RANDOMIZE]  Please select all that apply, or none of these.

Please select all that apply or "None of these."

- o   Pasta food products  → **PROCEED**
- o   Frozen foods
- o   Produce
- o   Candy and Treats
- o   Meat and Seafood
- o   Bakery & Bread
- o   Coffee
- o   Beverages (non-alcoholic)
- o   Breakfast & Cereal
- o   Snacks
- o   Eggs / Egg substitutes
- o   Dairy
- o   Something else [ANCHOR]
- o   None of these **[ANCHOR / EXCLUSIVE]**

**PROCEED IF 'PASTA FOOD PRODUCTS' IS SELECTED; OTHERWISE TERMINATE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

[PROCEED IF R SELECTED 'Pasta food products', **OTHERWISE TERMINATE**

IF RESPONDENTS IS ELGIBLE TO PROCEED, THEN FLAG THE R.

CREATE **DOV ELIGIBLE1** =  1 'Pasta Purchaser'

**TERMINATE IF DOV ELIGIBLE1 DOES NOT EQUAL 1**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11

MULTI SELECT.  RANDOMIZE ORDER OF 'DRIED' V. 'FRESH'; ANCHOR AND MAKE EXCLUSIVE 'NONE OF THESE'

S_PASTA_TYPE.

**In the past 12 months**, please select which **types of pasta** you have purchased for your personal use, if any. Please select all that apply.

- Dried  → **PROCEED**
- Fresh
- None of these [EXCLUSIVE / ANCHOR]

PROCEED IF R SELECTS 'DRIED,' **OTHERWISE TERMINATE.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MULTI SELECT.  RANDOMIZE RESPONSE OPTIONS.  ANCHOR 'Something Else.' ANCHOR AND MAKE EXCLUSIVE 'None of these.'

S_PASTA_TYPE.
**Which shapes of pasta have you purchased in the past 12 months?** Please select all that apply, or none of these.

RANDOMIZE]

- Spaghetti
- Fettuccine
- Linguine
- Giammattei
- Penne
- Rigatoni
- Macaroni
- Farfalle
- Rotini or Fusilli
- Shells
- Risoni
- Orecchiette
- Gnochi
- Something else [ANCHOR]
- None of these [EXCLUSIVE / ANCHOR]

**TERMINATE IF R SELECTS FICTITIOUS 'Giammattei' OR SELECTS 'NONE OF THE ABOVE' ;** OTHERWISE PROCEED

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

12

[DISABLE BACK BUTTON]

This survey asks consumers about **PASTA** products**.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
[SINGLE SELECT.  RANDOMIZE RESPONSE OPTIONS; ANCHOR DON'T KNOW AT BOTTOM.  DISABLE BACK BUTTON]

S_CONFIRM.

Please confirm your understanding of this survey. **What is this survey about?** Please select one.

- o   Retirement planning
- o   Pasta products → **PROCEED TO NEXT QUESTION**
- o   Protein drinks
- o   Favorite vacation destinations
- o   Don't know

**TERMINATE IF R DOES NOT SELECT PRODUCT '**Pasta products'

W1.

You have been selected to participate in our survey project.

To participate in this survey, you must agree to these instructions.

- o Answer the questions with your honest answers and opinions. Do not guess.

- o Answer the questions by yourself and without asking anybody else for help.

- o Answer the questions without getting help from a website or other materials.

- o Answer all the questions in one sitting and not stopping in the middle.

Do you agree to our instructions?

- o Yes, I agree to do this
- o No, I do not agree to do this     →TERMINATE

**TERMINATE ALL CASES THAT DO NOT AGREE**

**CREATE DOV ELIGIBLE2 = 1 WHERE W1 = YES**

**SCREENER IS COMPLETE**

14

**MAIN STUDY INTERVIEW**

**INTRODUCTION FOR ALL GROUPS**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

[NEW SCREEN. PUT IN 10-SECOND SPEED BUMP]

For this survey, we will be showing you a **PASTA PRODUCT** package.

Because we want you to take your time, you might need to wait a few seconds before going to the next screen.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

[NEW SCREEN. PUT IN 10-SECOND SPEED BUMP]

It is very important that you complete the rest of the survey in one sitting – without any interruption.  We need about five minutes of your uninterrupted time.

If you cannot take our survey in one sitting, please quit the survey now and come back another time to complete the survey when you have more time.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

[NEW SCREEN. PUT IN 10-SECOND SPEED BUMP]

It is also important that you base your answers <u>only</u> on the packaging that we show you.

If you do not have an opinion on our questions, please select "Don't know/not sure."

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

15

[NEW SCREEN. 10-SECOND SPEED BUMP. IF R CLICKS THE IMAGE, ENLARGE THE IMAGE IN A POP-UP BOX USING PROVIDED ENLARGED IMAGE]

Here is the **<u>front</u>** of the packaging. Please examine it like you would in a store considering a product for purchase. You can click on the image to enlarge it.



ENLARGED IMAGE TO SHOW IF R CLICKS ON ABOVE IMAGE



16

[NEW SCREEN. [10-SECOND SPEED BUMP. IF R CLICKS AN IMAGE, ENLARGE THE IMAGE IN A POP-UP BOX]

Below are images of the other sides of the packaging.  Please examine them like you would in a store considering a product for purchase. You can click on any image to enlarge it.





ENLARGED IMAGES ARE BELOW TO SHOW WHEN R CLICKS ON AN ABOVE IMAGE. DISPLAY NUTRITION FACTS PANEL VERTICALLY.





**Nutrition Facts**

8 servings per container

Serving size 2 oz (56g)

Amount Per Serving

**Calories** 200

% Daily Value*

| | |
|---|---|
| **Total Fat** 1g | **1%** |
| Saturated Fat 0g | **0%** |
| Trans Fat 0g | |
| **Cholesterol** 0mg | **0%** |
| **Sodium** 0mg | **0%** |
| **Total Carbohydrate** 42g | **15%** |
| Dietary Fiber 3g | **11%** |
| Soluble Fiber 2g | |
| Insoluble Fiber 1g | |
| Total Sugars 1g | |
| **Protein** 7g | |
| | |
| Vitamin D 0mcg | 0% |
| Calcium 12mg | 0% |
| Iron 2mg | 10% |
| Potassium 118mg | 2% |
| Thiamin 0.5mg | 40% |
| Riboflavin 0.2mg | 15% |
| Niacin 5mg | 30% |
| Folate 199mcg DFE (112mcg folic acid) | 50% |

Not a significant source of added sugars.

* The % Daily Value tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice.

INGREDIENTS: SEMOLINA (WHEAT), DURUM WHEAT FLOUR.

VITAMINS/MINERALS: VITAMIN B3 (NIACIN), IRON (FERROUS SULFATE), VITAMIN B1 (THIAMINE MONONITRATE), VITAMIN B2 (RIBOFLAVIN), FOLIC ACID.

CONTAINS WHEAT INGREDIENTS.

THIS PRODUCT IS MANUFACTURED ON EQUIPMENT THAT PROCESSES PRODUCTS CONTAINING EGGS.

Barilla America, Inc. Northbrook, IL 60062 Made in the U.S.A. with U.S.A. and imported ingredients.

**Call 1-800-922-7455 with any comments or questions.**

20

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q_EXAMINE.

Were you able to examine the product?

- o   Yes
- o   No

**NO TERMINATIONS**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Next, we want to know what you understand some of the statements on the packaging to be communicating.

We will show you some possible ways that people might or might not understand the meaning of statements on the packaging.

We want you to tell us whether you think the packaging <u>does</u> communicate that meaning or whether you think the packaging <u>does not</u> communicate that meaning, or answer "Don't know/not sure" if you do not have an opinion.

Because we want you to take your time, you might need to wait a few seconds before being able to advance to the next question.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

21

CP_1 THRU CP_3:

- RANDOMIZE THE ORDER OF THE CP_1 thru CP_3 QUESTIONS;
- 10-SECOND SPEED BUMP FOR EACH QUESTION
- MEASURE THE LENGTH OF TIME SPENT ON EACH SCREEN FOR EACH CP* QUESTION
- RANDOMIZE THE ORDER OF THE RESPONSE OPTIONS AND KEEP FIXED FOR EACH RESPONDENT.  THAT IS, FOR A RANDOM HALF OF THE RESPONDENTS, THE TOP REPONSE OPTION IS ALWAYS: THE STATEMENT <u>DOES</u>   THIS.   FOR THE OTHER HALF OF THE RESPONSE OPTIONS, THE TOP RESPONSE OPTION IS ALWAYS: THE STATEMENT DOES NOT COMMUNICATE THIS.
- ANCHOR "DON'T KNOW/NOT SURE"
- RESPONDENTS HAVE THE OPTION TO CLICK ON THE THUMBNAIL IMAGES TO VIEW ENLARGED IMAGE IN THE POP-UP

22

[SINGLE_SELECT.]

CP_1A.
**[RANOMLY ASSIGN TO VERSION 1 (200 responses)]**

This question is about your understanding of this statement on the packaging:



Do you or do you not believe this statement communicates the following meaning, or do you not have an opinion?

**<u>The product's ingredients are sourced from Italy</u>.**

[BLANK ROW]
Please select one.
o The statement does communicate this
o The statement does not communicate this
o Don't know / not sure

CP_1B.
**[RANOMLY ASSIGN TO VERSION 2 (400 responses)]**

This question is about your understanding of this statement on the packaging:



Do you or do you not believe this statement communicates the following meaning, or do you not have an opinion?

23

**The brand is the largest selling pasta in Italy**.

[BLANK ROW]

Please select one.

o The statement does communicate this

o The statement does not communicate this

o Don't know / not sure

**[RANOMLY ASSIGN TO VERSION 3 (400 responses) HALF SEE BELOW AND HALF SEE RELABEL ON NEXT PAGE]**

CP_1C.

This question is about your understanding of this statement on the packaging:



Do you or do you not believe this statement communicates one or both of the following meanings, or do you not have an opinion? **[Randomize Meaning A and Meaning B]**

**Meaning A: <u>The brand is the largest selling pasta in Italy</u>**

**Meaning B: <u>The product's ingredients are sourced from Italy.</u>**

[BLANK ROW]

**Meaning A: <u>The brand is the largest selling pasta in Italy.</u>**

Please select one.

o The statement does communicate meaning A

o The statement does not communicate meaning A

o Don't know / not sure

[BLANK ROW]

**Meaning B: <u>The product's ingredients are sourced from Italy.</u>**

24

Please select one.

o The statement does communicate meaning B

o The statement does not communicate meaning B

o Don't know / not sure

CP_1Calt

This question is about your understanding of this statement on the packaging:



Do you or do you not believe this statement communicates one or both of the following meanings, or do you not have an opinion? **[Randomize Meaning A and Meaning B]**

**Meaning A:** <u>**The product's ingredients are sourced from Italy.**</u>

**Meaning B:** <u>**The brand is the largest selling pasta in Italy.**</u>

[BLANK ROW]

**Meaning A:** <u>**The product's ingredients are sourced from Italy.**</u>

Please select one.

o The statement does communicate meaning A

o The statement does not communicate meaning A

o Don't know / not sure

[BLANK ROW]

**Meaning B:** <u>**The brand is the largest selling pasta in Italy.**</u>

Please select one.

o The statement does communicate meaning B

o The statement does not communicate meaning B

o Don't know / not sure

25

[PLACE RELABEL VERSION IN DIFFERENT VARIABLES, SO WE CAN EASILY SEE WHICH LABELING EACH RESPONDENT SAW]

[SINGLE_SELECT.]

CP_2.

This question is about your understanding of this statement on the packaging:



Do you or do you not believe this statement communicates the following meaning, or do you not have an opinion?

<u>**The product's ingredients are sourced from non-GMO plants.**</u>

[BLANK ROW]

Please select one.
- o  The statement <u>does</u> communicate this
- o  The statement <u>does not</u> communicate this
- o  Don't know / not sure

[SINGLE_SELECT]


CP_3.

This question is about your understanding of this statement on the packaging:



Do you or do you not believe this statement communicates the following meaning, or do you not have an opinion?

**<u>The company making this product received a certification for using non-GMO ingredients.</u>**

[BLANK ROW]

Please select one.
- o   The statement does communicate this
- o   The statement <u>does not</u> communicate this
- o   Don't know / not sure

## FINAL QUESTIONNAIRE SECTION

**[POST CONSUMER PERCEPTION PART OF THE SURVEY**

**SHOW THIS FINAL QUEX MODULE TO ALL RESPONDENTS COMPLETING CONSUMER PERCEPTION QUESTIONS]**

-------------------------------------------------------------------------------------------

NEW SCREEN:

Thanks for your answers.  You are almost done!
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

[SP]

CP_BASIS.

When answering the questions about your understanding of the packaging, did you or did you not base your answers on the packaging we showed you in the survey?

       o   Yes, my answers <u>are based</u> on the packaging shown in the survey
       o   No, my answers <u>are not based</u> on the packaging shown in the survey

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - .

[SP]

P_COUNTY.

To help us group your responses with those of others, please select the COUNTY in California where you are a resident.

DROP DOWN PICK LIST OF CALIFORNIA COUNTIES, INCLUDING A 'Don't Know' option at the bottom of the list]

---

Alameda County

Alpine County

Amador County

Butte County

Calaveras County

Colusa County

Contra Costa County

Del Norte County

El Dorado County

Fresno County

Glenn County

Humboldt County

Imperial County

Inyo County

Kern County

Kings County

Lake County

Lassen County

Los Angeles County

Madera County

Marin County

Mariposa County

Mendocino County

Merced County

Modoc County

Mono County

Monterey County

Napa County

Nevada County

Orange County

Placer County

Plumas County

Riverside County

Sacramento County

San Benito County

San Bernardino County

San Diego County

San Francisco

San Joaquin County

San Luis Obispo County

San Mateo County

Santa Barbara County

Santa Clara County

Santa Cruz County

Shasta County

Sierra County

Siskiyou County

Solano County

Sonoma County

Stanislaus County

Sutter County

Tehama County

Trinity County

Tulare County

Tuolumne County

Ventura County

Yolo County

Yuba County

DON'T KNOW

---

[SP]

RUCA.

Which of the descriptions below best describes the area where you live? Please select one.

- A large metropolitan area (over 1 million people)
- A large city (100,000 up to 1 million people)
- A small city or town (10,000 up to 100,000 people)
- A very small town or rural area (under 10,000 people)
- Not sure

SINGLE SELECT.

GROCERY_SHOP_FREQ.

**In a typical week over the past three (3) months**, how often would you say that you visited a grocery store to purchase groceries?  Please include both online purchases and purchases at actual brick and mortar stores.  Please make your best estimate.

- o  Less than once a week
- o  Once a week
- o  2 to 3 times a week
- o  4 or more times a week
- o  Don't know / not sure

**NO TERMINATIONS**

32

---------------------------------------------------------

[SP. KEEP RESPONSE OPTIONS IN THE SHOWN ORDER. SINGLE SELECT.]

PRIMARY.

Are you the **primary** purchaser of **pasta-type products** in your home, or not?

- Yes, I am
- No, I am not
- Hard to say

---------------------------------------------------------

MULTI-SELECT. RANDOMIZE RESPONSE OPTIONS; ANCHOR "STORE BRAND" 'SOMETHING ELSE' 'NONE OF THESE']

BRAND.

Please select any **PASTA product brands** you purchased **in the last 12 months**. (Please select all that apply.)

- o   Barilla
- o   Banza
- o   DeCecco
- o   Garofalo
- o   Ronzoni
- o   Rao's
- o   Mueller's
- o   Creamette
- o   Buitoni
- o   Skinner
- o   San Giogrio
- o   Rana
- o   Sylvain's Spaghetti
- o   Store Brand/Private Label                    [ANCHOR]
- o   Something else [ANCHOR]
- o   None of these                                [ANCHOR / EXCLUSIVE]

------------------------------------------------------

[SP. KEEP RESPONSE OPTIONS IN THE SHOWN ORDER. SINGLE SELECT.]

FIRST_PURCH.

Please indicate **when** you made your **first purchase** of a pasta-type product or select "Never purchased" or "Don't know / not sure."

- o   In the past 12 months
- o   1 to 5 years ago
- o   More than 5 years ago
- o   Never purchased [ANCHOR]
- o   Don't know / not sure  [ANCHOR]

34

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

[ASK IF FIRST_PURCH NOT EQUALS 'NEVER PURCHASED…"

SINGLE SELECT] HOW_FREQ_PURCH.

How would you describe yourself as a purchaser of **pasta-type** products?

I purchase pasta-type products …

- o   A great deal
- o   A moderate amount
- o   Occasionally
- o   Rarely
- o   Never
- o   Don't know / not sure

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Which of the following reasons are most important to you when deciding which pasta brand to buy? Select all that apply. [RANDOMIZE]

**[SHOW Features IN THE TABLE BELOW WITH A TICK. ADD "OTHER:____" IN THE END OF THE LIST.]**

| REASON | TICK |
|---|---|
| Price | |
| Available shape(s) | |
| Made in Italy | |
| Made in USA | |
| Innovative brand | |
| Good value | |
| Good for everyday use | |
| Quality of the pasta | |
| Has a great taste | |
| Brand name | |
| Healthy choice | |
| High quality ingredients | |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**[From the table above, in the following only present the features the respondent has chosen and in the random order. CONSTANT SUM QUESTION.  DYNAMIC DISPLAY OF SUM. DO NOT ALLOW RESPONDENT TO LEAVE SCREEN UNTIL 100 IS THE SUM.  If only one item selected above auto fill 100 for question below.]**

Next, we would like to understand how important each of these reasons is to you when deciding which pasta brand to buy.  Please allocate 100% across the reasons by putting a number between 0 and 100 for each reason, such that the percentages for all chosen reasons add up to exactly 100%.  Enter the most points for the reasons you care about the most and the fewest points for reasons you care about the least.

|          | Enter number to Total to 100% |
|----------|-------------------------------|
| Reason 1 |                               |
| Reason 2 |                               |
| …        |                               |
| Reason N |                               |
| TOTAL    | ###                           |

**Is there any other feedback you would like to share with us about this survey?**

**(This question is optional. Please do not respond with any personally identifiable information.)**

**FINAL SIGN OFF SCREEN**

**Those are all of our questions, you have completed the survey. Thank you for participating in this online study.**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# APPENDIX B
# PRICING DATA AND ANALYSIS

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Circana Data



As stated by Barilla's Interrogatory response, all products at issue had the label in question, but only Barilla's Classic Blue Box products had the label removed.[4] Additionally, Barilla's

---

[1] Interrogatory 2 from Defendant Barilla America, Inc.'s First Supplemental Objections and Responses to Plaintiffs' Interrogatories, Set 1, Matthew Sinatro et al. v. Barilla America, Inc. (Aug. 15, 2023).
[2] Id.
[3] Id, pp. 9-10.
[4] Id, p. 14. See e.g., "Barilla further responds that the 'Prior Visual Identity' packaging was used during the RELEVANT PERIOD for all PRODUCTS and continues to be used for those PRODUCTS that do not list bates labels for a "New Visual Identity" in the above table."

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Interrogatory response states that products with the New Visual Identity (i.e., products with the label removed) "started becoming available to consumers in October 2022 and that 80% of the New Visual Identity products were available for sale to consumers at retailers by February 2023."[5]

---

[5] Id, p. 16.

**Attachment 1
Curriculum Vitae**



**ROBIN A. CANTOR, PH.D.**
BERKELEY RESEARCH GROUP, LLC
1800 M Street NW, Suite 200 | Washington, DC 20036

Direct: 202.448.6729
rcantor@thinkbrg.com

**SUMMARY**

Dr. Robin Ann Cantor is a managing director in Berkeley Research Group's Washington, DC, office. She has a Ph.D. in economics from Duke University and a B.S. in mathematics from Indiana University of Pennsylvania. Dr. Cantor has more than 30 years of experience in environmental, health, and energy economics, applied economics, statistics, risk management, and health and insurance claims analysis.

Before joining BRG, Dr. Cantor led practice groups at Exponent, Inc., and Navigant Consulting; and assisted companies and financial institutions with analysis to better understand environmental, health, and other product liability exposures. She has also acted as a principal and managing director of the Environmental and Insurance Claims Practice at LECG, LLC; and program director for Decision, Risk, and Management Sciences, a research program of the National Science Foundation; and held senior research appointments at Oak Ridge National Laboratory.

Dr. Cantor held a faculty appointment in the graduate part-time program in engineering of the Johns Hopkins University. She was president of the Society for Risk Analysis in 2002, and from 2001 to 2003 served as an appointed member of the Research Strategies Advisory Committee of the U.S. Environmental Protection Agency's Science Advisory Board. Dr. Cantor is a fellow of the Society for Risk Analysis and past president of the Women's Council on Energy and the Environment. She also serves or has served on science review and advisory boards for the Climate and Energy Decision Making Center at Carnegie Mellon University, Johns Hopkins University's graduate part-time program in Environmental Engineering, Science, and Management, the National Academies of Sciences, the National Center for Environmental Decision Making Research, Carnegie Council for Ethics in International Affairs, National Oceanic and Atmospheric Administration, National Academy of Public Administration, and Center for International Earth Science Information Network.

Dr. Cantor's consulting practice focuses on economics at the interface of science and technology. Many of her projects involve evidence-based economic analysis used in litigation support, expert testimony, risk assessment, and other advisory services addressing energy, environmental, and health issues Dr. Cantor's testimonial experience includes analysis of market share theories of product liability, fair market compensation in eminent domain matters, healthcare reimbursement, economic damages, product liability estimation in bankruptcy matters and insurance disputes, asbestos settlements, premises and product claims, cost contribution allocation in Superfund disputes, derailment risks, reliability of statistical models and estimation methods, and class certification issues.

Dr. Cantor has prepared expert reports that address economic issues in healthcare and energy markets, antitrust, commercial practices and contracts, intellectual property, employment discrimination, false advertising, regulation, and other areas of product and market analysis. Dr. Cantor has submitted analysis, testimony, and affidavits in federal arbitration, regulatory and Congressional proceedings, and state and federal courts. Her publications include refereed journal articles, book chapters, expert reports,



reports for federal sponsors, a book on economic exchange under alternative institutional and resource conditions, and an edited book on product liability published by the American Bar Association.

**EDUCATION**

Ph.D., Economics     Duke University, 1985
Dissertation: An Analysis of Public Costs and Risks in the Canadian Nuclear Industry.
B.S., Mathematics     Indiana University of Pennsylvania, 1978

**PREVIOUS POSITIONS**

Principal Scientist, Exponent, Inc. 2008–2013

Managing Director, Navigant, 2004–2008

Lecturer, Graduate Program, Johns Hopkins University, Engineering and Applied Science Programs for Professionals, Program in Environmental Engineering, Science and Management, 1996–2019

Principal and Managing Director, LECG, 1999–2004

Senior Managing Economist, LECG, 1999

Managing Economist, LECG, 1996–1998

Member, U.S. Environmental Protection Agency, Science Advisory Board, Research Strategies Advisory Committee, 2001–2003

Program Director, Decision, Risk, and Management Science, National Science Foundation, 1992–1996

Coordinator, NSF Human Dimensions of Global Change, 1992–1996

Project Manager, Oak Ridge National Laboratory, 1990–1991

Technical Assistant to the Associate Director, Advanced Energy Systems, Oak Ridge National Laboratory, 1989–1990

Group Leader, Social Choice and Risk Analysis Group, Energy and Economic Analysis Section, Oak Ridge National Laboratory, June 1987–1989

Research Staff, Energy and Economic Analysis Section, Oak Ridge National Laboratory, Oak Ridge National Laboratory, October 1982–1987

Consultant, Indonesian Energy Project, Harvard Institute for International Development, July 1987

Visiting instructor, North Carolina Central University, Spring 1982



**PROFESSIONAL HONORS**

Society for Risk Analysis Outstanding Practitioner Award, 2022
Who's Who Legal: Competition Economists 2022
Women We Admire: The Top 50 Women Leaders of DC for 2022
Who's Who Legal: Experts - Financial Advisory and Valuation – Quantum of Damages 2022
Consulting Magazine: Excellence in Leadership, 2021
Who's Who Legal: Insurance & Reinsurance Expert Witnesses 2015 - 2023
President, Women's Council on Energy and the Environment, 2015 - 2017
Society for Risk Analysis Presidential Recognition Award, 2008
Fellow, Society for Risk Analysis, 2002
President, Society for Risk Analysis, 2002
Society for Risk Analysis Outstanding Service Award, 1999
NSF Director's Award for Superior Accomplishment, 1996
NSF Special Act Award, 1995
NSF Director's Award for Program Officer Excellence, 1994
Oak Ridge National Laboratory Significant R&D Accomplishment Award, 1993
YWCA Tribute to Women Award for Business and Industry, 1990
Martin Marietta Special Achievement Award, 1990
Martin Marietta Special Achievement Award, 1989
Martin Marietta Energy Systems Significant Event Award, 1988
C.B. Hoover Scholar, 1980–1981
Mellon Fellowship, 1978–1981


**PUBLICATIONS**

Brody, N., Cantor, R., Sexton, S., Bista, S. The Expanding Economic Scope of Exposure to Claims of Greenwashing. In: International Comparative Legal Guides: Class & Group Actions 2024, Global Legal Group, 2023.

Cantor, R., Klenk, J., Langenfeld, J., Ring, C. United States - Economist's Perspective: Class actions – litigation, policy and latest developments. Global Competition Review, December, 2022.

Abshier, D., Brody, N., Cantor, R., Tosic, D. Emerging Areas of Group and Class Actions Related to ESG Disclosures. In: International Comparative Legal Guides: Class & Group Actions 2023, Global Legal Group, 2022.

Cantor, R., Bates, H. and MacKoul, C., Risk Attenuation and Amplification in the U.S. Opioid Crisis. Risk Analysis. First published 2021. *Risk Analysis,* Vol. 42, Issue 7, July 2022, 1393-1408, https://doi.org/10.1111/risa.13840

Cantor, R., Groehn, A., Meer, S., Nordby, K.L., Monitoring and the Status of Uninjured Plaintiffs in Class Actions. In: International Comparative Legal Guides: Class and Group Actions 2022, Global Legal Group, 2021.



Cantor, R., Daley, P., Klenk, J. Defining and Measuring Damages in "No-Injury" Class Actions. In: International Comparative Legal Guides: Class and Group Actions 2020, Global Legal Group, 2019.

Cantor, R., Klenk, J. Economic Analysis of Class Certification. In: International Comparative Legal Guides: Class and Group Actions 2019, Global Legal Group, 2018.

Meer S, Mackoul C, Cantor RA. "Payment Card Data Breach Class Actions: Who Foots the Bill?" *Commercial and Business Litigation*, Section of Litigation, American Bar Association, Fall 2017, Vol. 19, Issue 1.

Cantor, R. et al. *Amicus Curiae* brief submitted to the U.S. Supreme Court in the matter of *Tyson Foods, Inc. v. Bouaphakeo et al.* (No. 14-1146), September 29, 2015.

Cantor, R., Jordan, J. NYC ban on polystyrene foam misses a market opportunity. Law360, June 01, 2015.

Cantor R, Cross P, Lau E, Schmier J.  Bias in relative accuracy metrics.  Proceedings, 1st Annual World Conference of the Society for Industrial and Systems Engineering.  Fernandez JE, Santos DL, Subramanian A, Schmeidler N, Ware BR, Kumar AR (eds), Washington, DC, 2012:45-50.

Cantor, RA.  Product Liability.  In: Leadership in Science and Technology:  A Reference Handbook.  Bainbridge WS (ed), Sage Publications Inc: Thousand Oaks, CA, 2012:281–288.

Menzie C, Cantor R, Boehm P.  Business planning for climate change:  Identifying vulnerabilities and planning for changes in water, temperature, sea level, natural resources, health effects, and extreme events.  Environmental Claims Journal 2011; 23(3–4):190–198.

Cantor RA (ed.).  Product Liability.  ABA Publishing: Chicago IL, 2011.

Cantor RA, Lyman M, Reiss R.  Asbestos claims and litigation.  In:  Product Liability.  Cantor RA (ed), ABA Publishing: Chicago IL, 2011:125–145.

Review Committee (Cantor RA – member).  Review of the Department of Homeland Security's approach to risk analysis.  National Research Council, The National Academies Press: Washington, D.C., 2010.

Cantor RA, Gunaseelan P, Vopelius J, Bandza A.  Creating and financing the next-generation carbon offset project:  An application to carbon capture and storage.  In: Energy and Environmental Project Finance Law and Taxation: New Investment Techniques.  Kramer AS, Fusaro PC (eds), Oxford University Press, 2010:15–38.

Cantor RA, Lyman M, Reiss R.  Asbestos claims and litigation.  John Liner Rev 2009; 23(2): 28–38.

Cantor RA, Hlavin A, Katofsky R, McDonald C.  Current perspectives on trading environmental attributes.  In:  Energy and Environmental Trading:  U.S. Law and Taxation.  Kramer A, Fusaro P (eds), Cameron May, 2008; 183–235.

4



Cantor RA.  Enterprise risk management perspectives on risk governance.  In:  Global Risk Governance:  Concept and Practice using the IRGC Framework.  Renn O, Walker K (eds), Springer Press, 2008: 87–91.

Nieberding J, Cantor RA.  Price dispersion and class certification in antitrust cases:  An economic analysis.  J Legal Econ 2007; 14(2):61–84.

Bunting C, Renn O, Florin M-V, Cantor RA.  Introduction to the IRGC risk governance framework.  John Liner Rev 2007; 21(2):7–26.

Cantor RA, Lyman M.  Asbestos and state tort reforms.  John Liner Rev 2007; 20(4):39–45.

Cantor RA, Cook M, Lyman M.  Is the end in sight?  Global Reinsurance 2006; September, 45–46.

Cantor RA, Cook M, Lyman M.  After the FAIR Act.  Run Off Business 2006; 17:34–36.

Cantor RA, Cook M.  A chink in the FAIR Act.  Global Reinsurance 2006; April, 9.

Morgan MG, Cantor RA, Clark B, Fisher A, Jacoby J, Janetos T, Kinzing, Melillo J, Street R, Wilbanks T.  Learning from the U.S. national assessment of climate change impacts.  Environ Sci Technol 2005; October.

Nieberding J, Cantor RA.  Price dispersion, the "Bogosian Short Cut," and class certification in antitrust cases.  ABA Antitrust Law, Economics Committee Newsletter 2004; 4(1):5–9.  Also reprinted in Texas Business Litigation 2005; 23–25.

Zimmerman R, Cantor RA.  State of the art and new directions in risk assessment and risk management:  Fundamental issues of measurement and management.  In:  Risk Analysis and Society:  An Interdisciplinary Characterization of the Field.  McDaniels TL, Small MJ (eds), Cambridge University Press, 2004.

Cantor RA.  Introduction to the 2001 best paper special issue.  Risk Anal 2003; 23(6):1209–1210.

Adams GD, Cantor RA.  Risk, stigma, and property values:  What are people afraid of?  pp. 175–186.  In:  Risk, Media and Stigma.  Flynn J, Kunreuther H, Slovic P (eds), pp. 175–186, Earthscan Publications, Ltd., 2001.

Cantor RA, Rayner S, Henry S.  Markets, distribution & exchange after societal cataclysm, Books for Business, December 2000.

Cantor RA.  Discussion paper on net environmental benefits assessment for restoration projects after oil spills, or some reflections on the decision process.  pp. 145–152.  In:  Restoration of Lost Human Uses of the Environment.  Cecil G (ed), SETAC Press, 1999.

Cantor RA, Yohe G.  Economic analysis.  pp. 1–93.  In:  Human Choice and Climate Change:  An International Assessment, Volume 3:  Tools for Policy Analysis.  Rayner S, Malone EL (eds), Battelle Press, 1998.



Cantor RA (contributor), Jaeger CC, Renn O, Rosa EA, Webler T, McDonell G, Sergen G (eds.) Decision analysis.  pp. 141–2216.  In:  Human Choice and Climate Change:  An International Social Science Assessment State of the Art Report, Volume 3.  Rayner S, Malone EL (eds), Battelle Press, 1998.

Cantor RA.  Rethinking risk management in the federal government.  Ann Am Acad Political Social Sci 1996; 545:135–143.

Cantor RA.  Estimating externalities of coal fuel cycles, Lee R (ed.), Report 3, Utility Data Institute, McGraw-Hill, Washington, DC, 1994.

Cantor RA, Rayner S.  Changing perceptions of vulnerability.  In:  Industrial Ecology and Global Change.  Socolow R, Andrews C, Berkhout F, Thomas V (eds), Cambridge University Press, 1994.

Cantor RA, Schoepfle M.  Risk, rationality, and community:  Psychology, ethnography, and transactions in the risk management process.  The Environmental Professional 1993; 15:293–303.

Cantor RA, Henry S, Rayner S.  Making markets:  An interdisciplinary perspective on economic exchange, Greenwood Press, Delaware, 1992.

Fulkerson W, Jones J, Delene J, Perry AM, Cantor RA.  The potential role of nuclear power in controlling $CO_2$ emissions.  In:  Limiting the Greenhouse Effect: Options for Controlling Atmospheric $CO_2$ Accumulation.  Pearman GI (ed), John Wiley and Sons, 1992.

Cantor RA, Schoepfle M, Szarleta E.  Sources and consequences of hypothetical bias in economic analysis of risk behavior.  In:  The Analysis, Communication, and Perception of Risk.  Garrick BJ, Gekler WC (eds), Plenum Press, New York, 1991.

Cantor RA.  Applying construction lessons to decommissioning estimates.  Energy J 1991; 12:105–117.

Cantor RA, Rizy C.  Biomass energy:  Exploring the risks of commercialization in the United States of America.  Bioresource Technol 1991; 35(1):1–13.

Cantor RA, Krupnick A, Rizy C.  Beyond the market:  Recent regulatory responses to the externalities of energy production.  pp. 51–61.  Proceedings, 1991 Conference of the National Association of Environmental Professionals, 1991.

Cantor RA, Rayner S.  Thinking the unthinkable:  Preparing for global disaster.  In:  New Risk: Issues in Management.  Ricci P (ed), Plenum Press, New York, 1990.

Cantor RA, Jones D, Lieby P, Rayner S.  Policies to encourage private sector responses to potential climate change.  In:  Energy Markets in the 1990s and Beyond.  Finizza A, Weyant JP (eds), IAEE, Washington, DC, 1989.

Cantor RA, Hewlett J.  The economics of nuclear power:  Some new evidence on learning, economies of scale, and cost estimation.  Resources Energy 1988; 10:315–335.



Rayner S, Cantor RA.  Quand le risque acceptable est-it socialement justifie.  In :  La Societé Vulnerable, Fabiani J-L, Theys J (eds), Presses De L'École Normale Supérieure, Paris, 1987.

Cantor RA, Rayner S, Braid RB.  The role of liability preferences in societal technology choices:  Results of a pilot study.  In:  Risk Assessment and Management.  Lave L (ed), Plenum Press, New York, 1987.

Rayner S, Cantor RA.  How fair is safe enough?  The cultural approach to societal technology choice.  Risk Anal 1987; 7(1):3–9.

Cantor RA, Rayner S.  The fairness hypothesis and managing the risks of societal technology choices.  ASME, paper 86-WA/TS-5, December 1986.

Cantor RA.  Regulatory trends and practices related to nuclear reactor decommissioning.  In:  The Energy Industries in Transition 1985–2000.  Weyant JP, Sheffield DB (eds), IAEE, Washington, DC, 1984.


## OTHER PUBLICATIONS

Cantor RA, Bremser A. Market share liability from an economics perspective. The BRG Review 2014; 4(1): 4-9.

Shifrin N, Cantor RA. The Safety of Chemical Products. The BRG Review 2014; 4(1): 10-16.

Cantor RA, Menzie C.  Seeing the forest through the trees:  NRD and dynamic ecosystems.  ABA Toxic Torts and Environmental Law Committee Newsletter; 2012; Winter.

Cantor RA, Patrick B.  Commercialization of nanotechnology:  Enterprise risk management issues.  Background Paper presented to the ABA Section of Environment, Energy, and Resources Nanotechnology Panel, 36th Annual Conference on Environmental Law, Keystone, CO, March 8–11, 2007.

Cantor RA, Zimmerman R.  First World Congress on Risk "Risk and Governance" conference highlights.  RISK Newsletter 2003; 23(4):1–10.

Cantor RA.  Risk analysis in an interconnected world.  RISK Newsletter 2001; 21(3):1–3.

Cantor RA, Zimmerman R.  Risk and governance:  An international symposium.  RISK Newsletter 2001; 21(1):20–21.

Cantor RA.  Book review of Public Reactions to Nuclear Waste by Riley E. Dunlap, Michael E. Kraft, and Eugene A. Rosa.  Science 1994; 266:145.

Cantor RA.  News from Washington.  Human Dimensions Quarterly 1994; 1(2):20–21.



Cantor RA.  Book review of The Risk Professionals by Thomas M. Dietz and Robert W. Rycroft. Environmental Professional 1989; 11(4):458–459.

Cantor RA.  Decommissioning:  The Next chapter in the nuclear saga.  FORUM 1988; 3(3):105–106.

## TECHNICAL MANUSCRIPTS

Cantor RA, Berman E, Jordan J. Assessment of Economic Impacts of the Proposed Hawai'i Dairy Farms Facility, July 2016.

Menzie C, Cantor RA, Boehm P, Bailey JR.  An approach to business vulnerability and risk assessments related to climate change.  SPE Paper Number SPE-127083-PP, November, 2009.

Analysis of the Estimated Production Cost Savings from Replacing the Dollar Note with the Dollar Coin.  Final report of analysis submitted to Congressional Record, June 12, 2000 (with Jessica B. Horewitz and Robert N. Yerman).

Rebuttal Verified Statement with Gordon C. Rausser for CSX Corporation and CSX Transportation, Inc., Norfolk Southern Corp., and Norfolk Southern Railway Co., Control and Operating Leases/Agreements, Conrail Inc. and Consolidated Rail Corp., Railroad Control Application, Applicants' Rebuttal Vol. 2B of 3, December, 1997.

Community Preferences and Superfund Responsibilities.  Prepared for the USEPA under Interagency Agreement 1824-B067-A1 with Oak Ridge National Laboratory, August 1993.

The U.S.-EC Fuel Cycle Study: Background Document to the Approach and Issues.  Oak Ridge National Laboratory, ORNL/TM-2500, November, 1992 (with L. W. Barnthouse, D. Burtraw (Resources for the Future), G. F. Cada, C. E. Easterly, A. M. Freeman (Bowdoin College), W. Harrington (Resources for the Future), T.D. Jones, R. L. Kroodsma, A. J. Krupnick (Resources for the Future), R. Lee, H. Smith (DOE), A. Schaffhauser, and R. S. Turner).

What are the Problems of Equity and Legitimacy Facing a Management Strategy for the Global Commons?  Managing the Global Commons:  Decision Making and Conflict Resolution in Response to Climate Change, Oak Ridge National Laboratory, ORNL/TM-11619, July, 1990 (with Roger Kasperson in Steve Rayner, Wolfgang Naegeli, and Patricia Lund).

Markets, Distribution, and Exchange after Societal Cataclysm, Oak Ridge National Laboratory, ORNL-6384, November 1989 (with S. Rayner and S. Henry).

Information.  Chapter 5 of A Compendium of Options for Government Policy to Encourage Private Sector Responses to Potential Climate Change, DOE/EH-0102, Report to Congress, October, 1989 (with G. G. Stevenson and P. J. Sullivan).

Agriculture and Forestry.  Chapter 10 of A Compendium of Options for Government Policy to Encourage Private Sector Responses to Potential Climate Change, DOE/EH-0102, Report to Congress, October, 1989 (with W. Naegeli and A. F. Turhollow, Jr.).



Evaluation of Implementation, Enforcement and Compliance Issues of the Bonneville Model Conservation Standards Program, Vol. I and II, ORNL/CON-263, July 1989 (with Steve Cohn).

Gas Furnace Purchases:  A Study of Consumer Decision Making and Conservation Investments. ORNL/TM-10727, October 1988 (with David Trumble).

An Analysis of Nuclear Power Plant Construction Costs.  DOE/EIA-0485, 1986 (with J. G. Hewlett and C. G. Rizy).

Nuclear Reactor Decommissioning:  A Review of the Regulatory Environments.  ORNL/TM-9638, 1986.

Nuclear Power Options Viability Study, Vol. I, Executive Summary, ORNL/TM-9780/1, 1986 (with D. B. Trauger et al.).

Nuclear Power Options Viability Study, Vol III, Nuclear Discipline Topics.  ORNL/TM-9780/3, 1986 (with D. B. Trauger et al.).

Clinch River Breeder Reactor:  An Assessment of Need for Power and Regulatory Issues, ORNL/TM-8892, September 1983 (with D. M. Hamblin et al.).


## SELECTED PRESENTATIONS

Cantor, R., Fine, M. ESG: Opportunities and Challenges for Health Care Organizations. American Health Law Association, Speaking of Health Law podcast, June 2, 2023.

Cantor, R., Bista, S. The Social Cost of Carbon: Insights from the Private Sector, Society for Risk Analysis, 2022 Annual Meeting, Tampa, FL, December 4-8, 2022.

Cantor, R., Tosic, D. COVID Conversations on Risk: Insights into reopening the economy. Society for Risk Analysis, Let's Talk Risk podcast, May 15, 2020.

Cantor, R., Citera, F., Daley, P. The COVID-19 Class Action, May 20, 2020 BRG Webinar.

Cantor R., Evidentiary reliability of alternative methodologies in support of class certification for product liability, mislabeling, and failure to warn litigation. Society for Risk Analysis, 2019 Annual Meeting, Arlington, VA, December 8-12, 2019.

Cantor R., Bates H., Mackoul, C. Economic Origins of the Opioid Crisis, Society for Risk Analysis, 2018 Annual Meeting, New Orleans, LA, December 2-6, 2018.

Cantor R, Bates H. Statistical Origins of the Opioid Crisis, Invited presentation, PLAC 2018 Spring Conference, Washington DC, April 11-13, 2018.

Cantor R. Survey Methodology and the Science of Risk: Limitations and future directions, Society for Risk Analysis-Europe, 2017 Annual Meeting, Lisbon, PT, June 18-21, 2017.



Cantor R. Alternative Dispute Resolution to Mass Claims, 1st Annual Class Action Money & Ethics Conference, New York City, May 1, 2017.

Cantor R, Cross P, Mackoul C. Challenges to product labeling: Consumer protection or opportunism? Society for Risk Analysis, 2016 Annual Meeting, San Diego, CA, December 11–14, 2016.

Cantor R, The role of the economist, ABA Section on Antitrust Law, Seminar and Teleconference, Class Action Fundamentals for Antitrust Litigators, Washington, DC, May 5, 2016.

Cantor R, Meer, S, Tyler, C.  What drives physician testing for pain medication compliance—risk or reward?  Society for Risk Analysis, 2014 Annual Meeting, Denver, CO, December 7–11, 2014.

Schmier J, Cross P, Cantor R, Lau E, Steffey D, Watson W.  Bias in relative accuracy metrics. International Poster Presentation at the Society of Pharmacoeconomics and Outcomes Research 18th Annual International Meeting, New Orleans, LA, May 18–22, 2013.

Cantor RA.  Entrepreneurship vs. Philanthropy: What drives women in the workplace?  Women's Council on Energy and the Environment, Brown-bag Luncheon, Washington, DC, February 21, 2013.

Cantor RA.  The Future of Energy Policy in America.  Public Leadership Education Network, Women & Science & Technology Seminar, Washington, DC, January 8, 2013.

Cantor R, Schmier J, Hulme-Lowe C, Meer S.  What will it really cost?  Hidden indirect costs and countervailing risks in regulatory impact assessment.  Society for Risk Analysis, 2012 Annual Meeting, San Francisco, CA, December 9–12, 2012.

Cantor R, Schmier J, Levine J.  Climate change and human health:  A sleeping giant?  Society for Risk Analysis World Congress on Risk 2012: Risk and Development in a Changing World. Sydney, Australia, July 18–20, 2012.

Cantor R, Meer S.  Product liability:  An overview of the emerging issues.  Society for Risk Analysis World Congress on Risk 2012: Risk and Development in a Changing World, Sydney, Australia, July 18–20, 2012.

Cantor RA, Menzie CA, Bremser AW, Deardorff TL, Hulme-Lowe CK, Wickwire WT.  Seeing the forest through the trees:  NRD and dynamic ecosystems.  Poster Presentation at the Society for Risk Analysis, 2011 Annual Meeting, Charleston, SC, December 4–7, 2011.

Cantor RA.  Evaluating vulnerabilities and identifying emerging risks.  Invited presentation, The Conference Board EHS Legal Counsel Meeting, Houston TX, January 15–16, 2009.

Cantor RA.  Using exposure science to ascertain asbestos liabilities.  Invited CLE presentation, Business Valuation Resources, LLC Teleconference, November 18, 2008.



Cantor RA.  Weather and temperature:  Emerging health issues for US companies.  REBEX 2008, Wheeling IL, October 23–24, 2008.

Cantor RA.  Asbestos risk transfers:  Unlocking value by walling off asbestos liabilities.  Invited CLE session at Willkie Farr & Gallagher, New York, NY, June 4, 2008.

Cantor RA.  The future of asbestos—New techniques for unlocking value by selling liabilities to investors.  Mealey's™ Teleconference, March 25, 2008.

Cantor RA.  Update on other U.S. long-tailed product liabilities.  Invited presentation, 4th International Asbestos Claims & Liabilities Conference:  The Practical Guide to Litigating, Settling and Managing Asbestos Claims, London, January 30-31, 2008.

Cantor RA.  Tax or cap:  What are the real differences for carbon policy in the US?  Invited session and presentation, McDermott Will & Emery 10th Annual Energy Conference, Washington DC, October 9-10, 2007.

Cantor RA.  Managing nanotechnology's life cycle risks responsibly.  Invited ALI-ABA teleconference, June 27, 2007.

Cantor RA.  Carbon emissions—Planning for the change.  Invited teleconference, Environmental Law Network, June 15, 2007.

Cantor RA.  Liability estimation and the historical future.  Invited presentation, Mealey's™ Asbestos Bankruptcy Conference, Chicago, IL, June 7-8, 2007.

Cantor RA.  Renewables and the value proposition for carbon credits.  Invited presentation, McDermott Will & Emery 9th Annual Energy Conference, Washington DC, October 19-20, 2006.

Cantor RA.  The ABCs of the value proposition for carbon credits.  Invited presentation, the Environmental Trading Congress, New York, NY, July 24-25, 2006.

Cantor RA, Lyman M.  Liability estimation in U.S. bankruptcy cases.  London Underwriting Centre, London, UK, January 10, 2006.

Cantor RA, Lyman M.  The status of the FAIR Act.  London Underwriting Centre, London, UK, January 10, 2006.

Cantor RA.  Economic appraisal of ecological assets.  Invited presentation, U.S. Environmental Protection Agency Science Advisory Board "Science and the Human Side of Environmental Protection" Series, Washington, DC, July 6, 2002.

Cantor RA.  Scientists and Homeland Security—The relevance of risk analysis.  Invited presentation, Council of Scientific Society Presidents, Washington, DC, May 2002.

Cantor RA.  NRD rules and economics.  Invited presentation, Environmental and Admiralty Law Committees of the Association of the Bar of the City of New York, December 7, 2000.



Cantor RA.   Revealed preferences and environmental risks:   Lessons learned from two policy debates.  Annual Meetings of the Society For Risk Analysis, Phoenix, AZ, December 8, 1998.

Cantor RA.  Valuing environmental impacts:  Lessons learned from the natural resource damage debate.  Invited Paper, Society of Environmental Toxicology and Chemistry, 19th Annual Meeting, November 19, 1998.

Cantor RA.  How will climate change affect economics and politics?  Invited panel speaker, Policy and Politics of Climate Change, ABA Section of Natural Resources, Energy, and Environmental Law Fall Meeting, October 8, 1998.

Cantor RA.   Natural resource damage rules:   A search for the path of least resistance in value disputes?   George Washington University Seminar Series on Environmental Values and Strategies, September 1997.

Cantor RA.  Rethinking the science of risk management:  Changing paradigms of the process and function.  Operations and Information Management Department Workshop, Wharton School of the University of Pennsylvania, November 1995.

Cantor RA, Arkes H.  Interdisciplinary perspectives on experimental methods.  1995 Meetings of the American Economic Association, January 1995.

Cantor RA.  Risk management:  Four different views.  Invited presentation, The Conservation of Great Plains Ecosystems Symposium, April 1993.

Cantor RA.   Human dimensions of global change:   A white paper on the USGCRP research programs.  National Academy of Sciences Board on Global Change, November 1993.

Cantor RA, Rayner S.  Changing perceptions of vulnerability.  Invited paper, NCAR/UCAR Summer Institute on Industrial Ecology and Global Change, July 17-31, 1992.

Cantor RA.  Should economic considerations limit the conservatism of risk assessment?  Invited paper, Workshop of the International Society of Regulatory Toxicology and Pharmacology on Risk Assessment and OMB's Report on its Application in Regulatory Agencies, Washington, DC, June 11, 1991.

Cantor RA.   Beyond the market:   Recent regulatory responses to the externalities of energy production.   Annual Meetings of the National Association of Environmental Professionals, Baltimore, MD, April 30, 1991.

Cantor RA.  Understanding community preferences at Superfund sites.  National Meeting of EPA Community Relations Coordinators, Chicago, IL, April 4-6, 1990.

Cantor RA.   Methodological myths and modeling markets:   A common framework for analyzing exchange.  Second Annual International Conference on Socio-Economics, Washington, DC, March 1990.



Cantor RA, Schoepfle GM, Szarleta EJ.   Sources and consequences of hypothetical bias in economic analyses of risk behavior.  1989 Meetings of Society for Risk Analysis, October 1989.

Cantor RA, Jones D, Lieby P, Rayner S.   Policies to encourage private sector responses to potential climate change.  1989 Meetings of International Association of Energy Economists, October 1989.

Cantor RA, Szarleta EJ.   The experimental approach in public policy analysis: precepts and possibilities.  Public Choice Society and Economic Science Association Annual Meetings, Orlando, FL, March 17-19, 1989.

Cantor RA, Rayner S.  Global disaster management:  Developing principles for research.  1988 Meetings of the Association for Public Policy Analysis and Management, October 1988.

Cantor RA.  Implementation and enforcement issues from early adopter experience.  Regional Evaluation Network, Northwest Power Planning Council, Portland, OR, June 1988.

Cantor RA.  Using information from toxic-tort litigation to value the health and safety consequences of regulatory decisions.  Public Policy Workshop, the Department of Economics and Waste Management Research and Education Institute, University of Tennessee, Knoxville, TN, February 1988.

Cantor RA, Bishop R, Jr.  Valuing safety and health effects in regulatory decisions:  A revealed-preference approach.  1987 Annual Meeting of the Society for Risk Analysis, November 3, 1987.

Cantor RA.  Government intervention and technology prices:  The CANDU example.  Invited paper, WATTEC Conference, Knoxville, TN, February 19, 1987.

Cantor RA.  Fairness hypothesis and managing the risks of societal technology choices.  1986 Winter Annual Meeting of the American Society of Mechanical Engineers, Anaheim, CA, December 10-12, 1986.

Cantor RA.  A retrospective analysis of technological risk:  The case of nuclear power.  Invited paper, Center of Resource and Environmental Policy Workshop Series, Vanderbilt University, Nashville, TN, December 4, 1986.

Cantor RA, Petrich C, Mercier J-R.  Evaluation of a large-scale charcoal project in Madagascar:  Attacking the deforestation problem from the supply side.  1986 IAEE North American Conference, Cambridge, MA, November 19-21, 1986.

Cantor RA, Rayner S.  Tools for the job:  Choosing appropriate strategies for risk management.  1986 Annual Meeting of the Society for Risk Analysis, Boston, MA, November 9-12, 1986.

Cantor RA, Rayner S.  Thinking the unthinkable:  Preparing for global disaster.  1986 Annual Meeting of the Society for Risk Analysis, Boston, MA, November 9-12, 1986.



Cantor RA, Rayner S, Braid B.  The role of liability preferences in societal technology choices: Results of a pilot study.  1985 Annual Meetings of Society for Risk Analysis, Washington, DC, October 8, 1985.

## CONFERENCE PARTICIPATION

Co-Chair, Class Action Money & Ethics, Virtual Sessions, June 29-30, 2021. Organizer and moderator for session, Easily Found and Hard to Forget: Class Action and Forever Chemicals, June 29, 2021.

Co-Chair, Class Action Money & Ethics, Virtual Sessions, September 21-23, 2020. Organizer and moderator for session, No-Injury Class Actions, September 23, 2020.

Co-Chair, Class Action Money & Ethics, New York City, May 2018; May 2019.

Chair, Finance Committee "Fourth World Congress on Risk," Singapore, July 2015.

Invited panelist for "An Integrated Risk Framework for Gigawatt-Scale Deployments of Renewable Energy:  The Wind Energy Case Study," 2009 Annual Meeting for the Society for Risk Analysis, Baltimore, MD, December 9, 2009.

Invited session organizer and panelist for "Global Warming and Greenhouse Gas Controls:  What do they mean for you?"  2008 Annual Meeting of the National Association of Publicly Traded Partnerships, Washington DC, June 26, 2008.

Co-chair, "Second World Congress on Risk," Guadalajara, Mexico, June 2008.

Invited panelist for "Climate Litigation: The Next Asbestos or the Next Y2K?"  ABA Section of Litigation Annual Conference, Washington DC, April 17, 2008.

Invited panelist for "Business of Mitigation:  Carbon Offsets and Trading," Oxford University Capstone Conference, Oxford, UK, September 10, 2007.

Panelist for "Issues Concerning Implementation," at the Public Forum on OMB's Proposed Risk Assessment Bulletin:  Implications for Practice Inside and Outside Government, sponsored by Society for Risk Analysis, Society of Environmental Toxicology and Chemistry in North America, Society of Toxicology, and International Society of Regulatory Toxicology and Pharmacology.

Session Chair, "Challenges Facing Industrial Countries," with key-note speeches by Philippe Busquin, EU Commissioner for Research, and Dr. John Graham, Administrator of the US Office of Information and Regulatory Affairs, Inaugural Conference of the International Risk Governance Council, Geneva, Switzerland, June 29, 2004.

Co-Chair, "First World Congress on Risk," Brussels, Belgium, June 2003.

Chair of the Organizing Committee, 2001 Annual Meetings for the Society for Risk Analysis.



Member of the Organizing Committee, Risk and Governance Symposium, Society for Risk Analysis, June 2000.

Organizing Committee Member for the 1996, 1997, 1998, and 2002 Annual Meetings of the Society for Risk Analysis.

Panelist for Net Environmental Benefits Assessment for Restoration Projects after Oil Spills, Conference on Restoration for Lost Human Uses of the Environment, Washington, DC, May 1997.

Session Organizer and Chair for Cost Benefit Analysis and Risk Assessment at the 1996 Annual Meeting of the Society for Risk Analysis.

Panelist for Challenges in Risk Assessment and Risk Management sponsored by The Annenberg Public Policy Center of the University of Pennsylvania at the National Press Club, Washington, DC, May 16, 1996.

Panelist for Media and Risk in a Democracy: Who Decides What Hazards Are Acceptable?  At the 1995 Annual convention of the Association for Education in Journalism and Mass Communication.

Session Organizer and Co-Chair for Experimental Methods: Insights from Economics and Psychology at the 1995 Meetings of the American Economic Association.

U.S. Organizer for the Third Japan-U.S. Workshop on Global Change Modeling and Assessment: Improving Methodologies and Strategies, Hawaii, October 1994.

Cluster Organizer for three sessions on Competitiveness at the Fall Meeting of the Operations Research Society of America/The Institute of Management Sciences, 1994.

Roundtable Panelist for Risk Communication Research: Defining Practitioner Needs at the 1994 Meetings of the Society for Risk Analysis.

Workshop Organizer for Organizational Transformation and Quality Systems, National Science Foundation, 1993.

Session Chair and Organizer for the NSF/Private Sector Research Initiative Projects at the 1992 Meetings of the Society for Risk Analysis.

Roundtable Panelist for the EPA Session on Risk Communication at the 1990 Meetings of the Society for Risk Analysis.

Session Chair and Organizer for the Computer Assisted Market Institutions Session at the Advanced Computing for the Social Sciences Conference, April 1990.

Discussant for the Issues in LDC Public Finance Session at the 1988 Meetings of the American Economic Association.

Session Chair and Organizer for Social Science Innovations in Risk-Analysis Methods, Special Session at the 1988 Meetings of the Society for Risk Analysis.



**ADVISORY AND OTHER APPOINTMENTS**

Invited presentation, National Academies of Science, Engineering, and Medicine, Committee on Developing a Long-Term Strategy for Low-Dose Radiation Research in the United States, October 27, 2021.

Member, NGOs and University Pillar, Dentons Smart Cities & Connected Communities Think Tank, 2018-present.

Advisory Board Member, Climate and Energy Decision Making Center, Carnegie Mellon University, June 2011-present

National Research Council Committee to Review the Department of Homeland Security's Approach to Risk Analysis, November, 2008–2010

Member, Advisory Group for the Joint Global Change Research Institute, a collaboration between Pacific Northwest National Laboratory and the University of Maryland, 2004–2008

Member, Planning Committee for a study to evaluate the U.S. National Assessment of the Potential Consequences of Climate Variability and Change, coordinated through Carnegie Mellon University, 2004

Neutral technical panelist working with Arbitrator Anthony Sinicropi on negotiation issues related to the pilots' compensation contract.  Retained by US Airways and the Air Line Pilots Association (ALPA), 2001 and 2002

Advisory Board Member, Johns Hopkins University Graduate Part-Time Program in Environmental Engineering and Science, 2000–2004

Planning Committee Member, Carnegie Council on Ethics and International Affairs Long Term Study of Culture, Social Welfare, and Environmental Values in the U.S., China, India, and Japan, initiated January 1997

Vice-Chair, U.S. Global Change Research Program working group on Assessment Tools and Policy Sciences, 1994–1996

US Federal Reviewer for the Intergovernmental Panel on Climate Change working group III 1995 Report on Socioeconomics

NSF Principal for the Committee on the Environment and Natural Resources' Subcommittee on Risk Assessment, 1993–1996.  Also served as the liaison between the Subcommittee on Risk Assessment and the Subcommittee on Social and Economic Sciences

Advisory panel member for Environmental Ethics and Risk Management, National Academy of Public Administration and George Washington University, 1993–1994



Science Advisory Board member for Consortium for International Earth Science Information Network, 1993

Review Panel member for Economics and the Value of Information, NOAA, 1993

NSF technical representative to the FCCSET Ad Hoc Working Group on Risk Assessment and member of its Subcommittee on Risk Assessment, 1992–1993

NSF representative to Working Party of the FCCSET Subcommittee for Global Change Research on Assessment, 1992–1993

Affirmative Action Representative for the Energy Division, Oak Ridge National Laboratory 1984–1989, AA Rep for the Central Management Organization of ORNL, October 1989 to November 1990

Board of Directors, Vice President (1987–1988), President (1988–1989), Matrix Organization, The Business Center for Women and Minorities, Knoxville, TN

## EDITORSHIPS AND EDITORIAL REVIEW BOARDS

Editorial Board, Journal of Risk Analysis, 1997–2012

Editorial Board, Journal of Risk Research, 1997–2005

## PEER REVIEWER

The Energy Journal, Climate Change, Contemporary Economic Policy, Growth and Change, Ecological Applications, Risk Analysis, Duke University Press, Princeton University Press, J. of Environmental Economics and Management, Resources and Energy, The Environmental Professional, Journal of Risk Analysis, Journal of Risk Research, National Science Foundation, National Oceanic and Atmospheric Administration, FORUM, U.S. Environmental Protection Agency



**PROFESSIONAL AFFILIATIONS**

American Bar Association

American Economic Association

Society for Risk Analysis
    Councilor, 2013
    President, 2002
    President-Elect, 2001
    Councilor, 1996–1999

Women's Council on Energy and the Environment
    Past President, 2017-2018
    President, 2015-2017
    Vice President, 2011-2014
    Secretary, 2007-2010
    Board Member, 2004-2006

Women in Technology



**Attachment 2**

**Robin A. Cantor, Ph.D.**
**Managing Director**


**EXPERT TESTIMONY IN THE LAST FOUR YEARS**

> **Coles's Wexford Hotel, Inc. et al. v. UPMC and Highmark Inc.**
> Boise Schiller Flexner, LLP (Class Plaintiffs)
> US District Court for the Western District of Pennsylvania
> Case No. 2:10-cv-01609-JFC
> - Deposition (May 1, 2018)
> - Hearing Testimony (September 19, 2018)
> - Hearing Testimony (November 20, 2018)
> - Hearing Testimony (May 15, 2019)
> - Declaration (June 7, 2019)
>
> **Catherine Papasan et al.  v. Dometic Corporation**
> Lash & Goldberg LLP and Weil, Gotshal & Manges LLP (Defendant)
> US District Court for the Southern District of Florida
> Case No.  1:16-cv-22482- SCOLA/OTAZO-REYES
> - Deposition (March 12, 2019)
> - Hearing Testimony (September 14, 2021)
>
> **NWRA et al.  v. The City of New York et al.**
> Beveridge & Diamond LLC (Petitioners)
> Supreme Court of the State of New York, County of New York
> - Affidavit (March 22, 2019)
>
> **In re: Dicamba Herbicides Litigation**
> Faegre Baker Daniels LLP (Defendant BASF)
> US District Court of the Eastern District of Missouri
> - Deposition (May 24, 2019)
>
> **In re: National Prescription Opiate Litigation**
> Ropes & Gray LLP (Defendants Mallinckrodt LLC and SpecGx LLC)
> US District Court of the Northern District of Ohio
> Case No. 1:17-MD-2804
> - Deposition (June 3, 2019)

1



**Bonnie George, et al. v. Omega Flex, Inc., Ward Manufacturing, LLC and Titleflex Corporation**
Shook, Hardy & Bacon, LLP; Montgomery McCracken Walker & Rhoads, LLP, and Kirkland & Ellis, LLP (Defendants)
US District for the Western District of Missouri
Case No. 6:17-cv-03114MDH
- Declaration (August 30, 2019)
- Declaration (September 20, 2019)

**TS Media, Inc. v. Public Broadcasting Service**
Morgan, Lewis & Bockius LLP (Defendants)
Superior Court of the District of Columbia
Case No. 2018 CA 001247 B
- Declaration (November 13, 2019)

**TMX Finance LLC et al. v AutoMoney, Inc. et al.**
North American Risk Services (Defendant)
Court of County Pleas, State of South Carolina, County of Charleston
C/A No. 2012-CP-10-7932
- Deposition (February 6, 2020)

**RSR Corporation and Quemetco Metals Limited, Inc. v. Andreas Siegmund, et al.**
Brewer Attorneys & Counselors (Plaintiffs/Counter Defendants)
District Court of Dallas County, Texas, 44th Judicial District
Case No. 08-13797
- Deposition (August 21, 2020)

**Terry Hamm, et al. v. Mercedes-Benz USA, LLC**
Squire Patton Boggs LLP (Defendant)
US District Court for the Northern District of California
Case No. 5:16-cv-03370-EJD
- Declaration (August 25, 2020)
- Deposition (October 20, 2020)

**In re: Cyprus Mines Corporation, Debtor**
Future Claimants' Representative (Roger Frankel)
US Bankruptcy Court for the District of Delaware
Case No. 21-10398 (LSS)
- Declaration (June 28, 2021)
- Supplemental Declaration (July 26, 2021)



**In re: Gold King Mine Release in San Juan County, Colorado, on August 5, 2015**
USDOJ Civil Division, Montgomery & Andrews, P.A., and Glaser Weil Fink Howard Avchen & Shapiro LLP (Defendants)
US District Court for the District of New Mexico
Case No. 1:18-md-02824-WJ
- Deposition (November 8-9, 2021)

**United Biologics, LLC d/b/a United Allergy Services v. Amerigroup Tennessee, Inc. et al.**
Reed Smith LLP; Alston & Bird LLP; and Kramer, Rayson LLP (Defendants)
US District Court for the Eastern District of Tennessee
Case No. 3:19-CV-00180-TRM
- Deposition (December 21, 2021)

**Boothe Farms Inc. et al. v. The Dow Chemical Company et al.**
Faegre Baker Daniels LLP (Defendant Corteva)
   US District Court of the Eastern District of Arkansas
   Case No. 3:19-cv-00264-DPM
- Deposition (April 12, 2022)

**Meghan Bright, et al. v. Brookdale Senior Living Inc., et al.**
Moore & Lee LLP (Defendant)
US District Court of the Middle District of Tennessee, Nashville Division
Case No. 3:19-cv-00374
- Deposition (July 10, 2023)

**Attachment 3**
**Expert Report of Robin Cantor, Ph.D.**
**Materials Considered**

## I. LEGAL DOCUMENTS

| |
|---|
| Matthew Sinatro and Jessica Prost v. Barilla America, Inc., "Class Action Complaint," U.S. District Court, Northern District of California, Case No. 4:22-cv-03460-DMR, filed June 11, 2022 |
| Matthew Sinatro and Jessica Prost v. Barilla America, Inc., "First Amended Class Action Complaint," U.S. District Court, Northern District of California, Case No. 4:22-cv-03460-DMR, filed July 20, 2022 |
| Matthew Sinatro and Jessica Prost v. Barilla America, Inc., "Stipulated Protective Order," U.S. District Court, Northern District of California, Case No. 4:22-cv-03460-DMR, filed March 24, 2023 |
| In re KIND LLC "Healthy and All Natural" Litigation, 627 F.Supp.3d 269, 119 Fed. R. Evid. Serv. 879 (2022) |
| McMorrow v. Mondelez Int'l, Inc., No. 17-cv-2327, 2020 WL 1157191 (S.D. Cal. Mar. 9, 2020) |
| Sean McGinity v. The Proctor & Gamble Company, "Opinion," U.S. Court of Appeal, Ninth Circuit, Case No. 22-15080, Docket Entry 44-1, dated June 9, 2023 |
| Matthew Sinatro and Jessica Prost v. Barilla America, Inc., "Defendant Barilla America, Inc.'s First Supplemental Objections and Responses to Plaintiffs' Interrogatories Set 1," U.S. District Court, Northern District of California, Case No. 4:22-cv-03460-DMR, filed August 15, 2023 |
| Steinberg v. Icelandic Provisions, Inc., 2023 WL 3918257, (U.S.C.A., 9th Cir. 2023) |
| Matthew Sinatro and Jessica Prost v. Barilla America, Inc., "Plaintiffs' Notice of Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel," U.S. District Court, Northern District of California, Case No. 4:22-cv-03460-DMR, Doc. 52, filed August 30, 2023 |
| Matthew Sinatro and Jessica Prost v. Barilla America, Inc., "Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel," U.S. District Court, Northern District of California, Case No. 4:22-cv-03460-DMR, filed August 30, 2023 |
| In Re: Kind LLC Healthy and All Natural Litigation, "Order Granting Defendant's Motion for Summary Judgment, Disqualifying the Opinions of Dr. Dennis and Dr. Toutov, and Decertifying the Class," U.S. District Court, S.D. New York, 627 F. Supp.3d 269, filed September 9, 2022 |
| Patrick McMorrow, et. al., v. Mondelez International, Inc., "Order Denying Motion for Class Certification, Granting Motion to Exclude Expert Testimony of Micheal Dennis and Granting Motion to Exclude Testimony of Colin Weir," U.S. District Court, Southern District of California, filed March 9, 2020 |
| In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig., 500 F. Supp. 3d 940, 949 (N.D. Cal. 2020), aff'd sub nom. Schell v. Volkswagen AG, No. 20-17480, 2022 WL 187841 (9th Cir. Jan. 20, 2022) |
| Matthew Sinatro and Jessica Prost v. Barilla America, Inc., "Plaintiffs' Administrative Motion to File Under Seal Unredacted Documents in Support of Plaintiffs' Motion for Class Certification," U.S. District Court, Northern District of California, Case No. 4:22-cv-03460-DMR, filed August 30, 2023 |
| Matthew Sinatro and Jessica Prost v. Barilla America, Inc., "Proof of Service Re: Plaintiffs' Administrative Motion to File Under Seal Unredacted Documents in Support of Plaintiffs' Motion for |

**Attachment 3**
**Expert Report of Robin Cantor, Ph.D.**
**Materials Considered**

| Class Certification," U.S. District Court, Northern District of California, Case No. 4:22-cv-03460-DMR, filed August 30, 2023 |
| --- |
| Matthew Sinatro and Jessica Prost v. Barilla America, Inc., "Proposed Order Re: Plaintiffs' Administrative Motion to File Under Seal Unredacted Documents in Support of Plaintiffs' Motion for Class Certification," U.S. District Court, Northern District of California, Case No. 4:22-cv-03460-DMR, filed August 30, 2023 |

## II.  DECLARATIONS, DEPOSITIONS, EXPERT REPORTS, & EXHIBITS

| Declaration of Colin B. Weir, August 16, 2023 and Materials Considered |
| --- |
| Declaration and Expert Report of J. Michael Dennis, PH.D., August 16, 2023 and Materials Considered |
| Deposition of Jessica Prost, November 11, 2023 |
| Deposition of Matthew Sinatro, November 27, 2023 |

## III.  ACADEMIC BOOKS, ARTICLES & LITERATURE

| Allenby, Greg M. and Brazell, Jeff D. and Howell, John R. and Rossi, Peter E., Valuation of Patented Product Features (April 2014). Fisher College of Business Working Paper No. 2013-05-02, available at SSRN: https://ssrn.com/abstract=2359003 or https://dx.doi.org/10.2139/ssrn.2359003 |
| --- |
| Athey, S. and G. W. Imbens. "The State of Applied Econometrics: Causality and Policy Evaluation," *Journal of Economic Perspectives,* 31(2), Spring 2017 |
| David Gal and Itamar Simonson "Predicting Consumers' Choices in the Age of the Internet, AI, and Almost Perfect Tracking: Some Things Change, the Key Challenges Do Not," Consumer Psychology Review, 2020 |
| Flavia Bonaiuto et al. 2021. "Italian Food? Sounds Good! Made in Italy and Italian Sounding Effects on Food Products' Assessment by Consumers," *Frontiers in Psychology*, March 12 |
| Groves, Robert M., Floyd J. Fowler, Jr., Mick P. Couper, James M. Lepkowski, Eleanor Singer, and Roger Tourangeau. Survey Methodology, 2nd ed. Hoboken, NJ: John Wiley & Sons, Inc., 2009 |
| Chung CE, Lee KW, Cho MS, "Noodle consumption patterns of American consumers: NHANES 2001-2002," Nutr Res Pract. 2010 Jun, 4(3):243-51. doi: 10.4162/nrp.2010.4.3.243. Epub 2010 Jun 29 |
| Jack Curran, "Dry Pasta Production in the US," IBIS World Industry Report OD4975, September 2023 |
| Pasta and Noodles in Italy," MarketLine Industry Profile, *MarketLine*, February 2022 |
| Bryan K. Orme. 2014. *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*. Manhattan Beach, CA: Research Publishers LLC. |
| Orme 2021, "Estimating willingness to pay given competition in conjoint analysis," *Sawtooth Software* |
| Joel Huber (1997), "What We Have Learned from 20 Years of Conjoint Research: When to use Self-explicated, Graded Pairs, Full Profiles or Choice Experiments," Sawtooth Software Research Paper Series |

**Attachment 3**
**Expert Report of Robin Cantor, Ph.D.**
**Materials Considered**

| |
|---|
| Schmidt and Bijmolt. 2020. "Accurately measuring willingness to pay for consumer goods: a meta-analysis of the hypothetical bias", *Journal of the Academy of Marketing Science* |
| Shari Seidman Diamond. 2011. Reference Manual on Scientific Evidence, "Reference Guide on Survey Research," *The National Academies Press* |
| Simeone, Mariarosaria & Marotta, Giuseppe & Rotondo, Giacomo, "Competitive Strategies in the Italian Pasta Industry," *Agricultural Economics Review,* 2015, Vol 16, No 1 |
| Thorgersen, J. 2023. "How does origin labelling on food packaging influence consumer product evaluation and choices? A systematic literature review" Elsevier Ltd |

## IV.  PRODUCED DOCUMENTS

| |
|---|
| BAI-CA_00000307-356 |
| DENNIS_0001-446 (Bradburn - Asking Questions) |
| DENNIS_0447 (CDC - Cognitive Interviewing) |
| DENNIS_0448-475 (CBC System for Choice-Based Conjoint) |
| DENNIS_0476-484 (Sample Size Issues in Conjoint Analysis) |
| DENNIS_0485-532 (Shari Diamond - Reference Guide) |
| DENNIS_0533-572 (Rajeev Kohli - Integrating Conjoint Analysis) |
| DENNIS_0573-577 (Reed Johnson - Patient Preferences) |
| DENNIS_0578-639 (Green - Conjoint Analysis in Consumer Research) |
| DENNIS_0640-643 (Gordon Willis - What do Respondents Think We're Asking) |
| DENNIS_0644-660 (Charles Cunningham - Adaptive Choice-Based Conjoint Analysis) |
| DENNIS_0661-671 (Wann Wu - Applying Conjoint Analysis to Evaluate Consumer Pref) |
| DENNIS_1707-1712 (Wittink - Commercial Use of Conjoint Analysis) |
| DENNIS_1713-1740 (Sawtooth Technical Papers, 2017) |
| DENNIS_1741-1770 (Sawtooth Technical Papers, 2009) |
| DENNIS_1771-1775 (Johnson, Zhou - Patient Preferences) |
| DENNIS_1776-1792 (Green, Srinivasan - Conjoint Analysis in Marketing) |
| DENNIS_1793-1797 (Omre - Formulating Attributes) |
| DENNIS_1798-1806 (Omre, Sample Size Issues) |
| DENNIS_1807-1823 (Omre, Market Stimulators) |
| DENNIS_1824-1838 (Omre, Dealing with Product Similarity) |

**Attachment 3**
**Expert Report of Robin Cantor, Ph.D.**
**Materials Considered**

| |
|---|
| DENNIS_1839 (Raw Data) |
| WEIR_0001-16 (Loueriro - Estimating Consumer Willingness to Pay) |
| WEIR_0017-46 (Bonaiuto - Italian Food Sounds Good!) |
| WEIR_0047-57 (Wind - Applying Conjoint) |
| WEIR_0058-97 (Thogersen - How Does Origin Labeling) |
| WEIR_0098-103 (Hirogaki - Estimating Consumers' Willingness) |
| WEIR_0104-110 (Drewnowski - Testing Consumer Perception of Nutrient) |
| WEIR_0111-119 (Gadioli - Evaluation of Packing Attributes) |

## V. OTHER DOCUMENTS

| |
|---|
| CONFID Barilla Report - Clarkson Law v2 7-18-2023.xlsx |
| Import from Italy, "Why is AL Bronzo Not Imported?," Barilla Presentation |
| Letter from Circana, Inc. to Clarkson Law Firm, re: Sinatro v. Barilla America Inc., U.S. Dist. Ct. for the Northern District of California, Subpoena to Circana, Inc., dated July 11, 2023 |
| Letter from ███████████████████████████████████████ ████████████████████████████, September 15, 2022 |