UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW SINATRO and JESSICA PROST, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BARILLA AMERICA, INC.,<br><br>Defendant. | Case No.: 3:22-cv-03460 |

**DRAFT REBUTTAL DECLARATION**

**J. MICHAEL DENNIS, PH.D.**

**FEBRUARY 6, 2024**

# UNREDACTED—PUBLICLY FILED PURSUANT TO COURT ORDER (ECF 97)

REFERENCES MATERIALS DESIGNATED "CONFIDENTIAL" OR "HIGHLY

CONFIDENTIAL -- ATTORNEYS' EYES ONLY" UNDER PROTECTIVE ORDER

I, J. Michael Dennis, Ph.D., declare as follows:

1.      I have been retained by counsel for the Plaintiffs in the above-captioned matter. If called upon to testify, I would and could testify competently to all such subject matter in this expert report.

2.      Plaintiffs' counsel has retained my services at the hourly rate of $525. My compensation is not contingent on the results of my work or any outcome of the litigation. My expert opinions expressed in this expert report are solely my own.

16.     I previously wrote a declaration and expert report, dated August 16, 2023, and henceforth, "Initial Report," in connection with this litigation. I concluded on the basis of my consumer perception survey that Defendant's Challenged Representation, "ITALY'S #1 BRAND OF PASTA®," which is surrounded by the colors of Italy's national flag,[1] led reasonable consumers into believing that the Products were made with ingredients sourced solely from Italy. I also concluded that my proposed price premium measurement approach – a choice-based conjoint survey or simply "conjoint survey" – is typical of, and generally accepted by, experts in the field of consumer market research and can be used to reliably measure and calculate any price premium solely attributable to the Challenged Representation.

3.      I have attached a true and correct copy of my curriculum vitae as Attachment A. It sets forth accurate statements concerning my background, education, training, and experience concerning my expertise in the field of survey research and marketing research. My expert report of August 16, 2023 summarizes relevant or notable qualifications related to the opinions expressed in this Rebuttal Declaration.

4.      Plaintiffs' Counsel asked me to respond to the November 30, 2023 declaration

---

[1] First Amended Complaint, Dkt. 11, ¶ 2.

authored by Defendant's expert, Dr. Robin Cantor (henceforth, "Cantor Decl.").

5.      My Rebuttal Declaration is organized as follows in the below sections:

- Summary of My Conclusions;

- Response to Dr. Cantor's Opinions about my Initial Report Regarding Consumer Perceptions;

- Response to Dr. Cantor's Consumer Survey; and

- Response to Dr. Cantor's Criticisms of my proposed Price Premium Survey in my Initial Report.

## I.      SUMMARY OF CONCLUSIONS

6.      My conclusions are summarized as follows with respect to my rebuttal of Dr. Cantor's opinions.

a)      Dr. Cantor argues that the Plaintiffs' experts have not demonstrated that the Challenged Representation misled a sufficient proportion of reasonable consumers about the ingredient sourcing. Dr. Cantor's opinion is based on several misunderstandings of my Initial Report and of her own consumer survey. As documented in my Initial Report, I prepared and executed a consumer perception survey using industry-standard and generally accepted methodologies to provide data measuring consumer perceptions of the Challenged Representation. Dr. Cantor's own fatally flawed consumer survey does not disprove my findings.

b)      Dr. Cantor's key question in her consumer perception survey, which asks respondents *simultaneously* for their opinions about two different interpretations of the Challenged Representation, does not follow generally accepted practices or principles in the field of consumer survey research and, accordingly, in my expert opinion, cannot provide reliable data to the Court.

c)      Dr. Cantor's finding that some consumers perceived the Challenged Representation to mean that the products sold well in Italy does not contradict my consumer survey but instead corroborates my findings. Consumers, logically, could perceive a connection between the brand's popularity in Italy and the local, within-country sourcing of ingredients. These are complementary perceptions about the Challenged Representation, not evidence of consumers having two different sets of beliefs about the Challenged Representations.

d)      Dr. Cantor's survey question about materiality is fatally flawed, asking respondents to select the "reasons" that are "**most important** to you when deciding which pasta brand to buy" (emphasis added). The question wording is inherently confusing to respondents, asking them to "select all that apply" when the question is asking about a singular, "most important" reason for purchasing a pasta brand. Even if the survey question had been worded correctly, the survey technique is antiquated and has been superseded in marketing analytics with more robust choice-based approaches like conjoint surveys that replicate real-world purchasing decisions.

e)      Dr. Cantor fails to provide a single valid criticism of my proposed conjoint survey and analysis. Instead, Dr. Cantor inaccurately criticizes my proposed conjoint survey and analysis for inappropriately excluding supply side factors in the calculation of damages. In point of fact, my proposed approach does incorporate supply-side considerations. My conjoint surveys, and conjoint surveys more generally, have been accepted by the Courts, in part, for this very reason.

## II.    RESPONSE TO DR. CANTOR'S OPINIONS ABOUT MY INITIAL REPORT REGARDING CONSUMER PERCEPTIONS

7.      In her **Opinion I**, Dr. Cantor argues that the "Plaintiffs' experts have not demonstrated that the Label [meaning the Challenged Representation] misled a sufficient proportion of reasonable consumers about the ingredient sourcing and caused them to base their purchases on this misguided interpretation and that these misguided purchases were sufficient to result in a price premium affecting all or nearly all members of the putative classes." (Cantor Decl., ¶ 13). Dr. Cantor's opinion is based on several misunderstandings of my Initial Report and of her own consumer survey.

8.      First, my consumer survey did establish that a substantial share of consumers was misled by the Challenged Representation. Dr. Cantor's survey does not disprove the relevance of my finding that 57.0% of consumers perceived the Challenged Representation to mean that the Product's ingredients were sourced from Italy. Dr. Cantor's own survey, when testing a survey question based on my design, found a statistically similar result. Even when Dr. Cantor radically

4

changed the question wording, her revised design still produced a statistically similar result: 49.2% when using my question wording and 36.8% when using her radical revision. (Cantor Decl., ¶ 38, Ex. 5 (Proportion)). In fact, the results from her Version 1 and Version 3 perception questions are almost statistically indistinguishable with the lower and upper-bound estimates for the two results being almost identical: deception rates of 42.0% and 41.8% for Versions 1 and 3, respectively. (Cantor Decl., ¶ 38, Ex. 5 (Confidence Interval)). Even Dr. Cantor's own consumer survey, when changing my question wording and radically altering the question in Version 3, replicated my findings that a substantial share of consumers understood the Challenged Representation on the Product's packaging to mean that the Product's ingredients are sourced from Italy.

9.      Second, my proposed conjoint survey and market simulation, if conducted, will determine if "misguided purchases" resulted in a price premium solely attributed to the Challenged Representation. Dr. Cantor complains that I have not "demonstrated" whether a price premium was paid by Class Members despite the fact that my assignment was only to propose a reliable methodology for doing so.

10.     Third, Dr. Cantor misunderstands the burden that Plaintiffs' experts have in assessing any damages caused by the Challenged Representation. Dr. Cantor argues that it is Plaintiffs' burden to demonstrate that "these misguided purchases were sufficient to result in a price premium affecting all or nearly all members of the putative classes." This is not accurate. By definition, all class members would be considered harmed if the market-clearing price for the Products would have been lower in the but-for scenario that Defendant did not market their Products with the Challenged Representation. Dr. Cantor misunderstands what is required of my proposed conjoint survey and analysis to evaluate whether there are damages owed class

members.

11.     Fourth, Dr. Cantor mischaracterizes my approach to my assignment by stating that both Mr. Weir and I "begin with the assumption that the Label continues that the Label communicates false or misleading information that the Products are made from ingredients sourced from Italy," even though, in Dr. Cantor's words, "the Label … makes no explicit reference to the country of origin for the ingredients." (Cantor Decl., ¶ 31). Dr. Cantor further implies I engaged in unprofessional behavior in stating that "Dr. Dennis admits that his research hypothesis is based entirely on Plaintiffs [sic] theory." (Cantor Decl., ¶ 34).

12.     Dr. Cantor's statements reveal that she misunderstands the appropriate role of the testifying expert in false and misleading advertising litigation. I explained the appropriate role of a testifying expert in my Initial Report (¶¶ 18-22).  Plaintiffs are entitled to have their theory of liability rigorously assessed with scientific methods. To do so, I followed standard practices by designing and executing a scientifically rigorous study to determine whether Plaintiffs' allegations have merit. As I made clear in my Initial Report, I have not adopted Plaintiffs' theory of liability as true but instead as a hypothesis worthy of investigation. However, in Dr. Cantor's interpretation of my work, she inappropriately second-guesses the propriety of my evaluating the Plaintiffs' allegations that the Challenged Representation conveyed to consumers that the Products' ingredients are sourced from Italy.

13.     Dr. Cantor introduces an invalid threshold for evaluating my consumer perception survey, a threshold that guided her design of the Version 3 question of her consumer perception survey. According to Dr. Cantor, if consumers were to have two or more interpretations of the Challenged Representation, no matter how complementary the interpretations are to each other, this counts as evidence that consumers were not deceived by the Challenged Representation with

respect to the country of origin for the ingredients. This is sophistry. Dr. Cantor uses this distinction to give weight to her conclusion that my consumer perception survey did "not established that a single unambiguous interpretation of the Label predominates for reasonable consumers and that this interpretation is deceptive because it is based on the ingredients being 'solely sourced from Italy.'" (Cantor Decl., ¶ 33).

14.     The argument is sophistry because it is a false standard. Respondents perceiving the Challenged Representation to mean that the Products were a best seller in Italy does not mean that consumers are not "deceived" when perceiving the Challenged Representation to mean the Products' ingredients are from Italy. Rather, these are complimentary interpretations that reinforce each other. Consumers can be expected to believe "ITALY'S #1 BRAND OF PASTA®" means that the Products are a best seller in Italy in large part because they were made with ingredients sourced from Italy. Instead, Dr. Cantor treats the two interpretations as contradictory, a false assumption that undermines her interpretation of the results of her Version 3 consumer perception question.

### III.    RESPONSE TO DR. CANTOR'S CONSUMER SURVEY

15.     In her **Opinion II**, Dr. Cantor argues that her consumer survey found that consumers "do not have a singular interpretation of the Label consistent with the Plaintiffs' allegations." (Cantor Decl., ¶ 13). As noted above, a finding that consumers have mutually consistent interpretations of the Challenged Representation is not a basis for claiming that class members were not deceived (as alleged by Plaintiffs). Dr. Cantor's survey cannot disprove my data-driven finding that a substantial share of consumers did perceive the Challenged Representation to mean that the Products had ingredients sourced from Italy. In fact, her consumer

7

survey in large part corroborates my key finding.

16.     Dr. Cantor's consumer survey had two components: i) consumer perception questions that in part replicated my consumer perception survey, and otherwise deviated from my survey with new questions to identify purported "multiple interpretations" of the Challenged Representation; and ii) a purchaser driver survey that attempted to measure respondents' reasons for buying the pasta brands they do buy. I shall address Dr. Cantor's consumer perception survey first and Dr. Cantor's purchaser driver survey second.

A.     <u>Dr. Cantor's Consumer Perception Survey Is Fatally Flawed And Cannot Contradict The Findings From My Consumer Perception Survey</u>

17.     Dr. Cantor had three consumer perception questions: Versions 1, 2, and 3.

18.     Version 1 attempted to replicate my key consumer perception question, with formatting changes. My survey question and her Version 1 are shown below.

**Dennis Key Consumer Perception Survey Question**



This question is about your understanding of this statement on the packaging:

ITALY'S #1 BRAND OF PASTA ®

Do you or do you not believe this statement communicates the following meaning, or do you not have an opinion?

<u>The product's ingredients are sourced from Italy.</u>

Please select one.

○ The statement <u>does not</u> communicate this
○ The statement <u>does</u> communicate this
○ Don't know / not sure

**Cantor Version 1: Replicating Dennis Key Consumer Perception Question**



19.     Dr. Cantor's survey results are statistically similar to my findings, as reported by Dr. Cantor in her Exhibit 5. (Cantor Decl., ¶ 38). My survey and Dr. Cantor's survey found that 57.0% and 49.2% of respondents, respectively, perceived the Challenged Representation to mean that the product's ingredients are sourced from Italy. An examination of the confidence intervals in Exhibit 5 for my survey and Dr. Cantor's Version 1 reveals that the survey results are statistically indistinguishable.

20.     Dr. Cantor's Version 2 is an attempt to investigate whether a similarly worded question could show that that consumers have an alternative, but complimentary and mutually consistent, interpretation of the Challenged Representation. (Cantor Decl., ¶ 37, Ex. 3). Dr. Cantor substituted this interpretation into the survey: "The Brand is the Largest Selling Pasta in Italy." Dr. Cantor found that 80.5% of her respondents understood the Challenged Representation to convey this interpretation. (Cantor Decl., ¶ 39, Ex. 6).

21.     Dr. Cantor's key consumer perception question is Version 3, which is a radical

alteration of my key consumer perception question. (Cantor Decl., ¶ 37, Ex. 4). Dr. Cantor's

Version 3 question is shown below. She brought together her Version 1 "Sourcing Interpretation"

and Version 2 "Selling Interpretation" into one survey question.

**Dr. Cantor's Version 3 Survey Question**



22.     First, Dr. Cantor's question construction is irregular and not supported by

authoritative survey literature or any survey research textbooks with which I am familiar.[2]

---

[2] I cited key survey research treatises in my Initial Report, among them being the survey
research textbook by Robert Groves et al., Survey Methodology (Second Edition); Peter Marsden
and James Wright in the Handbook of Survey Research (Second Edition); Norman Bradburn et
al. in Asking Questions; on Roger Tourangeau et al. in The Psychology of Survey Response; and
Howard Schuman and Stanley Presser in Questions and Answers in Attitude Surveys. Other

Indeed, Dr. Cantor stated that she made a "modification" of the survey and did so without "worrying about expertise."[3] That is because Dr. Cantor admits that she does not consider herself an expert in survey research.[4] I have conducted or reviewed thousands of online surveys in my career, and I have never seen this question format of collecting two responses about different attitudes in the form of one question. Critically, Dr. Cantor's survey question violates basic principles in survey research by mashing together two measurements about separate issues into one survey question. The survey question construction prevents an unbiased and unprimed measurement of either perception statement because it requires the simultaneous consideration of two different meanings. Below I note additional and some of the most serious problems with the Version 3 question.

23.    Second, the response options are inconsistent with the survey question wording. In surveys that use closed-ended questions, it is important that the response options consist of the universe of possible answers that respondents might provide.[5] Dr. Cantor does not provide a list of response options that matches her question wording. The question is asking for a single answer about whether the statement is communicating one or both meanings, but instead of providing a

---

relevant treatises include <u>Web Survey Methodology</u> by Mario Callegaro et al., Sage Publications, 2015, and Don A. Dillman et. al., <u>Internet, Phone, Mail, and Mixed-Mode Surveys</u>, 4th Edition, Wiley, 2014.

[3] Cantor Dep. 96:22-97:8 ("A: But again, I'll point out that this design follows directly from Dr. Dennis' design." Q: And that's your expert opinion, right, or is that somebody else on your team's opinion that this question format is the same design as Dr. Dennis'?" A: "I would say that given that we agree that when it is asking about sourcing, it's the same format as this particular page, but this particular page allows two meanings, I would say that that is more or less a matter of logic as opposed to worrying about expertise.").

[4] Cantor Dep. 69:4-25 (Q: "Dr. Cantor, do you consider yourself an expert in survey research?" A: "I consider myself an economist to [sic.] uses survey data . . . . I don't consider myself a survey methodologist."); *id.* at 70:4-11 (Q: "So what qualifies you as an expert in the field of survey research?" A: "I wouldn't characterize it as an expert in the field of survey research . . .").

[5] Norman Bradburn's <u>Asking Questions</u> is an authoritative resource.

single response list, she asks the respondents to make two selections (one per interpretation). This is a fundamental design error in questionnaire design.

24.     Third, the survey question wording is incomplete. Dr. Cantor biases the respondents by planting seeds that the statement might be communicating "one" or "both" meanings, but does not inform respondents that a legitimate answer is that the statement could potentially communicate none of the two meanings.

25.     Fourth, the survey question wording is priming the respondents to consider that the statement is conveying only one of the two meanings, in my expert opinion. By putting both interpretations in the same question, Dr. Cantor created a compare-and-contrast exercise for the respondents that suggests only one meaning is the correct meaning. This sort of priming produces unreliable and biased results.

26.     Fifth, I see no evidence in Dr. Cantor's Declaration that indicates she tested respondents' ability to answer this question reliably via qualitative research such as focus groups or cognitive interviews. Indeed, Dr. Cantor testified in deposition that she did not conduct any sort of qualitative research to ensure respondents understood her Version 3 perception survey question.[6] Without any focus groups or qualitative research in testing her survey questionnaire, she has no evidence that respondents were able to understand her survey question the way she intended.

27.     Even with the unsound question format used by Dr. Cantor for Version 3, the results from Dr. Cantor's survey are statistically similar with respect to consumers' understanding of the

---

[6] Cantor Dep. 120:12-22 (Q: "Did you do any focus groups?" A: "No." Q: "Did you conduct any cognitive interviews?" A: "No." Q: "Did you debrief with any respondents?" A: Just at the end of this survey there was a question asking if they had any comments. And that was provided in the raw data. And so I did review those." Q: "With respondents?" A: "I didn't review them with the respondents.").

Challenged Representation in Version 1 and Version 3. Dr. Cantor's results for the "Sourcing Interpretation" alleged to be deceptive by Plaintiffs are statistically similar for both of Dr. Cantor's survey questions -- both Version 1 that test's the Plaintiffs' allegations in isolation and in Version 3 where both "Sourcing" and "Selling" interpretations are tested. The difference in the survey results is *borderline* statistically different. When considering the statistical confidence intervals provided by Dr. Cantor, the percentage of respondents perceiving the Challenged Representation to mean the ingredients are sourced from Italy could be as low as 42.0% for Version 1, and as high as 41.8% for Version 3. (Cantor Decl., ¶ 38, Exhibit 5). In other words, there is a significant probability that there is not a statistically significant difference in the results between the two survey questions. Thus, even with the unsound question format in Version 3, where Dr. Cantor forces the respondents to consider both meanings simultaneously, a significant portion of respondents (albeit a smaller portion as a result of the methodological errors discussed above) understood the Challenged Representation to mean that the Product's ingredients are sourced from Italy.

28.     Dr. Cantor's key consumer perception question (using Version 3) relies on a question format that I personally have not seen used in my professional experience, which includes the design, implementation, review, and analysis of more than a thousand surveys over the course of my career. Dr. Cantor required respondents to make two selections within a survey question when asking a single-selection question. (Cantor Decl., ¶ 37, Ex. 4). I am not aware of any precedent in the survey research literature that indicates that this is a valid question format. Stated differently, the question format Dr. Cantor used in Version 3 is a format that is not generally accepted in the field of marketing science or survey research.

B.  Dr. Cantor's Purchase Driver Questions Fail to Reliably Measure Materiality

29.     Also, in **Opinion II**, Dr. Cantor asserts that her consumer survey found "a minimal influence, if any, on product selection from the country-of-origin interpretation that Plaintiffs allege." (Cantor Decl., ¶ 13).

30.     Dr. Cantor bases her conclusion on a primitive two-question battery of questions asking respondents to select their "most important" reasons "when deciding which pasta brand to buy" and then allocating 100 points among the selected reasons. (Cantor Decl., ¶ 42, Ex. 9). Dr. Cantor's purchase driver question asking for the "most important reasons" is shown below:

**Dr. Cantor's Purchase Driver Question**



31.     Dr. Cantor's question fails in its basic survey question construction. First, the survey is inherently confusing to respondents. The question asks respondents to select "reasons" – a concept meaning more than one – that are "most important" – a concept implying singularity and uniqueness. The juxtaposition of concepts meaning "more than one" and "one" is jarring and perplexing to respondents, in my expert opinion. Because Dr. Cantor failed to do any qualitative

research regarding her questionnaire, she does not have any evidence that the respondents understood her survey question in the way that she intended. As previously stated, Dr. Cantor admits in her deposition testimony that she did not conduct any qualitative research.[7]

32.    Moreover, I have been advised by counsel that: "To establish materiality, a plaintiff is not required to show that the challenged statement is the 'sole or even the decisive cause' influencing the class members' decisions to buy the challenged product."[8] Rather, "[a] misrepresentation is judged to be 'material' if a reasonable [person] would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question."[9] To be clear, materiality does not require challenged statement to the be *most* or *dominant* factor responsible for purchase decisions.[10] Thus, if Dr. Cantor intended to measure materiality, her survey failed to do so. Her survey question simply cannot reliably determine whether the "Made in Italy" feature is important to consumers in deciding whether to buy the Products, or otherwise

---

[7] Cantor Dep. 120:12-22 (Q: "Did you do any focus groups?" A: "No." Q: "Did you conduct any cognitive interviews?" A: "No." Q: "Did you debrief with any respondents?" A: "Just at the end of this survey there was a question asking if they had any comments. And that was provided in the raw data. And so I did review those." Q: "With respondents?" A: "I didn't review them with the respondents.").

[8] *Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 403 (N.D. Cal. 2021) (quoting *Kwikset Corp. v. Super. Ct.*, 51 Cal.4th 310, 332 (2011)).

[9] *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 332 (2011); *accord Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1106 (9th Cir. 2013) ("A representation is 'material,' however, if a reasonable consumer would attach importance to it or if 'the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action.'") (citations omitted); *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011) ("if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question") (quoting *Steroid Hormone Product Cases*, 181 Cal.App.4th 145, 157 (2010)).

[10] *In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009) ("It is not ... necessary that [the plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the **predominant** or decisive factor influencing his conduct.") (emphasis added); *Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 529-530 (N.D. Cal. 2012) ("the plaintiff need not demonstrate [the misrepresentation] was the only cause, or even the predominant or decisive factor influencing his conduct") (quotations and citations omitted).

influenced consumer purchase decisions, because Dr. Cantor's survey expressly asked respondents about the singular "most important" reason or "most important" reasons (depending on how respondents understood the question).

33.    Second, Dr. Cantor did not test the correct attribute. She included the attribute "Made in Italy," when the Plaintiffs' allegation is that consumers perceived the Challenge Representation to mean that the *ingredients were sourced from Italy*.

34.    Third, the survey research literature is clear that online "check all that apply" survey questions are problematic when there are long lists of responses. Respondents tend to overlook response options and not give each response option sufficient attention to collect reliable information.[11]  Respondents tend to select the most salient options and under-select the less salient ones that, nonetheless, should have been selected to accurately measure all applicable responses. Dr. Cantor's survey question includes 12 closed-ended response options and one option to write in a response. By any measure, this is a lengthy list of response options. The practical impact is an over-reporting of salient attributes like "Price" and an under-reporting of less salient attributes like "Made in Italy."

35.    Fourth, Dr. Cantor's purchase driver question uses a primitive, outdated technique. Dr. Cantor's respondents were not provided a shopping context or even asked to consider product alternatives in a shopping context. Dr. Cantor's respondents were not shown real-world Products, making her purchase driver question a theoretical exercise for her respondents. Dr. Cantor's approach has been superseded by market research analytics using choice-based conjoint analysis

---

[11] Callegaro et al. in <u>Web Survey Methodology</u>, pp. 79-80 explains that multiple-answer questions like Dr. Cantor's that it is difficult to interpret what it means when a respondent does not select a response option. It could mean that the respondent "missed the option" or it could mean a refusal to answer the question. Alternatively, it could mean that the respondent did not have an opinion.

and other choice methodologies. Unlike Dr. Cantor's approach which is devoid of marketplace realism, choice-based approaches like choice-based conjoint surveys require respondents to make choices among alternatives like consumers do in the real-word marketplace.

36.    For the reasons stated above, Dr. Cantor's survey purchase driver survey question is unreliable and fails to conform to generally accepted principles governing the design of surveys.

37.    After the "check all that apply" purchase driver question, respondents were shown the following constant-sum question, which displays the attributes selected by the respondent at the purchase driver question and then asks respondents to allocate 100 points across the displayed attributes. (Cantor Decl., ¶ 43, Ex. 10).

**Constant-Sum Question Used by Dr. Cantor**

Next, we would like to understand how important each of these reasons is to you when deciding which pasta brand to buy.

Please allocate 100% across the reasons by putting a number between 0% and 100% for each reason, such that the percentages for all chosen reasons add up to exactly 100%. Enter the most points for the reasons you care about the most and the fewest points for reasons you care about the least.

| | | |
|---|---|---|
| Price | | % |
| Healthy choice | | % |
| Good for everyday use | | % |
| Available shape(s) | | % |
| Made in Italy | | % |
| Has a great taste | | % |
| Total (must be 100%) | 0 | % |

38.    Based on my background, education, training, and professional experience as a survey expert and marketing scientist, respondents find constant-sum type questions to be

cognitively challenging.[12] Some respondents do not have the motivation to engage in the exercise of entering in values that sum to 100, while some refuse to engage in an exercise that requires some numerical literacy. Others will take mental short-cuts by placing most of the points on one or two attributes (e.g., price), and not make the effort to enter in points for less important attributes that altogether will sum to 100. These methodological failings make Dr. Cantor's constant-sum type survey question an unreliable measure of the importance placed on product attributes.

39.     Even if this question were viewed as acceptable according to antiquated methodologies, its results hinge on the preceding purchase driver question, which is fatally flawed for the reasons set forth above. The question asks respondents to allocate percentages to only those reasons that the respondent selected in the preceding question. Any reasons that respondents did not select will not appear in this question. Thus, this question adopts and perpetuates the same methodological failings from which the purchase driver question suffers.

40.     For the reasons stated above, Dr. Cantor's survey constant-sum question is unreliable and fails to conform to generally accepted principles governing the design of surveys.

41.     I have been involved in designing or reviewing over a hundred survey questionnaires per year, for the past twenty years, and I typically see constant-sum questions only when the topic involves collecting voters' preferences on policy priorities and government spending or surveys about budgets. When the research involves measuring attribute importance (similar to this case), I almost exclusively see surveys that use a form of discrete choice methodology such as maximum difference scaling and choice-based conjoint analysis or other approaches (similar to my choice survey) where respondents are asked to make trade-off decisions

---

[12] Callegaro et al. agree. "This is an … example of a cognitively demanding question, where respondents need to consider and process more dimensions or subjects (items) at the same time." From Web Survey Methodology, p. 84.

across product profiles like consumers in real-world marketplaces.

42.     Even when using this outdated and misapplied method, Dr. Cantor still found that 12.2% of consumers stated a preference for pasta products "Made in Italy," nearly twice as high as the share of respondents stating a preference for pasta products "Made in USA" (6.2%). (Cantor Decl., ¶ 44, Ex. 11).

## IV.     RESPONSES TO DR. CANTOR'S COMMENTS ON MY PROPOSED PRICE PREMIUM SURVEY

43.     In her **Opinion III**, Dr. Cantor asserts that Mr. Weir and I are inappropriately excluding supply side factors in the calculation of damages. I respectfully disagree on multiple levels. Dr. Cantor's argument is a familiar one that has been repeatedly rejected by courts in similar cases. My responses to Dr. Cantor's criticisms below are essentially identical to my responses to defendants' experts in other matters, including *Allen v. ConAgra Foods, Inc.*,[13] *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,[14] *de Lacour v. Colgate-Palmolive Co.*,[15] and *McMorrow v. Mondelez.*[16]

44.     For example, in *Allen*, like in this case, the defendant's expert alleged that my survey had not accounted for supply-side factors and instead measured only consumers' subjective willingness to pay. The court rejected this argument because I had relied on "actual quantities of Parkay Spray sold during the class period," used "actual, historical, market-clearing prices," and ..included a "no-buy option."[17] Similarly, in *McMorrow,* the court ruled that my conjoint survey

---

[13] 331 F.R.D. 641, 673 (N.D. Cal. 2019).
[14] 326 F.R.D. 592, 605-06 (N.D. Cal. 2018).
[15] 338 F.R.D. 324, 345 (S.D.N.Y. Apr. 23, 2021).
[16] No. 3:17-cv-2327-BAS-JLB, 2021 WL 859137 at *15. (S.D. Cal 2021).
[17] *Allen v. Conagra*, 331 F.R.D. 641, 673 (N.D. Cal. 2019).

"adequately account[s] for the supply-side factors" … [because] (1) the prices used in the survey[] underlying the analys[is] reflect the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect the actual quantities of products sold during the class period."[18] As described in more detail below, the conjoint survey I proposed here followed the same design principles I used in those other cases, and are equally applicable to the assignment in this case.

45.    Importantly, courts routinely accept my surveys involving measurement of economic damages. These cases include, but are not limited to, *Fitzhenry-Russell v. Dr. Pepper Snapple Group*, 326 F.R.D. 592, 599-601 (N.D. Cal. 2018); *De Lacour v. Colgate-Palmolive Co. and Tom's of Maine Inc.*, 338 F.R.D. 324, 345 (S.D.N.Y. Apr. 23, 2021); *Martinelli v. Johnson & Johnson and McNeil Nutritionals*, No. 2:15-cv-01733-MCE-DB, 2019 WL 1429653 at *3-4 (E.D. Cal. Mar. 29, 2019); *Willis v. Colgate Palmolive*, C.D. Cal. Case No. 2:19-cv-08542-JGB-RAO, Order Granting-in-Part Defendant's Motions to Exclude, Denying Defendant's Motions to Exclude, Granting Plaintiff's Motion for Class Certification, and Granting Plaintiff's and Defendant's Applications to Seal, filed on 01/05/2023, Dkt. No. 105; and *McMorrow, et al. v. Mondelez International Inc.*, No. 3:17-cv-2327-BAS-JLB, 2021 WL 859137 at *15. (S.D. Cal 2021). I have also participated in the design and execution of other price premium studies using non-conjoint approaches in, for example, *Price [Miles] v. Philip Morris*, 219 Ill. 2d 182 (Ill. 2005); *Zill, et al. v. Sprint Spectrum et al.*, No. RG03114147, Order Granting Plaintiffs' Motion for Class Certification (Cal. Super. Ct. Alameda County May 25, 2006); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 565 (S.D.N.Y. 2014).; *In Re Scotts EZ Seed Litigation*, No. 12-cv-4727 (VB), 2017

---

[18] No. 3:17-cv-2327-BAS-JLB, 2021 WL 859137 at *15. (S.D. Cal 2021).

WL 3396433 at *8-10 (S.D.N.Y. Aug. 8, 2017); and *Dzielak v Whirlpool*, No. 2:12-0089 (KM) (JBC), 2017 WL 1034197 at *16-18 (D. N.J. Mar. 17, 2017). I followed the guidance that I received from those courts in designing the survey I used in this case.

46.     In **Opinion IV**, Dr. Cantor fails to provide a single valid criticism of my proposed conjoint survey and analysis. The reason is simple: I followed the best practices that I have employed in the past as a court-qualified expert in conjoint surveys and analysis. Dr. Cantor is dismissive of my proposed conjoint analysis by asserting that "my proposed approach … estimates an average shift in demand." (Cantor Decl., ¶ 13(d)). That is a gross over-simplification of my proposed conjoint survey and analysis. In designing the conjoint survey, I considered supply-side factors, competitors' products, and real-world market transaction information from consumer transaction data for the Products. As such, I have incorporated supply-side consideration in designing the conjoint survey and the proposed conjoint analysis.

47.     In **Opinion V,** Dr. Cantor overstates the relevance of pricing information that she claims shows that the pricing of the Products is not sensitive to the removal of the Challenged Representation. (Cantor Decl., ¶ 13(e)). Dr. Cantor ignores that her analysis cannot control for multiple factors which can confound her analysis, such as the differences between the Label and post-Label time periods with respect to competitors' actions, Defendant's strategy and tactics, and general marketplace conditions.

## V.    <u>RESERVATION OF RIGHTS</u>

48.     The facts and data that I considered for developing my opinions in this report are cited herein. There are aspects of the Cantor Declaration that I do not discuss in this Rebuttal Report. My silence on those matters should not be taken for tacit agreement or endorsement of those aspects of Dr. Cantor's Declaration. I reserve the right to augment or modify my opinions.

Additionally, if I were to be provided additional information, I may supplement or amend the opinions I have expressed in connection with this case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 6, 2024.

J. MICHAEL DENNIS, PH. D

ATTACHMENT: Current Curriculum Vitae

# EXHIBIT A

# CV FOR J. MICHAEL DENNIS

Phone: (650) 288-1930                                              274 Redwood Shores Parkway, #529
JMDSTAT@gmail.com                                              Redwood City, CA 94065

Education

| University of Texas, Austin | Government | B.A. | 1984 |
| University of Texas, Austin | Government | M.A. | 1986 |
| University of Chicago | Political Science | Ph.D. | 1992 |

Employment

| 2015-Present | Senior Vice President, NORC |
| 2014-Present | President and Owner, JMDSTAT Consulting Inc. |
| 2012-2014 | Managing Director, GfK Custom Research LLC (GfK acquired Knowledge Networks in January 2012) |
| 2009-2011 | Executive Vice President, Knowledge Networks |
| 2007- 2008 | Senior Vice President, Knowledge Networks, Inc |
| 2001-2006 | Vice President and Managing Director, Knowledge Networks, Inc |
| 2000-2001 | Vice President of Operations and Survey Research, Knowledge Networks, Inc. |
| 1999-2000 | Senior Scientist, Abt Associates Inc. |
| 1998-1999 | Senior Survey Director, Abt Associates Inc. |
| 1992-1998 | Survey Director, Abt Associates Inc |
| 1989-1992 | Research Assistant, Political Science Department, University of Chicago |

Notable Past Projects

- 2020 Facebook Election Research Project, 2020-Present, NORC Director. Funded by Facebook Technologies, NORC's study director a national study examining the impact of social media on U.S. politics, democratic institutions, and elections.
- America in One Room (A1R), 2019, NORC Director. Funded by Helena Project and conducted under the supervision of Professors James Fishkin and Larry Diamond from the Center for Deliberative Democracy at Stanford University.
- Time-Sharing Experiments for the Social Sciences (TESS), 2016-2020, Co-Investigator, Funded by the National Science Foundation (Award No. 1628057). NORC's study director for approximately 140 hundred social science experiments funded by the TESS program.
- Demonstration of a Feasibility of Improving Scientific Literacy and Lifelong Learning through a Just-in-Time Dissemination Process, 2016-Present, Co-Investigator, Funded by National Aeronautics and Space Administration (NASA), (Grant No. F041712). NORC's director of the five-year survey project funded by NASA in collaboration with researchers from the Institute for Social Research, University of Michigan.
- GenForward Panel, 2016-Present. NORC Director, funded by John D. & Catherine T. MacArthur Foundation. NORC's study director for the University of Chicago polling panel of young adults in collaboration with the Black Youth Project and the Associated Press-NORC Center for Public Affairs Research.
- Connecting Health and Technology, 2013-2014, GfK Director, Funded by the American Legacy Foundation. GfK's Study Director responsible for the survey design and management of a custom panel study of 10,000 U.S. teens and young adults measuring the effectiveness of the Legacy "Truth" smoking prevention media campaign.
- Google Screenwise Research Panel 2011-2014, Director. Knowledge Networks' and later GfK's study director responsible for the design and implementation of a new custom panel of broadband households measuring how consumers use the internet.
- Time-Sharing Experiments for the Social Sciences (TESS), 2012-2016, Co-Investigator, Funded by the National Science Foundation (Award No. 1227179). Knowledge Networks/GfK's study director for more than two hundred social science experiments funded by the TESS program.

- American National Elections Studies 2007-2009 Panel Study, Knowledge Networks Principal Investigator, Funded by the National Science Foundation.   The Knowledge Networks study director responsible for sampling, data collection methodology, and project management for a longitudinal study of approximately 2,500 households during the historic 2008 Presidential election.
- National Annenberg Election Survey 2007-2009, Knowledge Networks Director, Annenberg Public Policy Center, University of Pennsylvania.  The Knowledge Networks study director responsible for project management for large-scale tracking study (20K interviews per wave) of the U.S. electorate during the historic 2008 Presidential election.
- National Immunization Survey, Abt Associates Data Collection Director, 1997-2000, Funded by the U.S. Centers for Disease Control and Prevention.  Responsible for the data collection for the U.S. Federal government's largest random digit dialing telephone survey with approximately 1M households contacted each year.
- Project Network (First Followup), Abt Associates Project Director, Funded by the U.S. Social Security Administration.  Led the project management team for this in-person field study.
- Estimation of the Number of Hard Core Drug Users in the U.S., Office of National Drug Control Policy
- Access to Kidney Transplantation, Agency for Health Care Policy and Research.  Led the survey project management team for this in-person field study testing an experimental method for estimating hard core drug use.
- A Case Control Study of Stomach Cancer in Poland and Polish Americans, National Cancer Institute
- The Prevalence of Alcohol and Other Drug Abuse and Dependence in Short Term General Hospitals and the Impact of Abuse and Dependence on Hospital Utilization, Charges and Costs, National Institute of Alcohol Abuse and Alcoholism

Expert Witness in Litigation: Testifying at Deposition or Trial in the Last 4 Years

1. January 16, 2020. Expert Deposition. In Re: Santa Fe Natural Tobacco Company Marketing & Sales Practices and Products Liability Litigation. U.S. District Court for the District of New Mexico (Case No. 1:16-md-02695-JB-LF).
2. April 6, 2020.  Expert Deposition. Pardini v. Unilever. U.S. District Court for the Northern District of California (Case No. Case No. CV13-1675 SC).
3. May 27, 2020. Expert Deposition. Patrick McMorrow et al. v. Mondelez International, Inc. U.S. District Court, Southern District of California (Case No. 3:17-cv-2327-BAS-JLB).
4. December 30, 2020. Expert Deposition. Michael Maeda et al. v. Kennedy Endeavors, Inc. U.S. District Court, District of Hawaii (Case No. 1:18-CV-00459-JAO-WRP).
5. January 19, 2021. Expert Deposition. Shelly Benson et al. v. Newell Brands, Inc. and NUK USA LLC. U.S. District Court, Northern District of Illinois (Civil Action No. 19-cv-06836).
6. February 26, 2021. Expert Deposition. Sharon Willis et al. v. Colgate-Palmolive Co. U.S. District Court, Central District of California (Civil Action 2:19-CV-08542-JGB-RAO).
7. March 15, 2021. Expert Deposition. Sharpe et al. v. A & W Concentrate Company and Keurig Dr. Pepper Inc. (E.D.N.Y.) (Civil Action No. 19-cv-00768 (BMC)).
8. July 1, 2021. Expert Deposition. Sharpe et al. v. GT's Living Foods, LLC. U.S. District Court, Central District of California. Civil Action 2:19-CV-10920-FMO-GJS.
9. July 12, 2021. Expert Deposition. Vizcarra et al. v. Unilever United States, Inc. U.S. District Court for the Northern District of California (Case No. 4:20-cv-02777-YGR).
10. August 23, 2021. Expert Deposition. State of New Mexico v. Solvay Pharmaceuticals, Inc., Abbott Products, Inc., Abbott Laboratories, Abbvie Inc. State of New Mexico, County of Santa Fe (Case No. D-101-CV-2019-01897).
11. August 24, 2021. Expert Deposition. Minor et al. v. Baker Mills, Inc. and Kodiak Cakes, LLC. U.S. District Court for the Northern District of California (Case No. 20-cv-02901-RS).
12. September 20, 2021. Expert Deposition. Senne et al. v. Office of the Commissioner of Baseball, et al. U.S. District Court for the Northern District of California (Case No. 3:2014-cv-00608).
13. October 8, 2021. Expert Deposition. Fishon et al. v. Peloton Interactive, Inc. United States District Court, Southern District of New York (Case No. 1:19-CV-11711-LJL).
14. October 25, 2021. Expert Deposition. IN RE KIND LLC "Healthy and All Natural" Litigation. United States District Court, Southern District of New York (15-MD-2645 (WHP)).

2

15. October 26, 2021. Expert Deposition. IN RE: FCA US LLC Monostable Electronic Gearshift Litigation. United States District Court, Eastern District of Michigan Southern Division (Case No. 16-md-02744).
16. November 4, 2021. Expert Deposition.  IN RE: FISHER-PRICE ROCK 'N PLAY SLEEPER MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION, United States District Court, Western District of New York (Case No. 1:19-md-2903).
17. November 29, 2021. Expert Deposition. Sharpe et al. v. A & W Concentrate Company and Keurig Dr. Pepper Inc. (E.D.N.Y.) (Civil Action No. 19-cv-00768 (BMC)).
18. March 10, 2022. Expert Deposition. Montera [Fishon] et al. v. Premier Nutrition Corp. U.S. District for the Northern District of California, San Francisco Division (Case No. 3:16-CV-06980 RS).
19. March 24, 2022. Expert Deposition. Testone et al. v. Barlean's Organic Oils, LLC. U.S. District for the Southern District of California (Case No: 19-cv-0169-JLS-BGS).
20. May 27, 2022. Trial Testimony. Montera [Fishon] et al. v. Premier Nutrition Corp. U.S. District for the Northern District of California, San Francisco Division (Case No. 3:16-CV-06980 RS).
21. June 17, 2022. Expert Deposition. Hall v. Marriott International, Inc. U.S. District for the Southern District of California (Case No.: 3:19-cv-01715-JLS-AHG).
22. September 9, 2022. Trial Testimony. IN RE: FCA US LLC Monostable Electronic Gearshift Litigation. United States District Court, Eastern District of Michigan Southern Division (Case No. 16-md-02744).
23. September 19, 2022. Expert Deposition. Anne De Lacour et al. v. Colgate-Palmolive Co., and Tom's of Maine Inc.  United States District Court, Southern District of New York (16 Civ. 8364 (RA) (AJP)).
24. January 24, 2023. Expert Deposition. IN RE: FOLGERS COFFEE MARKETING LITIGATION. U.S. District for the Western District of Missouri (Civil Action No.: 21-2984-MD-C-BP).
25. January 29, 2023. Expert Deposition. Bush et al. v Rust-Oleum Corp., U.S. District for the Northern District of California (Case No. 3:20-cv-03268-LB).
26. April 3, 2023. Expert Deposition. Freeman v. MAM USA Corp., U.S. District for the Northern District of Illinois, Eastern Division (Case No.: 1:20-cv-01834).
27. April 6, 2023. Expert Deposition. Barbera v. Olé Mexican Foods Inc., U.S. District for the Central District of California (Case No.: 5:20-cv-02324-JGB (SPx)).
28. April 14, 2023. Expert Deposition. Corbett et al. v. Pharmacare U.S., Inc., U.S. District for the Central District of California (Case No.: 3:21-cv-00137-JES-AHG).
29. April 21, 2023. Expert Deposition. Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC, Pfizer Inc., U.S. District Court for the Northern District of California (Case No.: 4:20-cv-09077-JSW).
30. May 25, 2023. Expert Deposition. Rusoff v. The Happy Group, Inc., U.S. District Court for the Northern District of California (Case No.: 4:21-cv-08084-YGR).
31. July 14, 2023. Expert Deposition. Miller et al. v. Travel Guard Group, Inc., AIG Travel, Inc., and National Union Fire Insurance Company of Pittsburgh, PA, U.S. District for the Northern District of California (Case No. 3:21-cv-09751-TLT).
32. September 22, 2023. Expert Deposition. Patane et al. v. Nestle Waters North America, Inc., U.S. District Court of Connecticut (Case No. 3:17-CV-01381 (JAM).
33. October 6, 2023. Expert Deposition. Cadena et al. v. American Honda Motor Company, Inc., U.S. District for the Central District of California (Case No.: 2:18-cv-04007-MWF-MAA).
34. October 16, 2023. Expert Deposition. Howard et al. v. Hain Celestial Group, Inc., U.S. District Court for the Northern District of California (Case No.: 3:22-cv-527-VC).
35. November 16, 2023. Expert Deposition. Glassman et al. v. Edgewell Personal Care, LLC., U.S. District Court for the Northern District of California (Case No.: 3:21-cv-07669-RS).
36. January 11, 2024. Expert Deposition. Iglesias et al. v. For Life Products, LLC., U.S. District Court for the Northern District of California (Case No.: 3:21-cv-01147-TSH).

Dissertation

"The Politics of Kidney Transplantation," Department of Political Science, University of Chicago, June 1992.  Chair:  Professor Jon Elster.  Published at https://sites.google.com/site/jmichaeldennis/home.

3

Publications

Fulton, B., Bilgen, I., Pineau, V., Liebert, L., King, D., & Dennis, M. 2022. "Evaluating Nonresponse Bias for a Hypernetwork Sample Generated from a Probability-Based Household Panel." Journal of Quantitative Methods, 6(2).

Michaels, Stuart, Vicki Pineau, Becky Reimer, Nadarajasundaram Ganesh, and J. Michael Dennis. 2019. Test of a Hybrid Method of Sampling the LGBT Population: Web Respondent Driven Sampling with Seeds from a Probability Sample. Journal of Official Statistics 35(4):731-752.

Cantrell J, Hair E. C., Smith, A., Bennett M., Rath, J.M., Thomas, R.K., Fahimi, M., Dennis, J.M., and Vallone, D. 2018. Recruiting and Retaining Youth and Young Adults: Challenges and Opportunities in Survey Research for Tobacco Control. Tobacco Control 27(2).

Josh Pasek, S. Mo Jang, Curtiss L. Cobb III, J. Michael Dennis, and Charles DiSogra. 2015. Can Marketing Data Aid Survey Research? Examining Accuracy and Completeness in Consumer-File Data. Public Opinion Quarterly. 78 (4): 889-916.

DiSogra, Charles. Curtiss Cobb, Elisa Chan, and J. Michael Dennis. 2011. "Calibrating Non-Probability Internet Samples with Probability Samples Using Early Adopter Characteristics." Joint Statistical Meetings: 4501-4515.

Baker, Reginald, Stephen J. Blumberg, J. Michael Brick, et al. 2010. AAPOR Report on Online Panels. Public Opinion Quarterly 74(4):711-781.

Sanders, Alan R., Douglas F. Levinson, Jubao Duan, et al. 2010. The Internet-based MGS2 Control Sample: Self Report of Mental Illness. American Journal of Psychiatry 167(7) 854-865.

Timothy Heeren, Erika M. Edwards, J. Michael Dennis, Sergei Rodkin, Ralph W. Hingson, and David L. Rosenbloom. 2008. "A Comparison of Results from an Alcohol Survey of a Pre-recruited Internet Panel and The National Epidemiological Survey on Alcohol and Related Conditions." Alcoholism: Clinical and Experimental Research 32(2): 1-8.

J. Michael Dennis and Rick Li. 2007. More Honest Answers to Surveys? A Study of Data Collection Mode Effects. Journal of Online Research 10(7):1-15.

Tom W. Smith and J. Michael Dennis. 2005. "Online versus In-Person: Experiments with Mode, Format, and Question Wordings." Public Opinion Pros, December. Available at www.publicopinionpros.com/from_field/2005/dec/smithkn.asp.

Etzel Cardeña, J. Michael Dennis, Mark Winkel, and Linda J. Skitka. 2005. "A Snapshot of Terror: Acute Posttraumatic Responses to the September 11 Attack." Journal of Post-Traumatic Stress 6(2):69-84.

William E. Schlenger, Juesta M. Caddell, Lori Ebert, B. Kathleen Jordan, Kathryn M. Rourke, David Wilson, Lisa Thalji, J. Michael Dennis, John A. Fairbank, Richard A. Kulka. 2002. "Psychological Reactions to Terrorist Attacks: Findings from the National Study of Americans' Reactions to September 11." Journal of the American Medical Association, 288(5): 1235-1244.

J. Michael Dennis. 2001. "Are Internet Panels Creating Professional Respondents?" Marketing Research Summer: 484-488.

J. Michael Dennis, Martin Frankel, Nancy A. Mathiowetz, Candice Saulsberry, Philip J. Smith, K.P. Srinath, Ann-Sofi Rodén, and Robert A. Wright. 1999. "Analysis of RDD Interviews by the Number of Call Attempts: The National Immunization Survey." Proceedings of the Section on Survey Research Methods, American Statistical Association.

J. Michael Dennis, Victor G. Coronado, Martin Frankel, Ann-Sofi Rodén, Candice Saulsberry, Howard Speizer, and Robert A. Wright. 1998. "The Use of an Intranet to Manage a Telephone Survey." Proceedings of the Section on Survey Research Methods, American Statistical Association.

Paul Buckley, J. Michael Dennis, Candice Saulsberry, Victor G. Coronado, Trena Ezzati-Rice, Edmond Maes, Ann-Sofi Rodén, and Robert A. Wright. 1998. "Managing 78 Simultaneous RDD Samples." Proceedings of the Section on Survey Research Methods, American Statistical Association.

Alan J. White, Ronald J. Ozminkowski, Andrea Hassol, J. Michael Dennis, and Michael Murphy. "The Effects of New York State's Ban on Multiple Listing for Cadaveric Kidney Transplantation." Health Services Research 33 (June, 1998).

Alan J. White, Ronald J. Ozminkowski, Andrea Hassol, J. Michael Dennis, and Michael Murphy. "The Relationship Between Multiple Listing and Cadaveric Kidney Transplantation and the Effects of a Multiple Listing Ban." Transplantation Reviews, II (April 1997): 76-84.

J. Michael Dennis, Ph.D. "Scarce Medical Resources: Hemodialysis and Kidney Transplantation," in Jon Elster, ed., Local Justice in America, New York, NY: Russell Sage Foundation, 1995.

J. Michael Dennis, Patricia Hanson, Ernest E. Hodge, Ruud A.F. Krom, Robert M. Veatch, "An Evaluation of the Ethics of Presumed Consent and a Proposal Based on Required Response," UNOS Update 10 (February, 1994): 10-15-18.

J. Michael Dennis. "Surgeons Under Surveillance: Dialysis and Transplantation in the U.S.," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London: Pinter, 1994.

J. Michael Dennis. "The Colour of Genes in the U.S.," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London: Pinter, 1994.

J. Michael Dennis. "Three Countries, Three Systems," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London: Pinter, 1994.

Michael P. Battaglia, Mary Cay Burich, J. Michael Dennis, Marcia Russell, Hal Yahoo, Page Chapel, "The Prevalence of Alcohol and Other Drug Abuse and Dependence in Short-Term General Hospitals," 1993 Proceedings of the International Conference on Establishment Surveys, American Statistical Association (1993): 569-572.

J. Michael Dennis. "Government Regulations 'Politicizing' Transplantation," Nephrology News & Issues 6 (September 1992): 48.

J. Michael Dennis. "A Review of Centralized-Rule Making in American Transplantation," Transplantation Reviews 6 (April 1992): 130-137.

5

Selected Papers

Dennis, J. Michael, John Dombrowski, Kathleen Hall Jamieson, Josh Pasek and Kenneth Winneg. Disentangling Mode Effects and Mode Differences in Recruitment: Randomizing Survey Mode at the Margins and Testing Discontinuities. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research.

Bilgen, Ipek, J. Michael Dennis, Nada Ganesh, Edward Mulrow, Vicki Pineau, Mark Watts and Michael Yang. Estimation Methods for Combining Probability and Nonprobability Samples. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Stephanie Jwo, Rosalind Koff, Stuart Michaels, Vicki Pineau and Becky Reimer. Comparing Two RDS Approaches to Extend the Reach of a Probability-Based Panel. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research..

J. Michael Dennis.  Panel-based Probability Alternatives for Sampling Racial and Ethnic Minorities. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

Ipek Bilgen, J. Michael Dennis, and Nada Ganesh. Examination of Nonresponse Follow-up (NRFU) Impact on AmeriSpeak Panel Data Quality and Study Estimates. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

David Sterrett, Dan Malato, Jennifer Benz, Ipek Bilgen, J. Michael Dennis, and Vicki Pineau. Exploring the Methodological Tradeoffs of Mixed-Mode Surveys with an Experimental Design.   Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

Ipek Bilgen, J. Michael Dennis, and Tom Smith.  Comparing the Probability-Based AmeriSpeak Panel and the In-Person 2016 General Social Survey: Mode, Device, Item Wording Experiments. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

Nadarajasundaram Ganesh, Vicki Pineau, J. Michael Dennis. 2017. Managing Respondent Burden for a Household Panel using Permanent Random Number Sampling.  Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Pineau, Vicki, J. Michael Dennis, Stuart Michaels, Sherry Emery, Nadarajasundaram Ganesh. 2017. Surveying Rare or Hidden Populations Using a Probability-based Household Panel. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Pineau, Vicki, Paul J. Lavrakas, and J. Michael Dennis.  2017.  Deploying a Total Survey Error (TSE) and Total Survey Quality (TSQ) Assessment of the AmeriSpeak® Panel.  Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Reimer, Becky, Jennifer Benz, Trevor Tompson, Liz Kantor, Rosalind Koff, J. Michael Dennis, Emily Swanson, David Pace, 2017. Testing A New Methodology for Exit Polling: A National, Panel-based Experiment. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Malato, Dan, Jennifer Benz, Trevor Tompson, J. Michael Dennis, Vicki Pineau, Nadarajasundaram Ganesh.  2017. Impact of Mixed-Mode Recruitment and Data Collection on Sample Representativeness and Survey Estimates for a Probability-based Household Panel.  Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Barron, Martin and J. Michael Dennis. 2016. Multi-Client Household Panel Quality:  The Case of AmeriSpeak." Presented at the 2016 Annual Meeting of the American Association for Public Opinion Research.

Ganesh, N., J. Michel Dennis, and Paul J. Lavrakas. 2016.  Using Nonresponse Follow-up Recruitment to Help Build a Probability-based Research Panel.  Presented at the 2016 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Angela Fontes, Kean Chew, Paul J. Lavrakas, Nada Ganesh. 2015. "Boosting Probability-Based Web Survey Response Rates via Nonresponse Follow-Up." Presented at the 2015 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Kathleen Connolley, and Stephanie Jwo. "Online Survey Sampling Solutions for Studies of LGB." Presented at the 2013 Chicago Annual Workshop on Biomeasures Collection in Population-Based Health and Aging Research hosted by the Chicago Core on Biomeasures in Population-Based Health and Aging Research (CCBAR), October 17, 2013.

Dennis, J. Michael, Curtiss Cobb III. "How Far Have We Come? The Lingering Digital Divide and Its Impact on the Representativeness of Internet Surveys." Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Curtiss Cobb III, Michael Lawrence, and Jordon Peugh. "The Prevalence and Impact of Self-Selection Bias and Panel Conditioning on Smoker Studies Using Established Internet Panels." Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research.

Pasek, Josh, J. Michael Dennis, and Curtiss Cobb III. "Consumer File Ancillary Data and Nonresponse Adjustment: Assessing the Consistency of Estimates Across Weighting Strategies." Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research.   Submitted for publication.

Pasek, Josh. Seung Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. "Can Microtargeting Improve Survey Sampling?  An Assessment of Accuracy and Bias in Consumer File Marketing Data." Presented at the 2012 Annual Meeting of the American Political Science Association.

Disogra, Charles. J. Michael Dennis and Mansour Fahimi. 2012 "Using Ancillary Information in National ABS Samples to Recruit Hard-to-Reach Young Adults and Hispanics." Presented at the 2012 Hard to Reach Conference sponsored by the American Statistical Association.

Lavrakas, Paul J. J. Michael Dennis, Jordan Peugh, Jeffrey Shand-Lubbers, Elissa Lee, Owen Charlebois and Mike Murakami. 2012 "An Experimental Investigation of the Effects of Noncontingent and Contingent Incentives in Recruiting a Long-Term Panel: Testing a Leverage Salience Theory Hypothesis." Presented at the 2012 Midwest Association for Public Opinion Research.

Pasek, Josh. Seung Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. 2012  "How Accurate is Micro-Targeting? An Assessment of Marketing Data Bias for Political and Survey Purposes." Presented at the 2012Annual Conference of the American Association for Public Opinion Research and the 2012 Annual Conference of the American Political Science Association.

Dennis, J. Michael. Charles DiSogra and Erlina Hendarwan. 2012. "Using Ancillary Information to Stratify and Target Young Adults and Hispanics in National ABS Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research and the 2012 Hard to Reach Conference.

Pasek, Josh. S. Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. 2012. "The Public According to Marketers: Imputing National Demographics From Marketing Data Linked to Address-Based Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Shand-Lubbers, Jeff. J. Michael Dennis, Jordon Peugh, Liz Brisson and Zabe Bent. 2012 "The Use of Online Methodology to Inform Public Policy Planning: A Case Study from San Francisco." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Lavrakas, Paul. J. Michael Dennis, Jordon Peugh, Jeff Shand-Lubbers, Elissa Lee and Owen Charlebois. 2012. "Investigating Non-response Bias in a Non-response Bias Study." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

7

Lavrakas, Paul. J. Michael Dennis, Jordon Peugh, Jeff Shand-Lubbers, Elissa Lee and Owen Charlebois. 2012. "Experimenting with Non-contingent and Contingent Incentives in a Media Measurement Panel." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

DiSogra, Charles. Curtiss Cobb, Elisa Chan, and J. Michael Dennis. 2012 "Using Probability-Based Online Samples to Calibrate Non-Probability Opt-in Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Dennis, J. Michael. Yelena Kruse, and Trevor Tompson. 2011. "Examination of Panel Conditioning Effects in a Web-Based 2007-2008 Election Study." Presented at the 2011 Annual Conference of the American Association for Public Opinion Research.

Zukin, Cliff, Jessica Godofsky, Carl Van Horn, Wendy Mansfield, and J. M. Dennis. 2011. "Can a Non-Probability Sample Ever be Useful for Representing a Population? Comparing Probability and Non-Probability Samples of Recent College Graduates." Presented at the 2011 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/docs/aapor2011/aapor11-can-a-non-probability-sample.pdf

Baker, Reg. Stephen Blumberg, J. Michael Brick, Mick P. Couper, Melanie Courtright, J. Michael Dennis, Don Dillman, Martin R. Frankel, Philip Garland, Robert M. Groves, Courtney Kenned, Jon Krosnick, Sunghee Lee, Paul J. Lavrakas, Michael Link, Linda Piekarski, Kumar Rao, Douglas Rivers, Randall K. Thomas, and Dan Zahs. 2010 "AAPOR Report on Online Panels." The Final Report of the AAPOR Online Panel Task Force.  Prepared for the American Association for Public Opinion Research,  March, 2010.

Dennis, J. Michael, "Using Ancillary Data Available for Address-Based Sampling to Measure Self-Selection Bias" Paper presented to the International Workshop on Using Multi-level Data from Sample Frames, Auxiliary Databases, Paradata and Related Sources to Detect and Adjust for Nonresponse Bias in Surveys, Chicago, June, 2011.

Dennis, J. Michael, Jordon Peugh, and Pat Graham. 2010. "KnowledgePanel Calibration: Using KnowledgePanel to Improve the Sample Representativeness and Accuracy of Opt-in Panel Data." Available at http://www.knowledgenetworks.com/ganp/docs/KN-Calibration-Research-Note-2010-03-02.pdf

Dennis, J. Michael. 2010. "KnowledgePanel®: Processes & Procedures Contributing to Sample Representativeness & Tests for Self-Selection Bias."  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Dennis, J. Michael, and Charles A. DiSogra. 2010. "Does Providing Internet Access to Non-Internet Households Affect Reported Media Behavior for Latinos and Non-Latinos?  Results from a Six-Month Longitudinal Survey." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

DiSogra, Charles, J. Michael Dennis, and Mansour Fahimi. 2010. "On the Quality of Ancillary Data Available for Address-Based Sampling." Presented at the 2010 Joint Statistical Meetings, Vancover.  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Kruse, Yelena, Erlina Hendarwan, J. Michael Dennis, and Charles A. DiSogra. 2010. "Analysis of Late Responders to Probability-based Web Panel Recruitment and Panel Surveys." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Garrett, Joe, J. Michael Dennis, and Charles A. DiSogra. 2010. "Non-response Bias: Recent Findings from Address-based Panel Recruitment." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research.  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

8

Dennis, J. Michael, Larry Osborn, and Karen Semans. March 2009. "Comparison Study of Early Adopter Attitudes and Online Behavior in Probability and Non-Probability Web Panels."  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Dennis, J. Michael. 2009. "Description of Within-Panel Survey Sampling Methodology: The Knowledge Networks Approach."  Available at http://www.knowledgenetworks.com/ganp/docs/KN-Within-Panel-Survey-Sampling-Methodology.pdf.

Dennis, J. Michael, Trevor Tompson, Mike Henderson, and Yelena Kruse. 2009. "Measures of Non-Traditional Media Consumption During the 2008 Presidential Campaign."  Presented at the 2009 Annual Meeting of Midwest AAPOR, November 21, 2009.

Dennis, J. Michael, and Trevor Tompson. 2009. "Web Panel Studies of the 2008 Election: New Opportunities for Causal Analysis of Dynamic Change in the Electorate." Presented at the 2009 Annual Conference of the American Association for Public Opinion Research.  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Kruse, Yelena, Mario Callegaro, J. Michael Dennis, Stefan Subias, Mike Lawrence, Charles DiSogra, and Trevor Tompson. 2009. "Panel Conditioning and Attrition in the AP-Yahoo! News Election Panel Study." Presented at the 2009 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

J. Michael Dennis, Rick Li and Joe Hadfield. 2007. "Results of a Within-Panel Survey Experiment of Data Collection Mode Effects Using the General Social Survey's National Priority Battery." Presented at the 2007 Annual Conference of the American Association for Public Opinion Research.

J. Michael Dennis and Rick Li. 2005. "Results from a Knowledge Networks' Question Wording Experiment for Political Party Identification." Available at http://www.knowledgenetworks.com/ganp/docs/kn-party-id-experiment-022805.pdf

J. Michael Dennis, Cindy Chatt, Rick Li, Alicia Motta-Stanko, Paul Pulliam. 2005. "Data Collection Mode Effects Controlling for Sample Origins in a Panel Survey: Telephone versus Internet." Available at http://www.knowledgenetworks.com/ganp/rtimode.html.

J. Michael Dennis and Rick Li. 2004. "Health Condition Prevalence Rates Between National Health Interview Survey (NHIS) and Knowledge Networks (KN)." Available at http://www.knowledgenetworks.com/ganp/docs/KNvsNHIS2.pdf

J. Michael Dennis and Rick Li. 2004. "Weighting Procedures Used for the Veterans Administration Prescription Medication Study." Available at http://www.knowledgenetworks.com/ganp/docs/061604_Weighting-Description.pdf.

J.Michael Dennis, Rick Li, and Cindy Chatt, 2004. "Benchmarking Knowledge Networks' Web-Enabled Panel Survey of Selected GSS Questions Against GSS In-Person Interviews." Knowledge Networks Report, February 2004. Available at http://www.knowledgenetworks.com/ganp/docs/GSS02-DK-Rates-on-KN-Panel-v3.pdf

Vicky Pineau and J. Michael Dennis. 2004. "Methodology for Probability-Based Recruitment for a Web-Enabled Panel." Knowledge Networks Report

J. Michael Dennis. 2003. "Panel Attrition Impact: A Comparison of Responses to Attitudinal and Knowledge Questions about HIV Between Follow-up and Cross-Sectional Samples." Available at http://www.knowledgenetworks.com/ganp/docs/HIV-Study-Panel-Attrition-Impact-Research-Note-2003.pdf

J. Michael Dennis, Rick Li, J.R. DeShazo and Trudy Ann Cameron. 2003. "Correcting for Sample Bias in Internet Panel Surveys based on RDD Sampling." Presented at the Joint Statistical Meetings, August 2003

Dennis, J. Michael, Rick Li. 2003. "Effects of Panel Attrition on Survey Estimates." Presented at the 2003 Annual Conference for the American Association for Public Opinion Research.

Selected Workshops, Expert Panels, and Seminars

Workshop Participant. Mapping the Global Online Probability based Panel Landscape. RISCAPE Workshop. Amsterdam, Netherlands.  December 11-12, 2019.

Member, Expert Panel.  New Direction for the National Household Travel Survey. Sponsored by the Federal Highway Administration. 2018-Present.

Featured Speaker.  AARP "Think In" on Surveys of Asian Americans and Pacific Islanders.  July 23-24, 2018. Washington, DC.

Expert Panel Participant, National Survey of Family Growth, U.S. Centers for Disease Control and Prevention, April 30, 2018 – May 1, 2018.

Panel Participant and Featured Speaker.  "Workshop:  Harnessing Technology to
Reduce Attrition in Panel Surveys." Inter-American Development Bank.  Washington DC, October 2, 2017.

Featured Speaker.  Briefing Congress on the Legal Services Corporation New Report on *The Justice Gap: Measuring the Unmet Civil Legal Needs of Low-Income Americans*.  Russell Senate Building, Washington DC, June 14, 2017.

Panel Participant in an Invited Panel Session entitled "Better, Faster, Smarter – Maintaining Research Quality in a World of Intense Budget Pressure."  Annual Meeting of the Southern Association for Public Opinion.  October 10, 2013.

 "The NCRM Network of Methodological Innovation Web surveys for the general population: How, why and when?"  Workshop hosted by the University of Essex, Colchester, UK.  Presented the paper "Recommendations for Establishing a National Online Panel in the UK."  June 6-7, 2013.

"The Data Collection of the Future Has Already Started."  Seminar hosted by Willem Saris, RECSM, Universitat Pompeu Fabra in Barcelona.  Presented the paper  "Best Practices for Population-Based Online Surveys: Review of U.S. Methods Research."  July 2011.

"An International Workshop on Using Multi-level Data from Sample Frames, Auxiliary Databases, Paradata and Related Sources to Detect and Adjust for Nonresponse Bias in Surveys."  Sponsored by the National Science Foundation and hosted by NORC in Chicago.  June 2011.

"Innovative Survey Methods Workshop." Sponsored by the U.S. Department of Homeland Security and the Institute for Homeland Security Solutions.  December 2009.

"Sample Representativeness:  Implications for Administering and Testing Stated Preference Surveys."  Sponsored by EPA Cooperative Agreement CR83299-01 with the National Center for Environmental Economics, U.S. Environmental Protection Agency.  Hosted by the Resources for the Future. October 2, 2006.

"Recurring Surveys: Issues and Opportunities." Sponsored by the National Science Foundation. March 28-29, 2003.

Selected Guest Lecturer Assignments

George Washington University, University of California, Irvine, University of California, Berkeley, University of Michigan, University of Maryland, University of Pennsylvania, University of Southern California (USC), University of Texas, Austin, Stanford University.

<u>Educational Honors</u>
Century Fellowship, University of Chicago (1985-1988)
Phi Beta Kappa, University of Texas (1984-1985)
Honors in Government, University of Texas (1984)
Chapter President, Pi Sigma Alpha, University of Texas (1983-1984)
William Jennings Bryan Essay Winner, College of Liberal Arts, University of Texas (1983 and 1984)

<u>Affiliations</u>

American Association for Public Opinion Research (1992-), American Statistical Association, Member, AAPOR Online Task Force Report (2009-2010),  Chairman, Presumed Consent Subcommittee, Ethics Committee, UNOS (1992-1995), Member of Ethics Committee, the United Network for Organ Sharing (1992-1995), Member of Region 7, the United Network for Organ Sharing (1992-1995), American Political Science Association (1985-1994)