UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Ajay Krishnan, Magistrate Judge

SINATRO, et al., ) No. C 22-03460-ASK
)
Plaintiffs, )
)
vs. )
)
BARILLA AMERICA, INC., )
)
Defendant. )
______________________________)

Oakland, California
Wednesday, April 29, 2026

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 1:26 - 2:42 = 1 HOUR AND 16 MINUTES

APPEARANCES:

For Plaintiffs:

Clarkson Law Firm, P.C.
22525 Pacific Coast Highway
Malibu, California 90265
BY: BAHAR SODAIFY, ESQ.
BY: JIAMING ZHENG, ESQ.

Clarkson Law Firm, P.C.
1221 Brickell Avenue
Suite 900
Miami, Florida 33131
BY: CASSANDRA RASMUSSEN, ESQ.

(APPEARANCES CONTINUED ON THE NEXT PAGE.)

For Defendant:

Faegre Drinker Biddle & Reath LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
BY: TYLER ADAM YOUNG, ESQ.
BY: AARON VAN OORT, ESQ.
BY: KEVIN WAGNER, ESQ.

Transcribed by:

Echo Reporting, Inc.
Contracted Court Reporter/
Transcriber
echoreporting@yahoo.com

Wednesday, April 29, 2026 1:26 p.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK: Your Honor, we're calling Case Number 22CV3460, Sinatro, et al. v. Barilla America, Inc.

Counsel, if you could please step forward and state your appearances for the record.

MS. SODAIFY: Good morning, your Honor. Bahar Sodaify of Clarkson Law Firm for the Plaintiffs.

THE COURT: Good afternoon.

MS. RASMUSSEN: Good afternoon, your Honor. Cassandra Rasmussen of Clark Law Firm for the Plaintiffs.

THE COURT: Good afternoon.

MR. ZHENG: Good afternoon, your Honor. Jiaming Zheng from Clarkson Law Firm on behalf of Plaintiff.

THE COURT: Good afternoon.

MR. YOUNG: Good afternoon, your Honor. Tyler Young from Faegre Drinker for Defendant Barilla America, Inc.

THE COURT: Good afternoon.

MR. VAN OORT: Good afternoon, your Honor. I'm Aaron Van Oort from Faegre Drinker, also for Barilla.

THE COURT: Good afternoon.

MR. WAGNER: Hi, your Honor. Kevin Wagner from Faegre Drinker, also for Barilla.

THE COURT: Good afternoon.

Okay. Well, thank you, everyone, for coming, and for all of your papers. I think we are the second most followed case in this courtroom at the moment, or at least on this floor.

You know, there's a lot of papers that were submitted. I read everything, and I think where I'm coming out is that this may all just come down to this Ninth Circuit McGinity (phonetic) case, and it strikes me that that case is likely dispositive of Plaintiffs' claims, which I say with some sympathy, because this case has been litigated for quite some time, but it does seem to me that that is a difficult, and perhaps impossible, case for the Plaintiffs to get over, given the facts of the case, this case, and the nature of the claims.

So I'm going to start by -- and I think what I'm going to do today is really just focus on the summary judgment issue. If I go the way that I'm currently leaning, then I don't know how much else there is for me to decide, and one of the questions I do want to ask both parties is, what else do I have to do if I find that McGinity is dispositive?

It would be dispositive of what I think has been presented as the primary claim that the Plaintiffs have raised, I think, which really has to do with the claim

relating to where the ingredients of the pasta come from. I think it would also end up being dispositive of the claim about where the pasta is manufactured, although that claim may have different problems as well that the Defendants have raised -- Defendants raised.

And then I just don't know, if I go that direction, what more I would need to decide, you know, and there is a question -- you know, there's a strategic question, I think, that the Plaintiffs probably ought to be considering, which is, what more would you want if the -- if I go against you on McGinity? Because I think, if that sort of blows a gaping hole in your case, it may be that you just want to pursue an appeal at that point, but I don't know what other proceedings would be necessary.

My sense from reading all the papers -- and I haven't -- I have -- I think I've put it all together, but I'm not sure, and would welcome your thoughts on this, but I think it would resolve almost everything. There may be a couple small matters to decide, but, you know, there's also kind of a question of just what Plaintiffs would be interested in doing if they get an adverse ruling on that issue.

So, anyway, that's where I am, so I'll just -- so I'm going to start with the Plaintiffs, being the aggrieved party, and have them argue, and I'll just tell you a little

bit more about what I'm thinking on the McGinity case, which is that it seems to lay out the test of -- well, first is the front labeling claim that -- front label claim that is challenged, is that the "ambiguous," and -- you know, and there can be a debate about what, exactly, "ambiguous" means, although, on this record, we actually do have facts. We do have various expert opinions on that.

But I think that, even without resorting to the expert opinions, probably the claim is just ambiguous on its fact, and then, once there's a finding of ambiguity, I think that that ends things, because it means that you can go around and look at the back or side panel, wherever the "Made in USA" claim is located, and that then a reasonable customer is assumed to read that as well, and that would then be dispositive of your case, and that's even a type of ruling that could have happened at the pleading stage. McGinity didn't exist when this -- when pleadings challenges were heard in this case.

But, anyway, that's just to give you a little bit more specific thought on where I am, but please proceed with argument. I'm happy to hear whatever it is you'd like to say.

MS. SODAIFY: Yes. Thank you, your Honor. So I think it's important to stand back and see what the legal standard here is for summary judgment. It's clear that

summary judgment requires absolutely no genuine dispute of material fact. That's the law under the Ninth Circuit. Expert evidence alone here defeats summary judgment. Summary judgment is inappropriate where an expert's testimony supports the non-moving party's case, and that's in the Ninth Circuit case of Provenz v. Miller.

THE COURT: Well, let's talk about that. You have your expert. Your expert doesn't seem to opine one way or the other on whether the labeling is ambiguous, and, if anything, where your expert seems to land is that it is ambiguous, because your expert seems to say that a certain portion of people, 57 percent of people, would interpret the phrase in one way, which leaves open a wide group of people that could interpret it some other way, leading to a finding of ambiguity.

MS. SODAIFY: So, your Honor, just because a claim can have another interpretation doesn't make it ambiguous under the law. The Ninth Circuit case of Whiteside (phonetic) made that clear, where it explicitly said that, when defining "ambiguity," the Ninth Circuit held that, quote, "A front label is not ambiguous simply because it is susceptible to two possible meanings."

To find a front label ambiguous, your Honor, the Court would have to find as a matter of law that consumers would necessarily consult other aspects of the packaging before

being able to understand what the front claim says. Specifically in the Ninth Circuit case of Whiteside, which came out after McGinity --

THE COURT: Yes, I know Whiteside. I read it before coming here.

MS. SODAIFY: That --

THE COURT: I'm very familiar with it.

MS. SODAIFY: That court explicitly said, quote:

> "Contrary to the Defendant's suggestion, our cases affirm that a front label is not ambiguous simply because it has -- because it's susceptible to two possible meanings. A front label is ambiguous when reasonable consumers would necessarily require more information before reasonably concluding that the label is making a particular representation."

Here the claim, your Honor, is not ambiguous, and consumers, therefore, did not have to require more information. The front claim is, in and of itself, deceptive. When you have over half, you have 57 percent of consumers believe the products are made with Italian-sourced ingredients, as proffered by our expert, Doctor Dennis (phonetic), in his expert reports, which were also before

this Court during class certification, where the Court took that all into consideration.

THE COURT: The Court was very clear on class cert, that -- Judge Ree (phonetic) was very clear that she wasn't considering merits issues, and she really gave the Defendant's arguments much the back of the hand on class cert, saying that class cert -- those merits issues just weren't appropriate. So, yes, they were before the Court, but I think she was very clear that they weren't really relevant to the certification issues. They really went to the merits.

MS. SODAIFY: Your Honor, as it pertains to the McGinity case, the McGinity case was raised during certification. Defendant raised it again during reconsideration. At both points, the Court considered the arguments and proceeded with certification of the case.

THE COURT: Yes. I just don't think this is a --

MS. SODAIFY: This is --

THE COURT: I think Whiteside is your best argument, right? But I don't think this -- that the Court already considered this as a particularly good argument for you, just because I don't think that these issues were teed up on class cert.

MS. SODAIFY: I would also say that McGinity is also highly distinguishable on its facts.

THE COURT: But let's finish on Whiteside, though. Let's finish on Whiteside. So here's the problem. You know, you have an expert that says that 57 percent of the people interpret the phrase "Italy's number one" -- is it "Italy's" --

MS. SODAIFY: "Italy's number one brand of pasta."

THE COURT: -- "Italy's number one brand of pasta" -- to mean that the ingredients are sourced in Italy, right? Doesn't that mean that there are 43 percent of people that don't feel that way?

MS. SODAIFY: Your Honor, the law is clear.

THE COURT: Well, that, and your expert didn't give people an option to say anything more, right? Your option -- your expert simply asked, "Do you think this or do you think something else?" And they weren't given a question about ambiguity, right? I mean, that's the big critique of your expert.

MS. SODAIFY: Your Honor, the critiques regarding the experts are all questions that go to weight and not admissibility, and, ultimately, it ends up being a battle of the experts for the jury to decide.

THE COURT: Well, no, no, no. Let's assume you're right about that. Let's assume your expert comes in. It's evidence, right? I mean, as evidence, the issue with your expert testimony, right, is -- assume it comes in. It comes

in as evidence. Now you have an expert having asked people, "Do you think this phrase means that the ingredients are sourced in Italy, or do you think something else?" But the expert never asked about ambiguity.

MS. SODAIFY: Your Honor, the expert here performed a conjoint survey that is exactly how conjoint surveys have been performed in other cases with the closed-end question, and we can go get into that, but I wanted to first address --

THE COURT: But does -- did your expert ask anything, or make any findings one way or the other, about the ambiguity?

MS. SODAIFY: Your Honor, when defining "ambiguity" here, 57 -- here, 57 percent of consumers understood the product label to mean that the product pasta is sourced from Italy, even having exposure to all sides of the packaging at the time of the consumer survey. Even with that exposure, they believed the product to mean -- the label to mean that it was sourced -- the ingredients were source from Italy.

And I have to say that other cases have found that that's enough to show that there is deception here. Fitzhenry v. Dr. Pepper Snapple Group found 25 percent was sufficient. In Re: NJOY (phonetic) Consumer Class Action --

THE COURT: But sufficient for what? Sufficient

under --

MS. SODAIFY: To show deception.

THE COURT: But is it to show the lack of ambiguity?

MS. SODAIFY: There is no ambiguity here, your Honor.

THE COURT: You're saying there's no ambiguity --

MS. SODAIFY: Yes.

THE COURT: -- but let's start with my question.

MS. SODAIFY: Yes.

THE COURT: Did your expert ask survey respondents whether they found the claim ambiguous?

MS. SODAIFY: But that's not the -- your Honor, that's not the proper inquiry, and I'll let my colleague speak to that explicitly.

MS. RASMUSSEN: Your Honor, it was very clear in the question that Doctor Dennis performed that if respondents did not know the answer, they were supposed to select "I don't know." They were initially asked, "Do you think that this phrase means that these -- the ingredients are sourced from Italy?" "Yes, I believe that," "No, I do not believe that," "No, I do not know." It was baked into the question three times, "If you don't know the answer, then choose 'I don't know.'"

THE COURT: And how many people said, "I don't

know"?

MS. RASMUSSEN: Certainly less than 57 percent.

THE COURT: But, I mean, but how many less?

MS. SODAIFY: But, your Honor --

THE COURT: I mean, this isn't a point that you focused on in opposition. I mean, you're raising now -- I mean, you actually hardly addressed McGinity in your opposition brief, and McGinity asks first, "Is it ambiguous?" And I agree with you that Whiteside might give you a little bit of room to wiggle out of the ambiguous question, but I don't think that you get there on a factual dispute from your experience, because your expert did not ask about ambiguity.

MS. SODAIFY: But, your Honor, that is not the proper question on a consumer perception survey trying to understand how consumers perceive --

THE COURT: I agree it's not the proper question.

MS. SODAIFY: So --

THE COURT: I agree it's not the proper question, which means that it's not relevant to the McGinity analysis. That's the problem. McGinity is asking about ambiguity, and you said that "In order to demonstrate ambiguity, we're going to point you to your expert." But your expert wasn't asking about ambiguity, because your expert wasn't interested in ambiguity.

MS. RASMUSSEN: But, your Honor, McGinity is not a bar that says, because a claim could have been considered ambiguous, therefore, the whole thing should be tossed out. You have to take into account that the disclaimer on the side panel, the "Made in the USA," was incorporated into the survey, and even with seeing that claim, consumers interpreted the phrase to mean that the ingredients were solely sourced from Italy. That indicates that, unlike McGinity, in which reviewers did not get a chance to even see the back of the package to even be exposed to that, our case is clearly distinguishable.

THE COURT: Well, I think that that's not really what McGinity was. In your -- does your expert lay out -- ask a -- did your expert ask a subsidiary question, "Who looked at the 'Made in USA claim?,'" versus who didn't?

MS. RASMUSSEN: Your Honor --

THE COURT: Because that's what's happening, right in the -- like in a consumer walking down the shopping -- like, the grocery store aisle. There, you know, they may or may not look at the back label. I mean, that's what McGinity says. McGinity is talking about "We look at the front label first," and then you get to whether, you know, the side label or back label is even considered.

And I get you're saying your expert in the setup of the survey had both available for the people to see, but we

don't know who looked at it versus didn't, right, the Made in USA client?

MS. RASMUSSEN: Your Honor, not only was that available for consumers to see, they had to mark off whether or not they had the option to see it. They were told to look at the package as if they were at a grocery store, and so consumers were led towards reviewing the whole package before they answered Doctor Dennis' questions, which is different from McGinity, where they were not given access to the back of the package to begin with.

THE COURT: Wasn't McGinity a pleadings challenge?

MS. SODAIFY: Your Honor, it's -- I believe that's the case, but, again, it's also distinguishable on its facts, for the reasons already expressed in our briefing, but --

THE COURT: Go ahead and tell me. I cut you off before you got to why McGinity is distinguishable.

MS. SODAIFY: Yes. So, factually, it's distinguishable. There you have a claim, "nature fusion." The Plaintiffs there alleged that the product contained synthetic ingredients, and, therefore --

THE COURT: I know the facts.

MS. SODAIFY: Yes. So there the Court held that "nature fusion" was ambiguous on its own, and that it would warrant consumers to look at the back for clarification.

THE COURT: Yes. I take your point.

MS. SODAIFY: That is not the fact pattern here, your Honor. Here we have -- and, again, as my colleague mentioned, survey takers had zero access to the back of the label, where here they had the opportunity to view the full label, as they would shopping in the marketplace, including the disclaimer on the side panel, and still 57 percent affirmatively said that they were deceived. So we're not dealing with the same scenario as McGinity. Rather, there is no ambiguity here, and there's no need to consult other information on the packaging, per the Ninth Circuit's Whiteside case. But, even faced --

THE COURT: So the problem that I'm having with your argument is that you're now presenting something that's different from what McGinity says, right? You're saying they got to look at both, the front label and the side label. McGinity is saying you don't even look at the side label when you're addressing ambiguity. You're just looking at the front label, right?

I mean, so the argument that you're making -- McGinity says you look at the front claim on the front -- you look at the front label. You look at the claim, and is that claim susceptible to multiple interpretations? And, if so -- or not -- I mean, is it ambiguous? They kind of lay out their for ambiguity, and Whiteside elaborates on that test, but --

MS. SODAIFY: Your Honor --

THE COURT: -- but they're not saying, "Look at the front and decide at the same time." That's not what McGinity says. McGinity says you get to the side or back only if there's ambiguity.

MS. SODAIFY: Right. And we're stating, your Honor, that there is no ambiguity in the first place to require the Plaintiffs -- or consumers -- to look elsewhere on the packing, and even if --

THE COURT: But -- so focus on that point. Why is there no ambiguity?

MS. SODAIFY: Your Honor, we don't -- when there's multiple interpretations, that doesn't mean, automatically, there's ambiguity --

THE COURT: I agree with you there, but --

MS. SODAIFY: -- and that's what Whiteside said.

THE COURT: I agree with you, but you're still not -- you're saying, "Well, that doesn't necessarily mean there's ambiguity," but how do -- but you have to go a little further and explain why there is ambiguity, or why there isn't. Why isn't there --

MS. SODAIFY: There isn't, because we have expert evidence establishing that 57 percent of consumers who saw the front label packaging still ultimately believe it to mean exactly the challenged representation, which is that

the products are made with Italian-sourced ingredients.

THE COURT: But that doesn't mean that it's unambiguous. Yes, you have 57 percent that felt it meant one thing. They weren't asked whether there were other interpretations of it, but that doesn't mean -- that finding right there does not mean that there was -- there's evidence supporting ambiguity --

MS. RASMUSSEN: Your Honor, the --

THE COURT: -- or lack of ambiguity. That 57 percent of people think one thing doesn't tell me anything, one way or the other, as to whether or not there's ambiguity, and, if anything, it suggests that there is ambiguity. That's the problem with, I think, your -- I just don't think your expert gets you very far on this question of lack of ambiguity, again, because that's your -- right now you're at a point where you have to argue that you don't look at the back, you don't look at the side, because there's a lack of ambiguity, but I don't understand how your expert's findings get you to there's a lack of ambiguity.

MS. RASMUSSEN: Your Honor, thank you for those questions. A few points on that. As an initial matter, before conducting the consumer perception survey, Doctor Dennis did conduct some open-question surveys with focus groups to understand how consumers understood his question, to understand whether it was biased, whether it was leading,

and so there was this sort of focus group to understand how consumers responded to this phrase. But, your Honor, the cases in which it has been decided that there is ambiguity are cases where, if there are much clearly ambiguous words, like "nature" or --

THE COURT: I agree with that. I agree. I agree that "nature fusion" is much more ambiguous than -- or is more ambiguous than this phrase here.

MS. RASMUSSEN: And so, if anything, if there is a question of ambiguity, wouldn't that be a question of ambiguity, a question of fact?

THE COURT: That's not what McGinity says. McGinity is not -- McGinity says there was ambiguity at the pleading stage, so now we look at the back panel, and now the case is over. So the existence of ambiguity in McGinity is a reason for dismissing the case. It's not -- they're saying, "Oh, there's ambiguity, so we have to let it go forward." They're saying, "Oh, there's ambiguity, so we look at the side panel, and now the case is over."

MS. SODAIFY: Your Honor, but we have -- again, that was at the motion to dismiss stage. We are at summary judgment, which requires to show that there's actually no issue of genuine material fact in dispute. With the -- we have affirmative expert evidence establishing that 57 percent of consumers are deceived by this label, confirmed

that there -- that those consumers are not deceived by any kind of ambiguity. They're clearly seeing that label as meaning what we've been alleging regarding the challenged representation. That alone sets this up specifically for the jury to ultimately make a decision. It would be --

THE COURT: Doesn't that, at most, tell me that it's unambiguous for 57 percent of people?

MS. SODAIFY: Your Honor, that's not how or what this particular consumer survey was designed to test.

THE COURT: I know. I know. That's the problem. You keep coming -- you first say that the survey is relevant to ambiguity, and then you say the survey was never intended to look at ambiguity.

MS. SODAIFY: But because a consumer perception survey is to literally test how consumers perceive the label claim as alleged in the case. That is the point, that's the purpose, and that satisfies the standard of how consumer perception surveys are treated and used. To ask an additional question, "Do you find this label ambiguous?," is not even within the wheelhouse of what that consumer survey is meant to test.

THE COURT: I agree. I a hundred percent agree with you.

MS. SODAIFY: And so asking for that additional question, again, it has no basis here, and it is not a

proper basis for summary judgment, which makes clear that if you have expert evidence, and you have expert evidence on both sides, that, in itself, creates a triable issue of material fact, and to the extent that it ultimately leads to a battle of the experts, that is ultimately for the jury to decide, and we are establishing here that there is no ambiguity in the first place. McGinity doesn't get triggered as a result, and this is more like what Whiteside said, which, again, came after that case.

THE COURT: Okay. Well, I'll give you a chance to respond to what the Defendant has to say, but ask -- tell me this. What happens if I find that McGinity is dispositive of the claim relating to -- that -- your sort of core claim here that the label implies that the ingredients are sourced from Italy, and if I say you can't go forward on that claim, what's left, and what else would I have to decide with respect to this case?

MS. SODAIFY: Well, your Honor, I would say, for the reasons already expressed, your Honor should allow the consumer perception survey to move forward, for the reasons previously expressed, as well as it being standard.

THE COURT: Well, the consumer perception survey is just a piece of evidence. I mean, that's -- what claims would persist, and do you really want a trial on whatever you have left? I don't know what you have left, but what do

you have left?

MS. SODAIFY: Your Honor, the claims regarding the fact that that claim is deceptive, that it's material to consumers. All of these claims still remain.

THE COURT: Well, those are elements. I'm talking about, like, what causes of action would you have?

MS. SODAIFY: Those -- the California Consumer Protection statutes, UCL, FAL, CLRA (phonetic), breach of express warranty, unjust enrichment. All of those would still survive even without the consumer perception survey, if that ends up being excluded.

THE COURT: I'm not saying exclude the survey. I'm saying assume that I rule, as a matter of law, that your legal claim challenging Barilla's claim that -- you know, your legal claim, which says that their claim about being Italy's number one brand -- that that is -- that that's -- your challenge to that, that that's false advertising, it's an unfair business practice, it violates the CRLA, all of that -- assume that I rule against you on that under McGinity, right? McGinity had all those claims, and at least those three claims were at issue in McGinity. So assume they're gone. What more do I have to decide in the case? What else would still survive?

MS. SODAIFY: Your Honor, although that is the challenged representation here, we're -- I'm trying to

establish that there's still evidence of the elements for these particular causes of action beyond that.

THE COURT: But I'm saying, if the causes of action that would be disposed of by McGinity -- if those causes of action are gone, you don't just get to have a trial for elements on which you didn't lose, right? You know, if you can't prove an element, you lose the cause of action. The cause of action is gone. If these causes of action are gone, what is left?

MS. SODAIFY: Your Honor, to the extent that you believe that the consumer survey, expert survey, is not including additional information --

THE COURT: I'm not ruling on the survey as a piece of evidence. You know, the survey as a piece of evidence is not material to the question of, you know, does the claim survive or not? Assume the claim is -- does not survive. The claim is dismissed. Any claim that's covered by McGinity is dismissed. What claims do you have left?

MS. SODAIFY: I would imagine that we would have to appeal the decision.

THE COURT: I think that's where I am, too, but you have these warranty claims, which are sort of -- you know, McGinity didn't involve a warranty claim, so I don't know if there's something different that I have to decide on that, but -- and they have different arguments about your

warranty claim. So I can also ask them. Maybe you should take some time to think about it, but I do want the case management piece of this to be -- I want to understand it, so I want to understand what the consequence of that ruling would be.

Okay. Let me go over to defense, to defense counsel, and why don't we start with McGinity and Whiteside, and then -- so I think there are two categories of things that Plaintiffs' counsel has raised that I'd like you to address. One is Whiteside, because Whiteside does say that the ambiguity question isn't just "Can I literally parse the representation and find two meanings for it?" You know, it's more complex than that, and that was a pleadings-stage case. We're at summary judgment now.

I could just change the 12(b)(6) working in McGinity to summary judgment wording, and see how that lands, but I do want to understand how, exactly, to approach this ambiguity question, because it's not simply a question of, you know, is the statement susceptible to multiple meanings? So I'd like you to address that, which I think is largely kind of a Whiteside issue, and then I'd also like you to address what, if anything, we can glean from their expert, because, you know, that is the primary source of facts and fact dispute here. So I'd like to understand whether or not that creates some factual dispute.

MR. YOUNG: Thank you, your Honor. The test Whiteside sets forward, as you know, is that a statement is ambiguous if a reasonable consumer would necessarily require more information before assigning a particular meaning to that statement. We know that the statement "Italy's number one brand of pasta" meets that test and is ambiguous for a few reasons.

One, the statement doesn't say anything about ingredients. That's just not in the statement whatsoever. That word isn't used, so it's a matter of inference and interpretation to get there. I think it's also significant, if you look at Plaintiffs' opposition brief, that they really don't ever come in and say, "This statement is unambiguously deceptive," because that's just not credible.

But the biggest piece that I can add here today in terms of connecting this to the summary judgment standard, and to the expert evidence that Plaintiffs want to rely upon, is to say that, in McGinity, there was also a survey that was offered by the Plaintiffs.

It was a pleadings-stage case, right? But a survey was attached to the complaint, and the Court said, "At the pleading stage, we have to treat this as true, and give it all reasonable inferences." That survey showed a roughly 50/50 response rate favoring Plaintiffs' interpretation, and the McGinity court, the Ninth Circuit, said, "That is not

evidence of deception. That is evidence of ambiguity." So that was at the pleadings stage.

I'd also direct your Honor to the Corbett v. PharmaCare decision, which we cited in our papers, which is a summary judgment case, and in that case, there was a survey conducted by the Plaintiffs that showed a 51.9-percent --

THE COURT: Let's go back to your first three points. The things is, Plaintiffs' counsel is right that McGinity presents an easier case of ambiguity, because -- I forget what the phrase was.

MR. YOUNG: "Nature fusion."

MS. RASMUSSEN: "Nature fusion."

THE COURT: "Nature fusion." That -- who knows what that means? And, actually, in Whiteside, Judge Gould actually says that, you know, which -- and sort of makes fun of it, and, you know, that could in some ways really narrow McGinity to just cases where you have sort of a claim that's sort of a -- that's not really a full sentence or a full statement, and so it just kind of -- you know, but -- and, so anyway, so I just -- how do you know whether a reasonable consumer here would necessarily require more information?

MR. YOUNG: Yes. So I think your Honor is right that you could conclude, just at the pleadings, that this is the kind -- you could make that judgment, as a matter of law, that this is the kind of statement that a reasonable

consumer would require more information to assign a particular meaning to it. I think --

THE COURT: The nature of your argument is "Well, we're probably right in the first instance," right? I mean, the nature of your argument -- and I don't think you're right enough to get you to summary judgment on just the literal meaning of the phrase, but you start with "Well, probably this is what it means, what we say it means, and since we are -- since we have the more likely reading, anything else is necessarily ambiguous," and that framing seems different from what they're doing in McGinity, right? McGinity -- you know, in McGinity, they're saying, "Well, 'nature fusion,' I mean, who knows what that means?"

But, you know, in McGinity, what they' -- or in Whiteside, but they're saying is -- what the Court said in Whiteside was "Well, we ask whether the Plaintiff can plausibly plead that there was only -- plausibly plead that there was this deceptive interpretation, unambiguously, that there -- if they can plausibly plead that there was -- that this was unambiguously deceptive, then, you know, we let the claim go forward. So why isn't that sort of think, at the summary judgment stage, enough to get them past summary judgment?

MR. YOUNG: Yes. So I think the way the Court framed it in McGinity was to say it's only if Plaintiffs can

plausibly plead an unambiguously deceptive statement that the Defendant would be precluded from insisting that the rest of the label be considered. Here, I think Plaintiffs need to prove that the label is unambiguously deceptive in order to preclude us from insisting that the rest of the label be --

THE COURT: Don't they only need to show that there's a factual dispute on that?

MR. YOUNG: Even if that's true, I don't think they've done that, because, as they candidly said, their expert did not study ambiguity. Their expert --

THE COURT: Right. You know, if this case went to trial, would the jury instructions say what McGinity says, which is you first look at the front label, you don't even look at the back label until you first determine that there's ambiguity? Is that what the jury instructions would say now? Would they have to evaluate it in the same way that the Ninth Circuit does?

MR. YOUNG: I think it's possibly. We'd obviously have to give a lot of thought to the jury instructions, but, even before McGinity, there's a long line of cases that say that reasonable consumers evaluate a statement in context, and consider the statement in the context in when it's -- in which it's presented, and here that's on this product package that includes all of this additional information.

But I do think that it's possible that the jury instructions would adopt that McGinity test and say, "Do you find the statement to be ambiguous? In other words, do you find that reasonable consumers would need more information before they could decide that 'Italy's number one brand of pasta' means that the pasta's ingredients are all from Italy?"

Your Honor, I'd like to suggest -- two cases are informative on this question. You mentioned that "nature fusion" is more ambiguous, right? Before McGinity, the Ninth Circuit decided Moore v. Trader Joe's, and in that case, the claim was "100 percent New Zealand manuka honey" or "100 percent manuka honey," and the Court said that there was ambiguity in that phrase.

The Court didn't exactly frame the ambiguity test as concisely as it later did in McGinity, but it said the term "100 percent New Zealand manuka honey" is ambiguous because "100 percent" could modify "New Zealand," could modify "manuka," could modify "honey." And I think, if that's ambiguous, this is right in that zone.

THE COURT: Well, you know, there's an argument from Whiteside that Trader Joe's is now kind of a case about niche products, right, that, you know, the consumers of manuka honey know what they're talking about, and they know what -- you know, they know that all the bees don't go to

just one flower and all of that. So -- but, in any event, I -- do ahead.

MR. YOUNG: No. Thank you. And I would like to respond to that point, because it's true that manuka honey is a specialized product, as the Ninth Circuit said in that case, but I think that connects here, because the claim that the Plaintiffs are advancing is not merely that people want to buy pasta. It's that people have this particular interest. They want pasta whose ingredients come exclusively from Italy.

So it may not be a niche product in the same way, but that is a specialized consideration, and consumers who care about that, and encounter a statement that doesn't mention ingredients, that says, "Italy's number one brand," which has an obvious intuitive meaning, which the evidence shows is the most common meaning, and is true, I think they would necessarily need more information before they would assign that meaning to it.

The other case that I'd suggest is really instructive. Your Honor may have already read it, but it's the La Barbera decision.

THE COURT: By the way, at some point, you're going to have to circle back to this Corbett case, because I cut you off before you got to that, but go ahead.

MR. YOUNG: Yes. In the La Barbera decision, this

was another case about a product that tends to be -- a food product that tends to be associated with a particular country. It was tortillas that came from -- what were alleged to have been made in Mexico, and there were a number of different statements on the product, "El sabor de Mexico," "Taste of Mexico," La Banderita brand name, images suggestive of the Italian flag.

The Court originally denied a motion to dismiss, but then, after Moore, quote, "reconsidered," and it said, "Listen. This is probably in the first category of statements that Moore talks about, where it's just not deceptive to a reasonable consumer, but, to the extent it says anything about where it's made, it's ambiguous. Reasonable consumers would seek further information. They'd look at the back, and it says, 'Made in the USA,' and thus no one would be deceived."

THE COURT: Yes, but that's a good case for you. It's not a Ninth Circuit case --

MR. YOUNG: No, it's not.

THE COURT: -- but it goes -- it sort of -- it does take McGinity and sort of -- and I think make it a more robust rule than, you know, one might -- you know, Plaintiffs argue -- you know, and we'll see if they're right or not, but they argue that, after Whiteside, McGinity is really cabined, and maybe even -- you know, they could argue

that Trader Joe's is pretty cabined, too. But I agree that that La Barbera case is a good one, good one for you.

MR. YOUNG: And an obvious point, but, of course, Whiteside can't overruled McGinity. It's still good law. Whiteside talks about -- it recites the facts of McGinity, and recites the fact that there was a 50/50 split in the consumer survey in that case, which it was found to be evidence of ambiguity, not deception, which lines up right with our case here.

The significance of the Corbett case, to go back to that, your Honor, is that that's a case that was decided at summary judgment, so there was evidence. Again, there was an expert report that was offered. It was a consumer survey. 51.9 percent of respondents in the survey indicated that they agreed with the Plaintiffs' view, the reading of this label, which I believe was "Virologist developed." It was on a dietary supplement produce.

And the Court said, citing McGinity, "That 51.9 survey response, to the extent it shows anything, what is shows is that the statement is ambiguous, and, therefore, triggers the obligation to look at all these statements."

THE COURT: When was that case?

MR. YOUNG: I believe it was 2022, but let me just confirm.

THE COURT: So it was pre-McGinity.

MR. YOUNG: No. Excuse me. I think I've got that wrong. 2025.

THE COURT: Okay. Thank you. I'll take a look.

Okay. I think I got your position on the expert issue. Tell me about what's left if I -- what else would I have to decide if I go with you on McGinity?

MR. YOUNG: Yes. So, if you go with us on McGinity, I think that would dispose of the primary claim in the case, which is that the statement "Italy's number one brand of pasta" suggests to consumer either that its ingredients are from Italy or that it's made in Italy, right? It disposes of that claim.

What may theoretically be left -- we think it fails for a different reason -- is the theory that some other statements, right -- the complaint makes a number of allegations about the Barilla website, about the Barilla museum. There's some suggestion that Plaintiffs are pursuing claims against those statements. We think those fail just for lack of evidence. The named Plaintiffs didn't see them or rely on them. There's no expert support for them. I think those are just add-ons, atmospherics, and I think those fail.

To your question about the specific causes of action, the reasonable consumer standard applies directly to the CLRA, FAL, UCL, so those fall. The way courts -- and we

cited some cases for this proposition. The way courts typically handle this, when there's also an express warrant claim and an unjust enrichment claim, is to say, "Those claims fail for the same reasons," that the statutory claims fail. There are different ways you can get there, additional ways, but --

THE COURT: I agree with you for unjust enrichment, that if the claim is not misleading, because a reasonable consumer is presumed to read the side label and cure any ambiguity that may have arisen, that there also wouldn't have been an unjust enrichment. A warranty claim, though, seems different to me, although I read the warrant standard to be higher.

MR. YOUNG: Yes.

THE COURT: So, anyway, but that's not -- but what's the analysis for warranty?

MR. YOUNG: Sure. So you're correct that the standard is higher. Warranty requires a specific unequivocal promise that a product will have a certain characteristic, and here the statement is ambiguous. It's certainly not a -- "Italy's number one brand of pasta" is not a specific unequivocal commitment that the product's ingredients will be from Italy. So it's the same reasoning, but with a different legal standard at the end that is higher.

THE COURT: Okay. All right. Thank you.

MS. SODAIFY: Yes, your Honor. If I may respond?

THE COURT: Please.

MS. SODAIFY: So I want to first talk about the La Barbera case that Defendant seems to heavily rely on. That case is highly distinguishable. First, your Honor, it was a motion to dismiss case that legally misconstrued Moore. In particular, that decision rests on the fundamental misunderstanding of Moore. The Court --

THE COURT: Moore is Trader Joe's?

MS. SODAIFY: Yes.

THE COURT: Okay.

MS. SODAIFY: The Court misconstrued Moore, as the Ninth Circuit clarified later in Whiteside, that Moore did not overrule Williams. As held in the Whiteside case, the Ninth Circuit case, the Court held, quote:

"The standard articulated by the District Court" -- in Moore -- that's what it's referring to -- "would require a customer to consult the information on the back label any time such information is present. This is at odds with our holding in Williams that a consumer is not expected to look beyond misleading representations on the front of the box

to discover the truth from the
ingredient list in small print on the
side of the box."

I would also say that, again, that was on the motion to dismiss stage. Here, we're at the motion for summary judgment, after four years of record evidence, as well as robust expert evidence that was decided early on in the case without any such information or evidence at the motion to dismiss stage, so at a different standard, legal standard at that point.

Also, factually, the cases are very different. So, in the Barbera case, you're dealing with the phrase "Taste of Mexico" on a tortilla. Here it literally says, "Italy's," as in possessive, "Italy's number one brand of pasta." So consumers would -- it would be reasonable -- and, again, we're looking at the reasonable consumer standard. It would be reasonable, then, when calling something "Italy's," in the possessive, that it's from there. Ultimately, how consumers interpret that claim is a question for the jury, and not a proper basis for a summary judgment, because it is a genuine dispute of material fact.

THE COURT: I hear you. I'll just say that I think that that distinction is a mild one, on "Taste of Mexico" versus -- because I think "Taste of Mexico" is pretty close to -- you know, "Taste of Mexico" certainly

seems to imply Mexican, that the tortillas are Mexican when they're -- you know, their argument there is that they're not, they're just not. They're made in Georgia, I think, right? But, I mean, I hear you that "Italy's" is a little bit more of a claim than "Taste of Mexico," which you can taste -- you can have the taste of Mexico without being made in Mexico.

MS. SODAIFY: And -- yes, exactly, your Honor, and, in addition, unlike La Barbera, here Barilla has spent decades promoting its Italian products as authentic Italian products, made in Italy with Italian ingredients, specifically for their products that are actually sold in Italy. So that further reinforces the deception.

When you have a company expending all these resources to promote its product as authentic Italian pasta, consumers can reasonably believe that a product that is known to be the number one brand or the most popular product -- pasta in Italy would actually be made from Italian-sourced ingredients.

THE COURT: Well, let me ask you this question. What do you think America's number one car brand is?

MS. SODAIFY: I wouldn't be able to tell you.

THE COURT: But what -- guess.

MS. SODAIFY: I don't know. I don't even know the answer to that.

MS. RASMUSSEN: (Indiscernible.)
MS. SODAIFY: I was going to say --
THE COURT: Are you going for Ford? I think I heard "Ford."
MS. RASMUSSEN: And I don't really think that that's really relevant.
MS. SODAIFY: I don't know the relevance of that, your Honor.
THE COURT: But --
MS. SODAIFY: I myself drive a German car, but -- yes.
THE COURT: But let's say you said, "Ford." You know, when I -- that's a reasonable thing to say, "Ford, America's number one car brand," but that doesn't mean that the parts for Ford cars are all made in America, right? I mean, it just -- that's just not how someone interprets that statement.
MS. SODAIFY: Your Honor, but, just to be clear, Plaintiffs are not required to disprove every alternative interpretation.
THE COURT: No, I get you, but the reason why I'm saying it is this. Yes, they went around saying, "Oh, we're Italian. Oh, we're Italian. Oh, we have our roots in Italy," and all of this, but they did. They did have their roots in Italy, right? I mean, they are -- they're a brand

that was originally based in Italy. They have various Italian ties. They sell a lot of product in Italy, but their products that sold here are not sourced from Italy, right? But that is something that exists.

And so what I don't know is what to make of -- I don't know that I -- that there's -- that it really advances the argument that they spent a lot of time and effort bumping up their Italian-ness. I mean, there's some Italian-ness there, but I don't know that that means that it's deceptive for them to go around touting their Italian roots, that that's deceptive, because, you know, what we look at is we look at the claim on the box.

MS. SODAIFY: But, your Honor, again, whether something is deceptive is ultimately a question for the jury. I'm trying to remind the Court that we are at the motion for summary judgment stage, so --

THE COURT: No, no. I know.

MS. SODAIFY: So that --

THE COURT: But, for summary judgment, does it matter?

MS. SODAIFY: That literally requires that there be no genuine issue of material fact, but there is. There's multiple issues.

And I would also clarify here that literal truth is not a defense to deceptive advertising under California law. So

what the claim ultimately also conveys is a question of fact for the jury, and not a legal conclusion. California consumer protection laws also prohibit advertising claims that, even if literally true, nevertheless mislead reasonable consumers.

That's the Ninth Circuit case of Williams v. Gerber, and in the Vizcarra case, Vizcarra v. Michaels, which is a Northern District California case from 2024, it explicitly stated, quote:

> "Even advertisements which are technically true can still be misleading, deceptive, or confusing. Whether reasonable consumers are actually likely to be deceived by the Defendant's advertising is a question of fact."

THE COURT: Yes, I'm with you there. Yes, yes. You don't need to make this point. I get you. I understand this. It doesn't -- literal truth, but I don't think that that's really a big piece of this -- where I'm leaning on this.

MS. SODAIFY: And can --

THE COURT: They are making the argument about literal truth, but I don't think I'm going to rule on that on that basis.

MS. SODAIFY: Okay.

MS. RASMUSSEN: What was your -- go ahead.

MS. SODAIFY: Yes. I just wanted to add, again, the interpretations here, again, are not mutually exclusive. A belief that Barilla, again, is the most popular brand in Italy, and has all of this historic connection to Italianity (phonetic), which, again, is a term that Defendant coined by doing their own internal research --

THE COURT: Is that right? They made up the -- I was wondering where that word came from.

MS. SODAIFY: Yes. They literally coined that term, because they understand how material it is for consumers to know that their products are from Italy, that a term was created for that particular benefit, explicitly showing that Italianity is a top three driving factor for consumers, which, again, exhibits their knowledge that this is not just some random brand, but something that consumers care about in terms of their acquiring pasta products made from Italy (sic), with Italian ingredients, including that durum wheat, which is a higher-quality ingredient of wheat compared to those in the U.S. and made in U.S. factories.

So there -- it is material to consumers, and ultimately whether or not that's the case is a jury question. These are questions that are material, that are in dispute, and are not proper to be decided at the summary judgment stage.

I would also say that my colleague wanted to also add to that, so I'll let her speak before I --

MS. RASMUSSEN: Yes. Thank you. Yes. So, your Honor, a few points that I wanted to delve into. So, as an initial matter, McGinity stands for, if a phrase is ambiguous, you have to look at the disclaimers, at the back of the package, the whole package, for clarity. In Doctor Dennis' survey, we have exactly that.

If the phrase is indeed ambiguous, then consumers had access to the disclaimer on the side of the package, had to mark off on his survey that they had access, and if the consumer did not respond, "Yes, I had access to this whole package," then their response was not even considered in that 57 percent.

That's how important it was that survey takers were able to see the entire package, including that disclaimer, and so consumers who took that survey, they've already gone through both the steps, in a way. Whether or not "Italy's number one brand of pasta" is ambiguous, they have looked at the disclaimer, and they still come away believing that Barilla pasta is made in Italy, with Italian ingredients.

So, your Honor, I don't think that McGinity should stop us. It requires, at most, an additional step, looking at the side of the package. That has been done. That has been covered, and we've shown that the majority of survey takers

were deceived by that phrase.

Moreover, Defendants are posing these two different interpretations as if they're at odds, this idea that the brand is the most important thing, versus the pasta was made in Italy, but those two interpretations actually reinforce one another, not least of which because the pasta that makes Barilla have 17 percent of the market share in Italy, to have, you know, a little bit less than a fifth of the market share, is actually made in Italy, with Italian ingredients. Barilla promises on their website that all of their classic pastas destined for the Italian market are made with 100 percent pure durum Italian wheat.

So why would an American consumer seeing that phrase, "Italy's number one brand of pasta," think, "Oh, they're advertising to me, a consumer, that this is popular in Italy, but what the Italians get when the buy this pasta is not what I get"? You know, there's a sort of common-sense element, that a consumer thinks, if you're advertising something to them, that something is relevant to them, right? And so that --

THE COURT: Is that a different -- Barilla's counsel is saying, "Well, that's sort of a different claim, the claim that the -- you know, still under UCL and CLRA and FAL, but a different" -- you know, there's a question about whether the packaging is deceptive, and then there's a sort

of a separate claim that the website or whatever other marketing materials are deceptive. Isn't that how the law works, I mean, you kind of look at each of the representations and see whether they're deceptive?

MS. RASMUSSEN: Your Honor, I would say that even the challenged representation, on its own, just "Italy's number one brand of pasta," even on its own, is deceptive, and what is on the website reinforces that.

THE COURT: By the way, you know, one thing that I've been puzzling with is, do you -- I actually can't tell whether the Defendant's expert and the Plaintiffs' experts' conclusions are ultimately inconsistent with each other. You know, they actually seem, at some level -- and I couldn't quite tell where you were going. You'd said that, you know, the two interpretations are not necessarily at odds. I mean, are -- is that how -- I mean, I assume, if we go to trial, Plaintiffs will sort of -- because it that there's good stuff for you there, in their expert's findings. I'm just curious, how did those two, you know, expert opinions interact?

MS. RASMUSSEN: Your Honor, I would say that, sa you point to, you know, even what Defendant has proffered through their experts ultimately tends to be supportive of Plaintiff, even showing close to majority of consumers interpreting the phrase to mean that the products are

sourced in Italy, even according to Doctor Cantor (phonetic), Defendant's --

THE COURT: No, no. I -- that -- I understand that argument, but I'm asking, how does that interact with -- how does their expert survey results interact with your expert survey results? Put aside whether you think that their expert survey actually helps you. I'm just wondering how the two surveys interact.

MS. SODAIFY: Your Honor, the extent I understand the question, they reinforce what Plaintiffs have been arguing this entire time about how consumers interpret the challenged representation to mean that it's Italian-sourced ingredients. Doctor Cantor found 49 percent, which is statistically similar to the deception rate found by Doctor Dennis at 57 percent, but what it ultimately shows is that this is a disputed question of fact.

THE COURT: But I don't -- I mean, I guess what I don't understand is that you're suggesting that, actually, that there's not much of a dispute there, that their survey helps you. I was actually -- you know, I was surprised to read their survey results, and that they were touting this as their survey, because I thought there's actually a lot of good material for you in there, but then I was surprised to read in your opposition brief saying, "Oh, well, their expert had poor methodology, blah, blah, blah," seeming like

kind of a -- sort of an incipient Daubert challenge to their expert. Maybe you plan to only make those attacks, you know, not in the form of a Daubert, but as critiques, but I'm wondering why you're critiquing it at all, when it seems helpful to you.

MS. SODAIFY: Right. So, when Doctor Cantor replicated Doctor Dennis' survey, she found 49 percent, but, when she did her own version, which is a version that we -- our experts argue is incorrect, for the reasons expressed in the papers, that version still ultimately showed 36 percent. So, you know, we were still talking about the methodology, which ultimately, whether it's Plaintiffs talking about the methodology or the Defendant, is -- goes to the weight, and not to the admissibility, and ends up being a "battle of the experts" scenario.

What I would like to also just touch upon, just quickly, was the Corbett case, which Defendants --

THE COURT: Before we go there, I did want to -- and I forget who made the point that the two interpretations -- I guess it's -- remind me. Defendant's expert, again, is Cantor?

MS. RASMUSSEN: Cantor, yes.

THE COURT: That Cantor's and -- or maybe it wasn't that. Maybe you were saying that the interpretation of the "Italy's number one brand" representation is not

necessarily at odds with -- you know, that their interpretation of it is not necessarily at odds with the sourcing interpretation.

MS. RASMUSSEN: Correct. Defendants presented it, you know, as if it is in opposition, but that's a false dichotomy. If anything, they reinforce one another.

THE COURT: So, but tell -- explain -- play that out for me.

MS. RASMUSSEN: Your Honor, because the idea that if this pasta is the most popular brand in Italy, and that's what's being advertised to consumers --

THE COURT: It suggests that it's made in Italy.

MS. RASMUSSEN: Yes, and, in fact, the version that is sold in Italy, that makes the pasta so popular in Italy, is made in Italy, with Italian ingredients.

MS. SODAIFY: And I would like to add to that point, your Honor, that, exactly, Italian market leadership reinforces the perception of Italian authentic pasta and ingredients, and Doctor Dennis explicitly talks about this in his rebuttal report, at ECF 100-1, paragraph 14, where he says, quote:

"Consumers can be expected to believe
'Italy's number one brand of pasta'
means that the products are a bestseller
in Italy in large part because they were

made with ingredients sourced in Italy."

And Doctor Dennis continues to say that, in his deposition, that both interpretations are mutual and complementary to one another, so they work together in tandem to convey this deceptive messaging.

Now, just to go back to the Corbett case, just briefly, so that case is also easily distinguishable from the facts here. In that case, they were dealing with three different claims on various sides of the product packaging, not just the front, and there were also multiple asterisks and claims with disclaimers on the packaging. We're not dealing with that scenario here. So I just wanted to make that clear, that the packaging there and the facts there were different, and, therefore, the case is not applicable.

THE COURT: Although I think where Barilla's counsel is looking to in that case is simply that somewhere between 50 and 60 percent survey response rate -- that I didn't believe the -- I -- that I understand this claim to mean "X," that that can actually be used as evidence of ambiguity.

MS. SODAIFY: Your Honor, but I think the facts should also be considered, when there you have multiple disclaimers and asterisks on the packaging. We're not dealing with the same set of facts here. So I think that that distinction is important.

I wanted to also address this other issue that was raised regarding the advertising materials beyond the label.

THE COURT: Yes. So I would like to get to that issue. Just what remains of your case if I decide that they're right about McGinity?

MS. SODAIFY: So first I wanted to make clear why the advertising materials are still relevant, because Plaintiffs are not saying that they specifically saw those materials, but it's still relevant and admissible to show that Barilla itself -- what Barilla itself meant by its advertising, to help support further the breach of express warranty claim, which provides context. The advertising provides context for the label's representations. It shows Barilla's intent --

THE COURT: Okay. But that's how I interpreted --

MS. SODAIFY: -- in deploying the Italian --

THE COURT: That's how I interpreted these other materials. They weren't sort of a standalone claim. You didn't have your expert say, "Look at the website. Look at the museum, and evaluate what you think that to mean." You're using that to support your claim on the falsity of the package label? Okay.

MS. SODAIFY: Yes, your Honor.

THE COURT: Okay.

MS. SODAIFY: And, you know, the admissibility of

these advertising are not, you know, the proper subject of summary judgment, ultimately, but yes, that was the reason for introducing them.

THE COURT: I see. Okay.

MS. SODAIFY: And then --

MS. RASMUSSEN: Sorry, your Honor. I just wanted to make one more point.

THE COURT: Yes.

MS. SODAIFY: You asked me earlier if Doctor Dennis had addressed ambiguity, and I just -- I wanted to reinforce that his inclusions three times of the phrase "Do you agree with this statement or do you not know?," it really bakes in a level of testing for ambiguity, right? A majority of respondents felt that, unambiguously, that statement meant that the pasta ingredients were sourced solely from Italy, and so, because he's already properly accounted for ambiguity with closed-ended questions, as is exactly the standard, your Honor, that has already been taken into account.

MS. SODAIFY: And just lastly, to the extent that we were discussing breach of warranty, we believe that, along with all the other causes of actions, for the reasons we've expressed here and throughout the papers, and as well what the standard is on a motion for summary judgment, that it should continue to proceed, and that we have proffered

what is sufficient at this stage.

I would also say that whether that consumer understanding constitutes the basis of the bargain is a factual question for the jury, and not summary judgment, and that's in the Martin v. Monsanto case in the Central District.

THE COURT: Say that last bit one more time. Whether the --

MS. SODAIFY: It says:

"Whether the consumer understanding constitutes the basis of the bargain is a factual question for the jury, and not summary judgment."

And this was in the Martin v. Monsanto case of the Central District of California, issued 2017, where it explicitly said:

"Whether such a statement constitutes an express warranty, whether that warranty was breached, and whether that statement was likely to deceive a reasonable consumer are issues subject to common proof and generalized proof that ultimately is for -- ultimately for a jury to determine."

THE COURT: Okay. So -- but let me -- and let me

just ask you this, take a step back and just think about case management here. If I go with Defendant on McGinity, do you want a trial on your express warranty claim?

MS. SODAIFY: Your Honor, again, to reiterate --

THE COURT: No, I -- no need to reiterate. You don't want to lose on McGinity. I get that.

MS. SODAIFY: Right, for the reasons expressed in Whiteside. But I would say, your Honor, we do want to move forward. To the extent that changes for some reason, we would inform the Court, but, as of now, we would want to move forward with all of the claims, and we've been preparing for this case for over four years, to take it to trial, and we believe there is sufficient basis to do so.

THE COURT: Okay. And what are your remaining dates on the calendar? I didn't look at that before coming here.

MS. SODAIFY: Yes. So currently the class certification deadline -- I'm sorry, not class certification deadline. Excuse me. The trial is currently set for June 22nd.

THE COURT: Okay. What I'm going to do -- and, you know, just to be transparent, I'm still leaning against you on the whole McGinity issue. I don't want you spending a lot of time and resources prepping for trial if it's not going to go forward.

So -- and if I -- you know, if I end up -- so what I think will happen is, if I end up going your way on McGinity, I do think I'm going to have to decide a number of things that we haven't really discussed today. So what I'm inclined to do here is -- we don't need to sort of take the June 22nd date off calendar at the moment. As -- well -- right.

I don't think we have to take it off the calendar, off calendar, at the moment, but I will get you -- I will -- if I don't issue an order soon, I will -- that sort of expressly takes it off the calendar, I will -- I'll get you guidance soon, so that you know what you're doing, but I do want to get an order out soon, just so that you're not prepping for trial unnecessarily, or maybe we only have a trial on the warranty issue. Who knows? But I just -- I don't want there to be a lot of resources spent on that.

So I will -- even if it's not an order, if I need more time, I will -- I'll sort of let you know where we are, just so that you have a sense of that.

MS. SODAIFY: We appreciate that, your Honor, and I would have to say that a lot of these dates were set beforehand, so we're open to discussing with the Court what works for the trial date, if we need to extend it, because I know these -- we were working towards these motions, as well as preparing for trial, but we, again, anticipate and hope

to have a full trial, and if that means moving the date a little bit to accommodate everyone, we are happy to do so.

THE COURT: Okay. Thank you.

And anything from defense side on just the case management side of things?

MR. YOUNG: On the case management side of things, no. If your Honor is intending to give us guidance soon, I think the dates can otherwise stay on calendar. We do have pretrial filings due in less than a month now, so that is pretty tight.

THE COURT: Okay. Okay. I think we should move the trial date. I think we should take it off calendar. I don't want people working on -- just given my current mind state about where the case is going, I don't want people spending time and resources and money on pretrial filings.

So I think that we should vacate the trial date, vacate the -- if we have a pretrial date, we should vacate that. If we have a date for pretrial filings, I will vacate that. If we -- if the trial is to happen, I would like for it to happen in August, because I -- I'm not going to be able to do the trial in July. So I think it would have to -- and you don't have much time left in June, after that trial date. So I think we would reschedule it for August.

So, at some point, it will be -- make sense, you know, and this probably won't take a lot of time. Maybe it makes

sense for you all to just talk today about what -- when in August you could do a trial, and you can just submit something that is brief, just a brief joint statement, to just file it, that proposes whatever dates in August would be mutually convenient.

I can -- let me see. There is -- Kim (phonetic), is there a week in August that I'm unavailable? I think there is, right? I think it's that first week of August I'm unavailable.

THE CLERK: Correct.

THE COURT: Okay. So not the first week of August, but August would be okay. September would also be okay. So -- but why don't you all just meet and confer about that, but otherwise I'd like to take everything else off calendar.

MS. SODAIFY: And, your Honor, just to be clear, when would you like this joint statement by?

THE COURT: You know, in a week.

MS. SODAIFY: In a week?

THE COURT: Yes, yes.

THE CLERK: And, Judge, just to clarify, it's the second week.

THE COURT: It's the second week that I'm unavailable. So why don't we look at the third week of August and afterwards, so you can -- August, third week of

August, later in August, or in September.

MS. SODAIFY: Okay.

THE COURT: Okay.

MS. SODAIFY: Thank you, your Honor.

THE COURT: Thank you.

MR. YOUNG: May I add one point?

THE COURT: Yes.

MR. YOUNG: I understand you don't want to hear more on McGinity. You're wrapping up. I just want to respond to the warranty point, because it came up at the very end. The case that they cited, the Monsanto case, it's a class certification case. It's not a summary judgment case. Our argument is not that the warranty was not the basis of the bargain. It's that this is not the type of statement that can amount to an express warranty.

THE COURT: Right.

MR. YOUNG: That's it.

THE COURT: Okay.

MS. SODAIFY: Your Honor, we --

THE COURT: Please go ahead.

MS. SODAIFY: We continue to disagree, for the reasons expressed in our papers. Thank you, your Honor.

THE COURT: Okay. Anything else, other than the substance of the argument, that I can do for anybody today?

MS. SODAIFY: I believe that's it from Plaintiffs.

THE COURT: Okay.

MR. YOUNG: Thank you, your Honor.

THE COURT: All right. Thanks so much.

MS. SODAIFY: Thank you.

THE CLERK: Court is adjourned.

(Proceedings adjourned at 2:42 p.m.)

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.



Echo Reporting, Inc., Transcriber

Thursday, May 14, 2026